**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **T. MONTANA BELL; RONNIE E. JOHNSON; ANGEL MALDONADO; KAREEM MAZYCK; XAVIER PAGAN, on their own behalf and on behalf of all others similarly situated;** | **Case No. 2:22-cv-01516-CRE** |
| **Plaintiffs,** | **ELECTRONICALLY FILED** |
| **v.** | **JURY TRIAL DEMANDED** |
| **PENNSYLVANIA DEPARTMENT OF CORRECTIONS; LAUREL HARRY, Secretary, Pennsylvania Department of Corrections; CHRISTOPHER OPPMAN, Regional Deputy Secretary, Pennsylvania Department of Corrections; TREVOR WINGARD, former Regional Deputy Secretary, Pennsylvania Department of Corrections; JAMES BARNACLE, Director of BII, Pennsylvania Department of Corrections; LUCAS MALISHCHAK, Director of Psychology, Pennsylvania Department of Corrections; TINA WALKER, Superintendent, SCI Fayette; ERIC ARMEL, former Superintendent, SCI Fayette; SCOTT RIDDLE, Unit Manager, SCI Fayette; PETER SAAVEDRA, Psychiatrist, SCI Fayette;** | |
| **Defendants.** | |

## SECOND AMENDED CLASS ACTION COMPLAINT

### INTRODUCTION

1.     This class action lawsuit seeks to end the unlawful solitary confinement being imposed on men in the Security Threat Group Management Unit (STGMU) at the State Correctional Institution (SCI) Fayette. The STGMU holds approximately 30–50 men, the vast

majority of them Black and Latinx. The men are held in dreadful conditions that violate their constitutional rights. The STGMU isolates people with serious mental illnesses in permanent solitary confinement and creates mental illness in people who previously had no history of such.

2.      Placement in the unit is determined by secret evidence. Those condemned to warehousing in the STGMU are never provided the evidence the DOC uses to send them there, so they are unable to challenge their placement.

3.      The operations of the unit are managed by secret policies. DOC officials may halt or set back progression out of the STGMU for an undefined array of conduct and without following the DOC's usual procedures for  alleged rule violations.

4.      Defendants' callousness and failure to intervene, in combination with the STGMU's operational secrecy,  have led to torturous conditions, causing severe psychological decompensation, trauma-induced anxiety, cognitive decline, abject hopelessness and depression, and frequent suicide attempts by those trapped in the unit.

5.      STGMU prisoners are locked in extremely small cells for at least 22 hours a day.[1] The lights are on in the cells at all times. STGMU prisoners are denied adequate mental health care, including cognitive-behavioral therapy, interpersonal therapy, and groups. They are prohibited from working, prevented from participating in educational and rehabilitative programs, and may not attend religious services. They have virtually no contact with others, except when they are taken to the extremely small outdoor yard cages, surrounded by other incarcerated individuals who may be experiencing extreme emotional distress or psychosis.

---

[1] Prior to the filing of the original complaint, men were held in their cells for 23 hours a day without any meaningful opportunity for recreation time.

6.     Prolonged isolation under these extremely harsh conditions exacerbates the symptoms of the STGMU prisoners' mental illness, which can result in individuals refusing to leave their cells; declining medical treatment; experiencing sleeplessness, hopelessness, hallucinations, and paranoia; consuming foreign objects; overdosing on pills; covering themselves with feces; eating their own feces; banging their heads against walls; cutting themselves; and attempting suicide. Frequently, DOC officials, including the Defendants, neglect these symptoms and, grotesquely, regard them as prison rule infractions. They then punish individuals for exhibiting these symptoms by imposing even more time in the STGMU.

7.     Furthermore, these conditions result in the need for mental health treatment in individuals with no history of mental health treatment. It is by now a scientific fact that solitary confinement creates and worsens a predictable constellation of adverse psychological symptoms including but not limited to uncontrollable anxiety, impaired impulse control, depression and suicidality, cognitive impairments, memory loss, and auditory and visual hallucinations.

8.     The result is worse than a Dickensian nightmare: many STGMU prisoners, because of their mental illness, are trapped in a never-ending cycle of isolation and punishment resulting in further deterioration of their mental health, deprivation of adequate mental health care, lack of any prospect or avenues for release, and inability to qualify for parole.

9.     Plaintiffs seek to end the prolonged, never-ending cycle of solitary confinement in the STGMU. Plaintiffs seek an injunction requiring that Defendants end the solitary confinement of themselves and Class Members and provide them with functional avenues for re-entry into the general prison population.

10.     Plaintiffs also seek compensatory, nominal, and punitive damages from Defendants for the violation of their constitutional and statutory rights.

## JURISDICTION AND VENUE

11.    This case is brought pursuant to 42 U.S.C.§ 1983; 28 U.S.C. §§ 2201, 2202; Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq.; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

12.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)–(4).

13.    This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in Fayette County, in the Western District of Pennsylvania.

## PARTIES

14.    Plaintiff T. Montana Bell is currently in solitary confinement in the Intensive Management Unit (IMU) at SCI Phoenix. Prior to his May 2023 transfer he was held in the STGMU at SCI Fayette. He suffers from psychiatric disabilities, including anxiety and depression. He has spent the last one and a half years in solitary confinement. Overall he has spent more than 9 years in solitary while in DOC custody. Mr. Bell's confinement in the STGMU has caused him extreme distress, auditory and visual hallucinations, and severe suicidality with more than ten suicide attempts during that period.

15.    Plaintiff Ronnie E. Johnson is currently in solitary confinement in the Restricted Housing Unit (RHU) at SCI Houtzdale and was incarcerated in the STGMU at SCI Fayette when this case was originally filed. He suffers from psychiatric disabilities, including anxiety, depression, and an adjustment disorder. He has spent over one year in solitary confinement. Mr. Johnson's confinement in the STGMU has caused his depression and his anxiety to worsen and his mental health condition to substantially deteriorate.

16.     Plaintiff Angel Maldonado is currently incarcerated in the general prison population at SCI Camp Hill and was incarcerated in the STGMU at SCI Fayette when this case was originally filed. He suffers from psychiatric disabilities, including depression and anxiety. Prior to his transfer to SCI Camp Hill he had spent the last three years in solitary confinement. Overall, Mr. Maldonado has spent approximately 12 years in solitary confinement while in DOC custody. Mr. Maldonado's confinement in the STGMU has caused auditory hallucinations, an inability to sleep or concentrate, suicidality, and one suicide attempt.

17.     Plaintiff Kareem Mazyck was released from prison on December 23, 2022, directly from solitary confinement in the STGMU at SCI Fayette, where he was housed when this case was originally filed. He suffers from psychiatric disabilities, including PTSD, anxiety, and an adjustment disorder. Mr. Mazyck spent his last two years in DOC custody, and more than three of his four years in DOC custody, in solitary confinement. Mr. Mazyck's confinement in the STGMU has caused Post-Traumatic Stress Disorder (PTSD), increased anxiety, a sleeping disorder, auditory hallucinations, paranoia, and mood swings.

18.     Plaintiff Xavier Pagan is currently incarcerated in general population at SCI Fayette and was incarcerated in the STGMU when this case was originally filed. He suffers from psychiatric disabilities, including anxiety, depression, and PTSD. Mr. Pagan has spent three and a half years in solitary confinement in the STGMU. Mr. Pagan's confinement in the STGMU has worsened his anxiety and depression, intrusive thoughts, sleeping difficulties, memory problems, inability to concentrate, anger, mood swings, loneliness, suicidality, and hallucinations.

19.     Defendant Pennsylvania Department of Corrections (DOC) is an agency of the Commonwealth of Pennsylvania that is responsible for the operation of Pennsylvania's state prisons. The DOC receives federal funding and is responsible for, among other things, providing

the people in its prisons with safe and humane housing, adequate mental health care, and rehabilitative programming. The DOC's principal office is in Mechanicsburg, Pennsylvania.

20.     Defendant Laurel Harry is the Secretary of Corrections for the Commonwealth of Pennsylvania. She became Acting Secretary of the DOC in January 2023 and was confirmed as Secretary in June 2023. In this capacity, Defendant Harry is responsible for the management and operation of the entire adult corrections system in the Commonwealth and for protecting the constitutional and statutory rights of all individuals in the custody of the DOC, including those held in the STGMU. Defendant Harry determines rules, regulations, and policy regarding management, personnel, and the overall operation of the Department, including the STGMU. Defendant Harry authorized or condoned the unconstitutional policy of housing all STGMU prisoners in solitary confinement as described herein. Defendant Harry is sued in her individual and official capacities.

21.     Defendant Christopher Oppman is the Regional Deputy Secretary of Corrections for the Western Region of the Commonwealth of Pennsylvania. In this capacity, Defendant Oppman is one of the officials responsible for determining if individuals held in DOC custody will be sent to the STGMU, since the STGMU and SCI Fayette are in the Western Region. Defendant Oppman is sued in his individual and official capacities.

22.     Defendant Trevor Wingard was the Regional Deputy Secretary of Corrections for the Western Region of the Commonwealth of Pennsylvania. In this capacity, Defendant Wingard was one of the officials responsible for determining if individuals held in DOC custody, including Plaintiffs, were to be sent to the STGMU, since the STGMU and SCI Fayette are in the Western Region. Defendant Wingard is sued in his individual capacity.

23.     Defendant James Barnacle is the Director of the Bureau of Investigations and Intelligence (BII) of the Pennsylvania Department of Corrections. In this capacity, Defendant Barnacle is one of the officials responsible for determining if individuals held in DOC custody will be sent to the STGMU. Defendant Barnacle is sued in his individual and official capacities.

24.     Defendant Lucas Malishchak is the Director of Psychology for the Pennsylvania Department of Corrections. In this capacity, Defendant Malishchak is one of the officials responsible for determining if individuals held in DOC custody will be sent to the STGMU. Defendant Malishchak is sued in his individual and official capacities.

25.     Defendant Tina Walker is the Acting Superintendent of SCI Fayette. As Acting Superintendent of SCI Fayette, Defendant Walker makes operational decisions concerning administration of the prison, including its STGMU. Defendant Walker authorized or condoned the unconstitutional policy of housing STGMU prisoners at SCI Fayette in solitary confinement as described herein.  Defendant Walker is sued in her individual and official capacities.

26.     Defendant Eric Armel is the former Superintendent of SCI Fayette. As Superintendent of SCI Fayette, Defendant Armel made operational decisions concerning administration of the prison, including its STGMU. Defendant Armel authorized or condoned the unconstitutional policy of housing STGMU prisoners at SCI Fayette in solitary confinement as described herein. Defendant Armel is sued in his individual capacity.

27.     Defendant Scott Riddle is the Unit Manager for the STGMU program at SCI Fayette. As the Unit Manager for the program, Defendant Riddle makes operational decisions concerning the administration of the program, reviews disciplinary actions and grievances, and authorizes or condones the progression or regression of prisoners through the phases of the STGMU program. Defendant Riddle is sued in his individual and official capacities.

28.     Defendant Peter Saavedra is a psychiatrist employed at SCI Fayette. In this capacity, Defendant Saavedra is responsible for providing psychiatric care, including diagnosis, classification, and treatment for all individuals held in the STGMU. Defendant Saavedra is sued in his individual and official capacities.

## STATEMENT OF FACTS

### The Risks and Harms of Solitary Confinement

29.     Isolation causes painful, severe, and sometimes irreversible harm. There is a substantial body of literature from over the last 200 years documenting the harms of isolation, even for short periods of time.

30.     Over a century ago, the United States Supreme Court noted that:

> [People subject to isolation] fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.

*In re Medley,* 134 U.S. 160, 168 (1890).

31.     Justice Kennedy again noted in 2015 that prolonged isolation "exacts a terrible price," including "common side-effects… [of] anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors." *Davis v. Ayala,* 576 U.S. 257, 289 (2015) (Kennedy, J., concurring) (citing Grassian, *Psychiatric Effects of Solitary Confinement,* 22 Wash. U .J. L. & Pol'y 325 (2006)).

32.     There is broad consensus in the medical and psychiatric communities on the harms of isolation.[2]

---

[2] Grassian, *supra* ¶ 31, at 338 ("By now the potentially catastrophic effects of restricted

33.     People in isolation "suffer from a similar range of symptoms irrespective of differences in the physical conditions in various prisons and in the treatment of isolated inmates."[3]

34.     Studies also show that some people will continue to suffer from the consequences of isolation after they are released, with some suffering from permanent harms.[4]

35.     The most widely documented consequences of isolation are its psychological effects which include anxiety, depression, insomnia, confusion, withdrawal, emotional flatness, cognitive disturbances, hallucinations, paranoia, psychosis, and suicidality.[5]

36.     These effects begin to manifest within hours or days of isolation, worsening with time and potentially causing permanent damage to individuals, especially those who linger in isolation for months or years.

37.     For some people, isolation "can be as clinically distressing as physical torture."[6]

38.     Numerous studies show that people in isolation are more likely to engage in self-harm, self-mutilation, and suicide than those in the general prison population.[7]

---

environmental stimulation have been the subject of voluminous medical literature."); Craig Haney, *The Science of Solitary: Expanding the Harmfulness Narrative*, 115 Nw. U. L. Rev. 211, 219-20 (2020) (stating that "[t]he basic harmfulness of solitary confinement is now a largely settled scientific fact," and  that "many professional mental health, medical, legal, human rights and correctional organizations have promulgated strong position statements that urge or require significantly limiting the use of solitary confinement and even prohibiting it entirely for especially vulnerable groups of prisoners.").

[3] Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime & Justice 441, 488 (2006).

[4] Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 534–39 (1997); Grassian, *supra* ¶ 31, at 332-33.

[5] Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinq. 124, 130–31 (2003).

[6] Jeffrey Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psychiatry & L. 104, 104 (2010).

[7] Haney, *supra* note 5, at 131–32. For example, one study concluded that people in isolation in New York City jails were approximately 6.9 times more likely to commit suicide and self-

39.     The research also shows that people in isolation are at risk of physiological consequences such as  severe headaches; heart palpitations and increased heart rate; chest, abdominal, neck, and back pain; problems with digestion, diarrhea, and weight loss; loss of appetite; and dizziness and fainting.[8]

40.     When individuals are restricted in their movement and separated from natural light in solitary confinement, they are also stripped of the social interaction present even in supermax prisons. Louise C. Hawkley, Ph.D., assembled an expert report on solitary confinement stating that, in the population at large, "people who are socially isolated and are lonely have a significantly great risk of hypertension, cardiovascular illness and early mortality from heart attacks or other cardiovascular illnesses." Expert Report of Louise C. Hawkley 3, *Todd Ashker, et al., v. Governor of the State of California, et al.*, No. 09-05796 (N. D. Cal. March 12, 2015).[9] When Hawkley applied her knowledge to persons incarcerated in California, she found that an individual in solitary confinement was 3.9 times more likely to develop hypertension than an individual in general population, even when adjusted for age. *Id.* at 12. The youngest people in solitary confinement experienced the biggest increase in risk and developed conditions like hypertension earlier and more often than they would be expected to in general population and in the outside world. In her examinations of California prisons, Hawkley found that 63 percent of individuals between 27 and

---

mutilation than those in the general jail population. Fatos Kaba, et. al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates,* 104(3) Am. J. of Pub. Health 442, 445 (2014). Another study found that in systems where the percentage of people in isolation is 2% to 8%, 50% of the suicides in those systems occurred in isolation. Stuart Grassian & Terry Kupers, *The Colorado Study vs. the Reality of Supermax Confinement*, 13 Correctional Mental Health Report 1, 9 (May/June 2011).

[8] Smith, *supra* note 3, at 489–90.

[9] Accessed at: https://ccrjustice.org/sites/default/files/attach/2015/07/Hawkley%20Expert%20Report.pdf.

35 years old suffered from hypertension compared to 18 percent in general population. *Id* at 12. According to Hawkley, early development of hypertension quickens the onset of heart disease and stroke and has "grave implications" for future health. *Id*. at 16.

41.     Because human brains are designed for social interaction, social isolation also results in neurological changes to the brain, quickly degrading brain function.[10] Scientific studies have revealed that:

> [S]ocial and environmental deprivation has negative repercussions for both brain structure and function, including reduced cortical volume, diminished neuronal connections in cortical areas and the hippocampus, decreased myelin production, and altered activity in the reward system and the amygdala. These cerebral alterations have been connected to detachment from the environment, hostility towards others, high levels of aggression, as well as an increased risk of susceptibility to several behavioral conditions that emulate psychiatric diseases and disorders in humans, including neurodegenerative disorders and schizophrenia. Importantly, morphological and functional changes in the brain may occur even after a short period of time and appear to continue after the reintroduction of the subject into the social environment.[11]

42.     Researchers have observed lower levels of brain function because of isolation, including a decline of electroencephalogram activities after only seven days in isolation.[12]

43.     Although all incarcerated people placed in isolation are at risk of harm, some people are more susceptible to serious health consequences because of their disabilities, age, health conditions, or other characteristics.

44.     People with psychiatric or intellectual disabilities are more sensitive and reactive to psychological stressors and emotional pain.

---

[10] Grassian, *supra* ¶ 31, at 331.
[11] Federica Coppola, *The brain in solitude: an (other) eighth amendment challenge to solitary confinement*, Journal of La and the Biosciences, 184-225, September 25, 2019.
[12] Grassian, *supra* ¶ 31, at 335–36.

45.     As a result, isolation may worsen and intensify pre-existing mental-health-related symptoms such as depression, paranoia, psychosis, and anxiety, and can cause severe impairment in isolated individuals' ability to function.[13]

46.     Several professional correctional and healthcare organizations recommend that isolation should be used only sparingly, if at all. The DOC is aware of these recommendations.

47.     The National Commission on Correctional Health Care states that people with mental illness, juveniles, and pregnant women should never be in isolation.[14]

48.     The NCCHC has also declared that "[p]rolonged (greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's health."[15]

49.     The NCCHC further elaborates that prolonged solitary confinement should be banned altogether as a means of punishment.[16]

50.     The horrors of solitary confinement in the DOC have also been criticized by the U.S. Department of Justice, which issued a findings letter in 2014 stating "[t]he manner in which [DOC] subjects prisoners with [serious mental illness] to prolonged periods of solitary confinement involves conditions that are often unjustifiably harsh and in which these prisoners routinely have difficulty obtaining adequate mental health care" and "results in serious harm."[17]

---

[13] Human Rights Watch, *Callous and Cruel: Use of Force against Inmates with Mental Disabilities in US Jails and Prisons* (May 12, 2015), available at https://tinyurl.com/yj7d75xd

[14] Nat'l Comm'n on Corr. Health Care, *Solitary Confinement (Isolation)* (Apr. 2016), https://www.ncchc.org/solitary-confinement (last visited June 24, 2023).

[15] *Id.* at 4.

[16] *Id.*

[17] U.S. Dep't of Justice, *Findings Letter: Investigation of the Pennsylvania Department of Corrections' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities*, Feb. 24, 2014, at 2–3, https://www.justice.gov/sites/default/files/crt/legacy/2014/02/25/pdoc_finding_2-24-14.pdf.

51.    Often claimed by prison officials as a method to promote safety, isolation has a countereffect and precipitates aggressive or violent behavior among survivors of solitary confinement.[18]

52.    Isolation impairs an individual's ability to engage in prosocial behavior and raises the likelihood that they engage in behavior that violates prison rules.

53.    Consequently, incarcerated individuals are frequently penalized with extended periods of solitary confinement, which only worsens the underlying issues.

54.    Individuals who are released from prison after serving time in solitary confinement also suffer higher rates of post-prison adjustment issues than formerly incarcerated persons in general and are more likely to die in their first year of community reentry from acts of suicide, opioid abuse, and homicide.[19]

55.    Human rights organizations and authorities recognize the harms of isolation and advocate for severe limitations on its use. The 2011 Report of The Special Rapporteur On Torture And Other Cruel, Inhuman Or Degrading Treatment Or Punishment, for example, determined that more than 15 days in isolation amounts to torturous, cruel, and unusual punishment, and should be subject to an absolute prohibition.[20] Due to such physical and psychological effects, the report states that prolonged solitary confinement is in direct violation of Article 7 (Prohibition of torture, cruel, inhuman or degrading treatment or punishment) of the International Covenant on Civil and Political Rights, which is a legally binding international treaty that the United States ratified in

---

[18] Haney, *supra* n. 2 at 233.

[19] Haney, *supra* note 2, at 250.

[20]   Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *Interim Rep. of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, ¶ 76, U.N. Doc. A/66/268 (Aug. 5, 2011) (by Juan Mendez).

1992.[21]

56.     In 2015, the U.N. General Assembly revised its Standard Minimum Rules for the Treatment of Prisoners (renamed the "Mandela Rules") to state that, "[s]olitary confinement shall be used only in exceptional cases as a last resort, for as short a time as possible and subject to independent review."[22] The Mandela Rules forbid indefinite or prolonged use of isolation (defined as anything more than 15 consecutive days) and restrict its use for people with mental or physical disabilities.[23] Notably, the Mandela Rules emphasize that solitary confinement should never be used as a form of punishment.

## Deliberate Indifference of Defendants

57.     Defendants know that solitary confinement without some form of out-of-cell structured programming, group treatment, and other opportunities for meaningful social interaction, exacerbates adverse mental health symptoms, results in further decompensation, and at times can lead to suicidality and self-harm. In fact, the DOC recognizes that "[t]he potential for suicide is greater if the individual is subject to stress from increased pressures such as, but not limited to: . . . placement in RHU/SMU [and] any movement to and from Level 5 Housing Unit[.]" DOC Policy 13.8.1, Access to Mental Health Care, § 2(L)(1)(d).[24] The RHU and SMU are solitary confinement units, and Level 5 Housing Units refer to the most restrictive security level in the DOC and include all solitary confinement units, including the STGMU.

---

[21] *Id*.

[22] United Nations General Assembly, United Nations Standard Minimum Rules for the Treatment of Prisoners, A/RES/70/175, Dec. 17, 2015, at 14, https://www.unodc.org/documents/justice-and-prison-reform/Nelson_Mandela_Rules-E-ebook.pdf  (hereinafter "Mandela Rules").

[23] *Id*. at 14.

[24] Available at https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/13.08.01%20Access%20to%20Mental%20Health%20Care.pdf.

58.     Defendants Armel and Walker have also been made subjectively aware of the harmful impact of STGMU confinement through hundreds of grievances and request slips filed by various Plaintiffs and class members regarding the STGMU and access to mental health care services.

59.     Defendants have failed to take adequate steps to ensure that mentally ill Plaintiffs and class members who express suicidal thoughts, attempt suicide, or engage in self-harm are not placed in solitary confinement for any significant length of time despite their knowledge that solitary confinement dramatically increases the risk of self-harm and suicide.

60.     Defendants Harry, Oppman, Wingard, Armel, Walker, and Barnacle, as long-time DOC officials, are aware of the serious risks and harms presented by solitary confinement, including the risk to individuals with psychiatric disabilities and the risk posed by prolonged, indefinite solitary confinement.

61.     The risks associated with solitary confinement are institutional knowledge within the DOC, especially at the highest levels, in light of the relevant case law. In *Palakovic v. Wetzel*, the Third Circuit recognized that solitary confinement of a person with serious mental illness stated a claim under the Eighth Amendment.[25]

62.     The court emphasized that solitary confinement "can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, [PTSD], psychosis, and even a disintegration of the basic sense of self identity" and that "the damage does not stop at

---

[25] *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017) (finding parents of son who died by suicide in solitary confinement stated a claim against John Wetzel and other defendants where defendants were aware of the conditions of solitary confinement that caused severe psychological harm and exacerbated pre-existing mental health problems and knew of prior suicides in solitary confinement).

mental harm" and often results in suicide and self-mutilation which are behaviors "believed to be maladaptive mechanisms for dealing with the psychological suffering that comes from isolation."[26]

63.     This decision was rendered only two months after the decision in *Williams v. Secretary*, where, in the context of a procedural due process challenge to prolonged solitary confinement on death row, the Third Circuit recognized what it called the "[s]cientific [c]onsensus" regarding solitary confinement:

> A comprehensive meta-analysis of the existing literature on solitary confinement within and beyond the criminal justice setting found that the empirical record compels an unmistakable conclusion: the solitary confinement experience is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term damage . . . [A]ll individuals subjected to solitary confinement will experience a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability, and difficulty tolerating external stimuli.

> Anxiety and panic are common side effects. Depression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation are also frequent results . . . . [I]n the absence of interaction with others, an individual's very identity is at risk of disintegration . . .

> [I]t is well documented that [ ] prolonged solitary confinement produces numerous deleterious harms . . . . [T]he evidence shows that the psychological trauma associated with solitary confinement is caused by the confinement itself. The relationship cannot be dismissed as merely a simple correlation between pre-existing mental health issues and placement in solitary confinement. . . .

> Indeed, even a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium . . . .

> Continued solitary confinement . . . poses a grave threat to well-being.[27]

---

[26] *Id.* at 226–27 (quoting *Williams v. Sec'y  Pa. Dep't of Corr.*, 848 F.3d 549, 567–68 (3d Cir. 2017)).

[27] *Williams*, 848 F.3d 549 at 566–69 (cleaned up).

64.     Despite the growing body of jurisprudence recognizing that solitary confinement presents extraordinary risks and harms, especially for those with psychiatric disabilities, Defendants Harry, Barnacle, Oppman, Malishchak, Armel, Walker, Riddle, and Saavedra authorized sending plaintiffs and class members to the STGMU and/or were responsible for the administration of the STGMU, which is a program of indefinite solitary confinement that holds a substantial number of individuals with psychiatric disabilities.

65.     All defendants authorized or administered the STGMU without providing for a meaningful mental health evaluation to those being considered for placement in the unit.

66.     Defendant Malishcak, as the Director of Psychology, is very aware of the risks that solitary confinement poses to individuals with psychiatric disabilities as the DOC recognizes such a risk in several of its policies. Despite his awareness of the risks and harms of solitary confinement, he did not provide guidance, training, or protocols to psychology staff in the STGMU that would allow them to promptly and accurately identify and respond to signs and symptoms of decompensation.

67.     Similarly, Defendant Saavedra has extensive experiential knowledge of how solitary confinement results in greater frequency and severity of psychological decompensation due to his many years as a psychiatrist at SCI Fayette. His patients in the STGMU regularly engaged in self-harm, suicide attempts, and erratic behavior and exhibited despair and reclusiveness. Despite such behaviors presenting an obvious and readily observable risk to the mental and physical health of Defendant Saavedra's patients, he systematically failed to perform proper evaluations and diagnostic classification that would have resulted in his patients being removed from the STGMU to protect their health.

68.     All Defendants authorized or administered the STGMU without providing training, protocols, or any directives to mental health staff to conduct assessments of those held in the STGMU that were tailored to identifying and treating adverse symptoms of solitary confinement.

69.     All Defendants have failed to enact commonsense, minimal standards for identifying isolation-related decompensation for those held in the STGMU. Such standards, which are non-existent in the STGMU, include providing regular, confidential mental health evaluations and utilizing a standard set of questions designed to elicit meaningful and accurate psychological information pertaining to the impact of solitary confinement.

70.     In other words, Defendants have placed Plaintiffs and Class Members in conditions of solitary confinement that are known to cause serious harm, and enabled a mental health system that studiously avoids inquiry into the specific harms associated with solitary confinement.

71.     As a consequence of Defendants' failure to ensure basic mental health screening and identify solitary-confinement-related decompensation, Plaintiffs and other Class Members have experienced perilous decompensation, including severely heightened anxiety, depression, inability to concentrate, intrusive thoughts, self-harm, suicidality, and suicide attempts.

72.     Defendants Armel and Walker also receive "extraordinary occurrence reports" generated when individuals engage in self-harming conduct or there is a staff use of force in the STGMU. Self-harm and uses of force occur with regularity on the unit, and these defendants have not intervened to assess the serious harm that the conditions of solitary confinement were having on plaintiffs, individual class members involved in self-harm or uses of force, or the unit as a whole.

## **Conditions in the STGMU**

**The STGMU Structure According to DOC Policy**

73.    The DOC describes the STGMU as an area of a facility used to house and provide programming to individuals the DOC alleges exhibit "certain behavior" in connection with their affiliation with a "Security Threat Group" (STG).

74.    STGs are defined by the DOC as "groups of individuals who have been identified as a possible threat to the security, safety, and/or operation of the facility."

75.    The first STGMU within the DOC was created in or around 2012. During this period, there has only been one STGMU within the DOC at any given time. It has moved from SCI Greene to SCI Forest to SCI Fayette.

76.    The policy governing the STGMU has always been secret, as has the protocol, rationale, and evidentiary basis for how the DOC determines somebody is a member of a STG.

77.    The STGMU is a phased program, with five phases through which individuals can theoretically progress.

78.    Individuals enter the STGMU at Phase 5 and must progress down to Phase 1 before they are eligible to be removed from the STGMU.

79.    Individuals remain in Phase 5 "until appropriate staff has assessed [the individual's] progress through programing, [the individual's] STG Program Plan has been developed, and [the individual has] remained disciplinary action free for a sufficient period."

80.    The STGMU Handbook does not provide any guidance on how long "a sufficient period" is or how long individuals typically remain at this phase.

81.    There is no maximum time limit on how long an individual may remain in a Phase. Each Phase is of indefinite duration.

82.    On some Phases, individuals must complete in-cell packets before advancing to the next Phase.

83.     These packets bear no relationship to STG affiliation and are not meaningful educational opportunities.

84.     Changes in status from one Phase to another must be approved by the Superintendent.

85.     Thus, Defendants Armel and Walker were involved in each decision to keep an individual in conditions of solitary confinement in the STGMU, including all decisions to prolong that isolation by denying Phase advancement or setting someone back a Phase.

86.     According to the Handbook, changes from one Phase to another depend on "[the individual's] behavior, STG activity, information received from the security office, misconducts, program participation, ability to follow institutional rules, attendance at 30-day reviews and support of administrative staff."

87.     In other words, Phase changes can be based on almost anything at all without any concrete benchmarks for advancing through or being set back in the program.

88.     Indeed, some individuals placed in the STGMU have been phased back after progressing significantly through the program, making it impossible to ascertain when they may complete the program.

89.     Phase setbacks can be to the previous Phase or to any earlier Phase in the program.

90.     Upon transitioning to Phase 1, individuals are moved back into general population but remain on a probationary status. While on Phase 1, the individual may still be sent back to any other phase for any reason.

91.     Individuals must remain on Phase 1 for a minimum of 180 days, but there is no maximum amount of time for remaining on Phase 1.

92.     Upon successful completion and discharge from the STGMU Program, an individual may be released from the STGMU unit and placed in general population, a step-down unit, or in any facility deemed appropriate.

93.     There are no meaningful protections against being placed back in solitary confinement or the STGMU, and many Plaintiffs and class members have spent more than one stint in the STGMU and been housed in various solitary confinement units throughout the DOC.

94.     Individuals who "fail" the STGMU programing are "classified custody level 5H, submitted for placement in appropriate Security Level 5 RHU and considered by the Department of Corrections for placement on the Restricted Release List," which is yet another form of indefinite, prolonged solitary confinement.

**The Reality of the STGMU**

95.     There is no publicly available policy that explains how individuals are determined to be a member of a "Security Threat Group."

96.     Defendants never informed nor provided any notice of the basis for STG determinations to those who, like Plaintiffs, were considered STG members, even though such a determination that a person is a member of a STG is a prerequisite for placement in the STGMU.

97.     Defendants never provided Plaintiffs with a hearing or an interview process to determine their alleged STG affiliation.

98.     Plaintiffs are unaware of ever being under any investigation or of any internal DOC reports determining or substantiating whether they were or should be considered STG members.

99.     Typically, before and after an incarcerated individual's STGMU placement, Defendants arbitrarily approve and sign off on STGMU recommendations from their subordinates, who fail to give notice of their recommendation and reasons for such to incarcerated individuals.

100.    Plaintiffs have never received any response when they have written to the prison that sent them to the STGMU asking about the bases for their alleged STG status.

101.    At no time were Plaintiffs informed of the reasons for their STGMU recommendation and placement.

102.    Plaintiffs were never afforded an opportunity to respond in writing or at a hearing to the alleged evidence that led to their STGMU placement.

103.    Accordingly, Defendants never presented Plaintiffs with any alleged facts or evidence to substantiate any STG designation nor provided Plaintiffs any opportunity to challenge any alleged facts or evidence allegedly providing the basis for their STGMU placement.

104.    Individuals in the STGMU are subjected to phase regressions for actions characterized as misconduct without a meaningful opportunity to challenge DOC decisions, leading to a loss of the minimal privileges that phase progressions provide, prolonging their stay in the STGMU, and resulting in a loss of motivation to complete the program.

105.    Individuals in the STGMU are subjected to indefinite solitary confinement, without a clear path to be removed from the unit.

106.    In practice, STGMU confinement lasts approximately one year at a minimum, and far longer for many.

107.    Individuals in the STGMU, on average, serve a longer portion of their sentence before parole or maxing out than other individuals incarcerated in the DOC since they cannot access programs required for parole eligibility.

108.    Upon information and belief, nobody has ever been paroled from the STGMU, as the Parole Board considers the fact that a person is in the STGMU as *ipso facto* evidence that they should not be granted parole.

109.   Individuals in the STGMU are locked in single cells that are approximately 80 square feet.

110.   STGMU cells have minimal furniture, only a steel-and-concrete bed with a thin mattress and no pillow, a combination sink-toilet, and a small desk and chair.

111.   Many cells in the STGMU do not have a window facing outside and therefore incarcerated individuals held there are deprived of natural light.

112.   Each cell has a small window facing the block that limits the individuals confined within to only a very constricted view of the cell block.

113.   STGMU housing pods are extremely loud due to the slamming of solid steel cell doors and the screaming from incarcerated individuals who are experiencing mental health crises.

114.   To speak to someone in a nearby cell, incarcerated individuals must yell through their food slot or the cracks between their cell doors and frames.

115.   Some STGMU prisoners attempt to communicate with each other quietly by throwing paper poles tied to strings under their cell doors in a process known as "fishing."

116.   However, such fishing is deemed a disciplinary violation and STGMU prisoners can be punished for it, including by having the duration of their stay in the STGMU increased.

117.   Individuals incarcerated in the STGMU are confined to their cells for at least 22 hours every day, though many refuse recreation due to the mental health impacts of solitary confinement and the fact that recreation occurs in a cage that is not much bigger than the cell itself, or they are denied recreation due to arbitrary decisions by staff.

118.   During the 22 to 24 hours per day that individuals are in their cells, the fluorescent lights in the cell are always on, making sleep difficult and disorienting their sense of time.

119.   STGMU prisoners must eat every meal by themselves in their cells.

120.    The cell doors are solid steel—not bars—compounding their physical isolation from others.

121.    The cell doors have a small slot through which food is passed.

122.    Despite unceasing isolation and confinement, prison guards strip-search STGMU prisoenrs before allowing them to step out of their cells; individuals in the DOC's general population units are not strip-searched before leaving their cells.

123.    Unlike individuals in general population units, STGMU prisoners are handcuffed upon leaving their cells, and sometimes their legs are shackled.

**Restrictions on Visits**

124.     According to the STGMU handbook, STGMU prisoners are allowed a small number of visits per month, the number of which varies depending on the prisoner's STGMU phase.

125.    Many people do not receive these visits because of limitations on when they can be held, the technology needed to access them, and the difficulty in traveling to LaBelle, Pennsylvania, for family and friends of those in the STGMU.

126.    STGMU prisoners are not allowed contact visitation, depriving them of contact with loved ones. Deprivation of human touch is a profoundly harmful practice.

127.    According to policy, STGMU prisoners on Phase 5 can receive one non-contact visit per month from approved visitors, including a 45-minute video visit; individuals on Phase 4 can receive two in-person non-contact visits per month; individuals on Phase 3 can receive three in-person non-contact visits per month; and individuals Phase 2 can receive four in-person non-contact visits per month.

128.    In reality, in-person visits with individuals in the STGMU are rarely, if ever, permitted to occur.

129.    If and when they do occur, in-person non-contact visits are in a room divided by a wall with a glass partition, and the incarcerated person remains handcuffed throughout the visit.

130.    During video visits, the incarcerated individuals must speak through a phone, which can be difficult to hold because guards often keep them handcuffed throughout the video visit, despite the fact that they are locked in a cage by themselves.

131.    Individuals in the DOC's general population units are not subject to these restrictions on visitation.

**Lack of Programming**

132.    On weekdays, STGMU prisoners are allowed only one hour per day to exercise in isolation in small outdoor cages.

133.    Some individuals incarcerated in the STGMU manifest symptoms of acute psychological decompensation while in the exercise cages, which disincentivizes other STGMU prisoners from using the cages.

134.    Many in the STGMU do not utilize the outdoor cage because of their mental health symptoms, including fear of staff and other incarcerated people, heightened anxiety and traumatic stress symptoms, and severe depression.

135.    STGMU prisoners on Phase 5 are not permitted access to telephones, reading material, radios, televisions, commissary food, or the dayroom.

136.    STGMU prisoners may not purchase magazines or reading materials until they reach Phase 4.

137.    STGMU prisoners may not access radios or tablets until they reach Phase 3.

138.    STGMU prisoners may not access televisions until they reach Phase 2.

139.    STGMU prisoners are barred from attending religious services.

140.    STGMU prisoners are not allowed to hold a prison job with the exception of two individuals on Phase 2.

141.    STGMU prisoners cannot participate in therapeutic groups or programs.

142.    STGMU prisoners cannot participate in educational groups or programs.

143.    STGMU prisoners are unable to take part in alcohol and drug addiction rehabilitation services.

144.    STGMU prisoners are barred from participating in violence prevention programs.

145.    STGMU prisoners may not join cognitive behavioral group programs that address and change thought and behavior patterns that cause criminal offending.

146.    Nor can STGMU prisoners participate in domestic violence prevention programming or victim awareness programming.

147.    In many instances, participating in these programs is a prerequisite for parole.

**Lack of Mental Health Care**

148.    STGMU prisoners receive grossly inadequate mental health treatment or none at all.

149.    Contacts with mental health staff occur, at best, infrequently.

150.    Typically, mental health staff stand outside the cell and speak to the incarcerated individuals through the food slot or the crack between the side of the cell door and frame.

151.    Such visits are not private and often last no more than a few seconds.

152.    These visits do not constitute meaningful mental health treatment. In fact, they serve to minimize the identification of mental health issues and therefore diminish the mental health case load and treatment obligations of staff.

153.     Because of the total lack of privacy, many incarcerated individuals refuse to speak to mental health staff during these visits, which are known as "drive-bys".

154.     In addition, many STGMU prisoners suffering from mental illness require psychosocial rehabilitation services as part of their treatment.

155.     Psychosocial rehabilitation services include structured out-of-cell activities designed to decrease isolation, increase social interaction, increase treatment and medication compliance, and decrease psychiatric symptoms. These services are not available in the STGMU.

**Class Representatives**

156.     All class representatives in this action have psychiatric disabilities that limit major life activities, including but not limited to cognitive function, concentrating, learning, thinking, communicating and interacting with others.

**Montana Bell**

157.     Montana Bell is thirty years old, and he has been incarcerated in the DOC for the past 12 years.

158.     Mr. Bell spent almost two years in the STGMU prior to being transferred to another solitary confinement unit in May 2023.

159.     The extreme isolation and brutal conditions of the STGMU have caused Mr. Bell to attempt suicide at least ten times over the past two years.

160.     Prior to being warehoused in the STGMU, Mr. Bell was diagnosed with anxiety, anti-social personality disorder, depression, and PTSD

161.     The DOC previously assigned Mr. Bell a "D" designation on the Mental Health Roster, which indicates the DOC's awareness that he had been diagnosed with a serious mental illness.

162.    The DOC subsequently assigned Mr. Bell a "C" designation on the Mental Health Roster, meaning he is receiving treatment for his mental health conditions but is no longer considered by the DOC to have a serious mental illness.

163.    He is currently receiving the medications Buspar and Haldol for his mental illness.

164.    Mr. Bell was housed at SCI Phoenix from September 2019 to November 2021. While at SCI Phoenix, Mr. Bell informed mental health staff that he had visions of dying in solitary confinement and asked them to "protect me from the beast."

165.    While serving disciplinary custody time for alleged violations of prison rules, Mr. Bell was informed that he was being recommended for units that would provide counseling, therapy, and mental health services related to his alcohol abuse and mental illness.

166.    Instead, Defendants Wingard, Barnacle, and Malishchak authorized Mr. Bell's transfer to the STGMU.

167.    Defendants Wingard, Barnacle, and Malishchak approved Mr. Bell's placement in the STGMU without providing him any notice or opportunity to challenge the reasons and/or alleged evidence they based their decision upon.

168.    Mr. Bell was not provided any mental health evaluation prior to placement in the STGMU.

169.    Mr. Bell was transferred to SCI Fayette and placed in the STGMU on or around November 17, 2021.

170.    As soon as he stepped off the bus at SCI Fayette, Mr. Bell stated he intended to take his own life. STGMU Captain Walker responded by telling him to kill himself.

171.    Mr. Bell also told nursing and psychiatry staff at SCI Fayette that he was suicidal shortly after arriving at the prison.

172.    The first night in the STGMU, Mr. Bell made a noose out of his t-shirt, tied it to the top vent, wrapped it around his neck, and hung himself.

173.    His suicide attempt was unsuccessful because the shirt slipped off the vent.

174.    Mr. Bell then attempted to hang himself three additional times.

175.    Despite their knowledge of Mr. Bell's suicide attempts, and the knowledge all Defendants have of the serious risk to mental health caused by solitary confinement, staff at SCI Fayette did not intervene to change his conditions of confinement or change his Mental Health Roster designation back to D.

176.    Mr. Bell's mental health deteriorated so dramatically while in the STGMU that he lacked any motivation to shower.

177.    Mr. Bell stopped grooming himself or washing his clothes while in the STGMU as a result of the deterioration of his mental health.

178.    Mr. Bell went without outdoor exercise for 15 months at SCI Fayette on account of the self-isolating impacts of solitary confinement coupled with his being forced at times to choose between yard and law library.

179.    Mr. Bell has been experiencing hallucinations and delusions that cause him to believe he can see, hear, and receive messages from the dead, which cause him to be awake for two to three days at a time.

180.    Mr. Bell acts erratically toward staff on account of his serious mental illness and the decompensation he is experiencing due to solitary confinement.

181.    Mr. Bell was on Phase 5 of the STGMU for 18 consecutive months.

182.    Mr. Bell has written numerous grievances and request slips concerning the mistreatment he has experienced and the pain he has endured.

183.    Mr. Bell has also written letters to DOC Central Office.

184.    Mr. Bell has engaged in cutting his wrists and ankles, banging his head, and covering himself in his own feces.

185.    Mr. Bell has become so hopeless that he does not expect to make it out of solitary confinement alive.

**Ronnie E. Johnson**

186.    Ronnie Johnson is forty-three years old, and he has been incarcerated in the DOC since July 15, 1999.

187.    He has spent over one year in solitary confinement in the STGMU, where he was moved on March 31, 2022.

188.    Altogether he has spent approximately 16 years in solitary confinement in the DOC.

189.    He has been diagnosed with anxiety, depression, and an adjustment disorder in the DOC, conditions that have been exacerbated by his prolonged, extreme isolation.

190.    Additionally, he has been diagnosed with impulse control disorder, personality disorder, and bipolar affective disorder for well over a decade, as reflected in the findings of court-ordered mental health evaluations in his criminal cases.

191.    Mr. Johnson has a long history of mental illness and underwent multiple psychiatric evaluations as a child.

192.    Mr. Johnson has a known history of suicide attempts and self-harm incidents while in DOC custody, including at least 4 separate serious incidents.

193.    Mr. Johnson's mental health conditions and history of self-harm attempts require intensive treatment services.

194.    Instead, the DOC placed Mr. Johnson in the STGMU.

195.    Upon information and belief, none of Mr. Johnson's medical and mental health history was taken into account when the Defendants approved Mr. Johnson for placement in the STGMU.

196.    Mr. Johnson was not provided any notice of the reasons or alleged evidence that the DOC was relying on to determine that he was a member of a STG.

197.    Accordingly, he received no opportunity to challenge his placement in the STGMU.

198.    Prior to being placed in the STGMU, Mr. Johnson was placed on administrative custody status at SCI Mahanoy in December 2021.

199.    While on administrative custody status while his STG referral was pending, Mr. Johnson began refusing to eat meals.

200.    On March 31, 2022, the DOC transferred Mr. Johnson to SCI Fayette and placed him in the STGMU under Phase 5.

201.    STGMU personnel immediately stripped Mr. Johnson of all the privileges previously accorded him due to his administrative custody status and placed him on Phase 5 in a hard cell, which is a cell without running water.

202.    Mr. Johnson began to file numerous grievances and request slips due to the unavailability of programming and his being warehoused in indefinite solitary confinement.

203.    For a considerable time, the meager amounts of outdoor exercise provided to other individuals in the STGMU were further curtailed for Mr. Johnson. SCI Fayette staff would not permit Mr. Johnson to possess his asthma inhaler and instead wanted nursing staff to hold onto it, so STGMU staff prohibited him from using the yard when nursing staff members were unavailable.

204.    On April 22, 2022, Mr. Johnson entered an extreme state of depression after the untimely death of his grand aunt.

205.    He requested to speak to mental health staff, but a nurse informed him that no mental health staff were in the institution. Mr. Johnson began to panic.

206.    In April 2022, Mr. Johnson was battling numerous psychological issues that were severely compounded by his solitary confinement and harassment from guards. He became so paranoid that he believed staff were poisoning his food, leading him to starve himself out of fear of being poisoned.

207.    As a result, he lost more than 20 pounds.

208.    In April 2022, due to his decompensation, the DOC changed Mr. Johnson's Mental Health Roster designation to C.

209.    In June of 2022, Mr. Johnson was told at his cell door that he had been diagnosed with anxiety, depression, and an adjustment disorder.

210.    Mr. Johnson also began to react adversely to STGMU staff terminating television viewing on his pod indefinitely, which further diminished the already-sparse stimulation on the unit.

211.    On July 4, 2022, Mr. Johnson had an anxiety attack from the accumulated stress of such austere solitary confinement, and he was rushed to the prison infirmary as a result.

212.     On August 17, 2022, Mr. Johnson was denied breakfast and his anxiety medication, which led to his having a mental health crisis that included suicidal ideation. Mr. Johnson was removed from his cell and placed in a psychiatric observation cell under medical observation for 24 hours.

213.    On August 29, 2022, Mr. Johnson had a psychological episode and began smearing feces on his body and cell windows, but he was left without any mental health treatment despite being naked for several hours.

214.    In August 2023, the DOC transferred Mr. Johnson to solitary confinement in the RHU at SCI Houtzdale, where he continues to be denied access to out-of-cell time, programming, or any meaningful group therapy.

215.    Defendants are knowingly depriving him of the social stimuli needed to prevent serious decompensation.

216.    Mr. Johnson has not received a single misconduct citation since his placement in the STGMU in March 2022.

217.    As of the filing of this Second Amended Complaint, Mr. Johnson continues to suffer from paranoia, depression, anxiety, and extraordinary pain and suffering as a result of his prolonged solitary confinement.

**Angel Maldonado**

218.    Angel Maldonado is thirty-seven years old, and he has been incarcerated in the DOC since September 2008.

219.    He has spent the past two and a half years in the STGMU, and more than 3 consecutive years in solitary confinement.

220.    Mr. Maldonado is diagnosed with depression and anxiety, for which he is prescribed Celexa and Zyprexa. He has also been prescribed Remeron, Paxil, and Vistaril while in the STGMU.

221.    Extreme isolation has caused him to experience auditory hallucinations, extreme depression and anxiety, suicidality, and an attempted suicide.

222.    Prior to being warehoused in the STGMU on this most recent occasion, Mr. Maldonado had no history of any mental health diagnoses or having received any mental health care.

223.    The DOC previously designated Mr. Maldonado as an "A" on the Mental Health Roster, which is reserved for individuals the DOC considers to have no identified psychiatric needs or history of psychiatric treatment.

224.    Mr. Maldonado's Mental Health Roster Designation is now "C," a recognition by the DOC that he is now in need of psychological treatment.

225.    While housed at SCI Coal Township in September 2020, Mr. Maldonado was placed on disciplinary custody status in the RHU for 90 days in response to an incident where he nonviolently protested not receiving commissary.

226.    After his 90 days of disciplinary custody expired on December 9, 2020, Mr. Maldonado was placed on administrative custody status.

227.    Mr. Maldonado spent a year on administrative custody status in solitary confinement at SCI Coal Township.

228.    During that time, he was allowed the following privileges: phone calls, kiosk-email usage, tablet and radio usage, television, typewriter, in-person visitation, and commissary food.

229.    On December 28, 2021, Mr. Maldonado was transferred to SCI Fayette and placed on administrative custody status in the RHU.

230.    In February 2022, Mr. Maldonado was informed that he was being recommended for the STGMU, though he was not provided any notice as to why he was deemed a member of a STG or what alleged evidence or information was relied upon in making that determination.

231.    At that time, Mr. Maldonado had been misconduct-free for the preceding 16 months.

232.    He has now been misconduct-free for more than 3 years.

233.    Mr. Maldonado was not provided a hearing regarding his STG validation prior to or since his placement in the STGMU.

234.    Mr. Maldonado was not provided a mental health evaluation prior to his placement in the STGMU.

235.    Upon placement in the STGMU, Mr. Maldonado was stripped of all the privileges he had been granted while on administrative custody status. *See supra* ¶ 229.

236.    This is the fourth time that Mr. Maldonado has been placed in the STGMU during his incarceration in the DOC.

237.    He has spent at least twelve of the past fifteen years in solitary confinement.

238.    Mr. Maldonado had become hopeless and depressed because he was told by staff he would not make it out of the STGMU.

239.    Mr. Maldonado frequently requests group therapy and to see a program treatment specialist during his periodic reviews due to his recognition that those in the STGMU, including himself, require mental health services beyond what are provided, and that they require programmatic activity in order to have meaningful social interaction.

240.    On March 29, 2022, Mr. Maldonado wrote a request slip to Defendant Saavedra, the psychiatrist at SCI Fayette, informing him that he was mentally deteriorating due to his current solitary confinement and that he was experiencing insomnia, anxiety, depression, and suicidal ideation.

241.    The next day Defendant Saavedra paid him a drive-by visit at his cell door, asked him three questions, and told Mr. Maldonado that he would prescribe him 15 mg of Remeron, and have his Mental Health Roster designation changed to C.

242.    On or around April 4, 2022, Mr. Maldonado received another drive-by visit from Defendant Saavedra wherein Mr. Maldonado complained that he continued to experience thoughts of suicide.

243.    Defendant Saavedra said he would double Mr. Maldonado's Remeron prescription to 30 mg.

244.    Immediately after Defendant Saavedra exited the housing pod, other STGMU prisoners began to yell at and verbally abuse Mr. Maldonado, calling him weak and broken and telling him to kill himself. This went on for 10 hours and exacerbated Mr. Maldonado's suicidal ideation.

245.    Defendants and their STGMU staff failed to create a treatment plan for Mr. Maldonado despite knowing that he was slipping into deep depths of psychological pain and suffering.

246.    By May 2, 2022, Mr. Maldonado was placed in a psychiatric observation cell (POC) under suicide watch for 72 hours because he declined to see mental health staff due to the requirement that he be strip-searched.

247.    Once in the POC, he was paid another drive-by visit by staff who threatened him by stating that if he did not stop writing outside organizations and filing grievances and lawsuits the POC would become his permanent cell.

248.    By July 21, 2022, Mr. Maldonado had slipped into a shell of his former self and had begun engaging in acts of self-harm, including punching walls until he bled, spelling out in blood, "Kill me, I'm ready to go."

249.    On September 8, 2022, Mr. Maldonado attempted suicide by overdosing on 38 pills of Remeron and had to be rushed to a hospital for treatment.

250.    Mr. Maldonado lost all hope of survival while in the STGMU and is in serious need of adequate mental health treatment and psychosocial rehabilitation.

251.    In August 2023, Mr. Maldonado was transferred to SCI Camp Hill and placed in the general population.

**Kareem Mazyck**

252.    Kareem Mazyck is forty-one years old and was in the DOC for 4 years prior to his release.

253.    Mr. Mazyck spent two years in solitary confinement in the STGMU until he was released from prison on December 23, 2022, directly from the STGMU.

254.    After his placement in the STGMU, the DOC assigned Mr. Mazyck a "C" designation on the Mental Health Roster, an acknowledgement by the DOC that he was in need of psychological treatment.

255.    While in the STGMU, Mr. Mazyck was diagnosed with anxiety, insomnia, and an adjustment disorder, for which he was prescribed Remeron.

256.    As a result of the extreme isolation he experienced in the STGMU, Mr. Mazyck experiences paranoia, mood swings, difficulty sleeping and auditory hallucinations.

257.    Prior to warehousing in the STGMU, Mr. Mazyck cannot recall having any mental health issues. He had a Mental Health Roster designation of "A," an acknowledgement by the DOC that he had no identified psychiatric needs or history of psychiatric treatment.

258.    Immediately prior to his placement in the STGMU, Mr. Mazyck was housed on administrative custody status at SCI Dallas with privileges of phone calls, tablet, visits, and commissary food.

259.    Defendants then arbitrarily recommended and approved his placement in the STGMU.

260.    Mr. Mazyck was not provided notice of the basis for his placement in the STGMU, nor given any notice of the reasons or evidence that Defendants used to determine he was a member of a STG.

261.    Mr. Mazyck was not provided with a mental health evaluation prior to placement in the STGMU.

262.    Mr. Mazyck arrived in the STGMU on January 7, 2021, and was immediately stripped of all his privileges and placed on Phase 5.

263.    Over time, prolonged solitary confinement took its toll on Mr. Mazyck, and he began experiencing symptoms of serious mental illness that have long been associated with solitary confinement, including anxiety, depression, paranoia, and some delusional tendencies.

264.    Mr. Mazyck also reported suicidal thoughts to multiple staff members, including a psychiatrist, who prescribed him medication.

265.    Mr. Mazyck filed grievances and request slips demanding to be released into general population because there was no programming in the STGMU.

**Xavier Pagan**

266.    Mr. Pagan is thirty-three years old, and he has been incarcerated in the DOC for the past eleven years.

267.    Mr. Pagan has been in the STGMU multiple times.

268.    He was most recently in the STGMU for three and a half years, until his release to the general population at SCI Fayette in July 2023.

269.    Mr. Pagan has spent a cumulative total of approximately 8 years in solitary confinement while in DOC custody.

270.    Prior to his placement in the STGMU, Mr. Pagan was diagnosed with anxiety, PTSD, extreme depression, and schizophrenia; in 2019, while at SCI Camp Hill, he experienced hallucinations, which led to him trying to commit suicide.

271.    Despite his serious mental illness, the DOC assigned Mr. Pagan a "C" designation on the Mental Health Roster rather than "D."

272.    While Mr. Pagan was in the RHU serving a 15-day disciplinary sanction, DOC staff recommended and approved Mr. Pagan for placement in the STGMU.

273.    Mr. Pagan was not provided notice of the reasons for his placement in the STGMU, he was not interviewed by any DOC staff, nor was there a hearing of any sort through which he was allegedly validated as a member of a STG.

274.    The DOC also did not provide Mr. Pagan a mental health evaluation prior to placing him in the STGMU.

275.    Mr. Pagan was accepted into the STGMU in October 2020 despite Defendants knowing that the STGMU does not offer the intensive treatment services, minimum of 20 hours per week out of-cell time, programming, or group therapy that Mr. Pagan requires and that the DOC claims in its policies to provide to individuals with serious mental illness who are placed in administrative or disciplinary custody.

276.    At this time, the STGMU program was at a standstill due to the COVID-19 pandemic, and nobody was progressing through the supposed phases.

277.    Throughout his time in the STGMU, Mr. Pagan has experienced severe psychological decompensation due to his solitary confinement and lack of mental health treatment.

278.    Eventually, Mr. Pagan began to bang his head on his door, table, bunk, and sink every day when staff entered the pod, so he could attempt to convince them to start the program so he and others could progress through the phases.

279.    In response, staff told him to be quiet and be patient.

280.    Mr. Pagan was not offered any mental health treatment other than medication in response to these episodes. Instead, he was increasingly medicated at higher dosages.

281.    Mr. Pagan has been set back in the STGMU and had his Phase "frozen"—meaning he was prevented from advancing to the next Phase—numerous times by Defendants and their subordinates.

282.    This prolonged his STGMU time caused him to lose all hope of ever being released from solitary confinement.

283.    For every setback and Phase freeze, Mr. Pagan filed numerous grievances that further alerted Defendants Armel and Walker to the harm prolonged solitary was causing him.

284.    As of July 16, 2022, after 20 months of psychological torture, Mr. Pagan experienced a more acute, severe state of psychiatric distress. Mr. Pagan began to curse everyone, including friends and peers, in addition to staff. He began to flood his cell with dirty toilet water. Mr. Pagan began to punch the walls of his cell until his knuckles burst open and bled.

285.    Defendants Armel, Walker, Saavedra and their subordinates disregarded Mr. Pagan's worsening condition, continuing their deliberate indifference to his deteriorating mental health, acts of self-harm, and risk of yet more serious injury.

286.    On September 8, 2022, Mr. Pagan attempted suicide by overdosing on more than 20 Zoloft pills. Mr. Pagan was left in his cell and not provided any medical attention in response

to this attempted overdose even though correctional and mental health staff were present when the attempt was made.

287.    Since his release from the STGMU, Mr. Pagan continues to experience the effects of solitary confinement, including engaging in self-isolating behavior, feeling intensely anxious and paranoid, and experiencing visual hallucination.

## CLASS ACTION ALLEGATIONS

288.    Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(2) on behalf of themselves and the following class of similarly situated persons (the "STGMU Class"):

> All individuals who (a) currently are or in the future will be confined in the STGMU, or (b) were previously confined in the STGMU and have remained in Level-5 custody since leaving the STGMU.

289.    Additionally, Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(2) on behalf of themselves and the following sub-class of similarly situated persons (the "Mental Health Subclass"):

> All individuals within the STGMU Class who have received or will receive any mental health treatment during their incarceration in the DOC.

290.    Additionally, Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(2) on behalf of themselves and the following sub-class of similarly situated persons (the "Disability Subclass"):

> All individuals within the STGMU Class who have a mental health condition that substantially limits one or more major life activities.

291.    Plaintiffs also bring this action under Fed. R. Civ. P. 23(b)(3) on behalf of themselves and the following class of similarly situated persons (the "STGMU Damages Class"):

> All individuals who were confined in the Security Threat Group Management Unit (STGMU) at any time after October 27, 2020.

292.     Additionally, Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(3) on behalf of themselves and the following sub-class of similarly situated persons (the "Mental Health Damages Subclass"):

> All individuals in the STGMU Damages Class who received any mental health treatment in the DOC, or were recognized by the DOC as needing mental health treatment, prior to or during their confinement in the STGMU.

293.     Additionally, Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(3) on behalf of themselves and the following sub-class of similarly situated persons (the "Disability Damages Subclass"):

> All individuals in the STGMU Damages Class who had a "C" or "D" designation on the DOC's Mental Health Roster prior to or during their confinement in the STGMU.

294.     The members of these Classes and Subclasses (hereafter collectively referred to as "the Classes") are sufficiently numerous, as the STGMU has held up to 48 people at a time and a substantial number of these individuals have received mental health treatment while in the DOC. Joinder of all of the individual class members is impracticable.

295.     The exact size of the Classes and the identities of the individual members of the Classes (other than future members) can be determined through Defendants' records.

296.     Plaintiffs' claims are typical of the claims of all other members of the Classes.

297.     The claims of Plaintiffs and the other members of the Classes are based on the same legal theories and arise from the same unlawful conduct.

298.     Members of the Classes all have suffered similar injuries as a result of Defendants' conduct.

299.     Plaintiffs and their counsel will adequately represent the interests of the Classes.

300.     They seek relief that will benefit the entirety of the Classes.

301.     Plaintiffs' counsel are experienced in civil rights, prisoner rights, and class action litigation.

302.     There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Classes, and those questions predominate over any questions that may affect individual Class and Sub-Class Members.

303.     Common questions of law and fact affecting members of the Classes include, but are not limited to:

a.     Whether Defendants' policies and practices of permitting the placement of STGMU Class Members in solitary confinement in the STGMU without being afforded notice and an opportunity to challenge the basis of that decision violates their procedural due process rights under the Fourteenth Amendment;

b.     Whether Defendants' policies and practices governing STGMU placement and retention deprive STGMU Class Members of their procedural due process right to be heard by the decisionmakers responsible for their placement in the STGMU.

c.     Whether Defendants' policies and practices governing STGMU placement and retention deprive STGMU Class Members of their rights to procedural due process by failing to provide a meaningful guide for release from solitary confinement;

d.     Whether Defendants' policies and practices of permitting the placement of Mental Health Subclass Members in solitary confinement in the STGMU violates the Eighth Amendment;

e.      Whether Defendants' failure to implement training, policies, and practices that identify and appropriately respond to the symptoms of trauma caused or exacerbated by solitary confinement violates the Eighth Amendment;

f.      Whether Defendants' failure to mandate interventions that prohibit conditions of solitary confinement that cause serious harm to Mental Health Subclass Members violates the Eighth Amendment;

g.      Whether Subclass Members are denied the benefits of the DOC's services, programs or activities or otherwise discriminated against by reason of their disabilities.

304.    Defendants have acted or refused to act on grounds that apply generally to the Classes, and which make declaratory or injunctive relief appropriate for the Classes as a whole.

305.    Common questions of law and fact regarding DOC's operation of the STGMU predominate over any questions individually affecting Subclass members.

306.    The proposed Damages Class and Subclasses are ascertainable because DOC maintains classification and mental health records of all those in their custody, including those held in the STGMU, and these records enable Damages Class and Subclass members to be easily identified.

307.    Absent a class action, most Class and Subclass Members would find the cost of litigating their claims to be prohibitive, or would be unable to locate counsel, and thus would have no effective remedy.

308.    The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

**CAUSES OF ACTION**

**COUNT I: Fourteenth Amendment – Violation of STGMU Class and STGMU Damages Class Members Right to Procedural Due Process – Against Defendants Harry, Oppman, Wingard, Barnacle, Malishchak, Walker, Riddle, and Armel**

309.     Plaintiffs incorporate by reference the allegations set forth in all of the preceding paragraphs as though set forth fully herein.

310.     Placement in the STGMU is atypical and significant in relationship to the ordinary incidents of prison life in at least five ways: 1) the extreme isolation of the STGMU; 2) the duration and indefinite nature of STGMU confinement; 3) the inability to be granted parole while housed in the STGMU; 4) the stigmatizing impact that STGMU confinement has throughout one's incarceration, subjecting the individual to heightened risk of return to solitary confinement in the future; and 5) the inability of STGMU Class Members to challenge their placement or retention in the STGMU.

311.     STGMU Class Members, such as Plaintiffs, typically have endured several months or even years of consecutive solitary confinement prior to their placement in the STGMU, adding weight to their liberty interest in avoiding placement in the STGMU in the first instance.

312.     Contradictorily, while a rule violation that may result in up to 90 days in solitary confinement on disciplinary custody status requires a hearing where the incarcerated person can respond to the charges and present evidence, the drastically more severe and stigmatizing penalty of STGMU placement occurs without any hearing whatsoever. Defendants do not provide STGMU Class Members with notice of the basis for considering them to be members of Security Threat Groups, meaning neither description of the information relied upon nor evidence are provided. No evidence, no hearing, no basis to challenge STGMU placement nor any process in which to bring such a challenge: this total absence of process is a flagrant violation of the Fourteenth Amendment's right to procedural due process.

313.    Once in the STGMU, vague, arbitrary criteria are used to deny advancement through the phases of the unit and/or set Class members back to previous phases. Decisions to freeze or set back Class members' phase are not subject to any procedural protections, involving neither a hearing nor an opportunity to challenge the decision.

**COUNT II: Eighth Amendment – Unconstitutional Solitary Confinement of Mental Health Subclass and Mental Health Damages Subclass Members – Against Defendants Harry, Oppman, Wingard, Barnacle, Malishchak, Walker, Armel, Riddle, and Saavedra**

314.    Plaintiffs incorporate by reference the allegations set forth in all of the preceding paragraphs as though set forth fully herein

315.    The Mental Health Subclass Members have mental health conditions that the Defendants recognize require treatment. These mental health conditions place them at heightened risk of decompensation, emotional pain and suffering, elevated anxiety, panic attacks, hypertension, severe depression, and suicidality if they are placed or retained in solitary confinement.

316.    Mental Health Subclass Members are experiencing some or all of the following symptoms that are known to be caused by solitary confinement: anxiety, depression, intrusive thoughts, sleeping difficulties, memory problems, inability to concentrate, anger and difficulty controlling anger, emotional lability, lonesomeness, suicidality, auditory and visual hallucinations.

317.    Defendants are aware that Mental Health Subclass Members' mental health conditions place them at risk of substantial harm when placed in solitary confinement and nonetheless deprive them of basic human needs such as mental and physical health, social interaction, exercise, and environmental stimulation.

318.    Defendants have acted and continue to act with deliberate indifference to the Mental Health Subclass Members' mental health conditions in that they place or retain Subclass

Members in solitary confinement despite the well-known risk of substantial harm to their lives and health caused by such isolation.

319.     The placement of Mental Health Subclass members in solitary confinement despite the consensus that such confinement harms their health, deprives them of basic human needs, and presents a substantial risk to their life violates the Eighth Amendment to the Constitution.

**COUNT III: Americans with Disabilities Act – Claim for Disability Discrimination Pursuant to 42 U.S.C. § 12132 on Behalf of the Disability Subclass and Disability Damages Subclass – Against Defendant Pennsylvania Department of Corrections**

320.     Plaintiffs incorporate by reference the allegations set forth in all of the preceding paragraphs as though set forth fully herein.

321.     Plaintiffs and Disability Subclass Members are qualified individuals with disabilities that substantially limit many of their major life activities including but not limited to learning, reading, concentrating, thinking, communicating and interacting with others.

322.     Defendant Pennsylvania Department of Corrections is a public entity within the meaning of 42 U.S.C. §12131.

323.     Defendant has discriminated against the Disability Subclass Members on the basis of their psychiatric disabilities by, among other things:

      a.  placing and/or retaining Subclass Members in solitary confinement on the basis of their psychiatric disabilities and manifestations thereof, including issuing misconducts and phase setbacks for behavior caused by their psychiatric disabilities, thus excluding them from programs, services, and activities on the basis of their disabilities;

b.  failing to make reasonable modifications to its policies and procedures to account for and reduce the known deleterious effects of solitary confinement on individuals with psychiatric disabilities; and

c.  failing to make reasonable modifications to its policies and procedures to enable Subclass Members to derive the same benefits from the DOC's programs, services, and activities as similarly situated individuals without psychiatric disabilities.

324.  In particular, Defendant has failed to adequately identify and provide accommodations to Subclass Members in that they:

a.  do not have a reliable system of diagnosing or screening for mental health conditions in the STGMU, but instead rely on non-confidential cell-side rounds that are known to be ineffective at eliciting meaningful mental health information;

b.  do not conduct an assessment upon intake into the STGMU to identify whether Subclass Members are currently or have in the past experienced mental health conditions or symptoms that place them at a heightened risk of decompensation in solitary confinement;

c.  do not provide for adequate confidentiality when making rounds that would allow meaningful discussion of a patient's mental health concerns;

d.  do not conduct confidential evaluations after self-harm incidents;

e.  do not evaluate Subclass Members and reconsider their mental health classification after self-harm incidents or other instances of serious psychiatric decompensation;

f.  do not provide sufficient training to staff on interacting with individuals with psychiatric disabilities;

g.  Permit the use of punitive measures in response to requests for mental health treatment;

h.  Permit the use of punitive measures in response to behaviors that are expected from and consistent with the mental health conditions of the Subclass Members;

i.  Permit the use of punitive measures that are greater than necessary to maintain discipline or protect others from harm;

j.  Place and retain Subclass Members in solitary confinement notwithstanding their mental health conditions and the extraordinarily well-established risk that solitary confinement presents to Subclass Members;

325.    Subclass Members' placement and/or retention in the STGMU deprives them of numerous services and programs in the DOC, including but not limited to: congregate meals and recreational activity; contact visitation; drastically diminished telephone and email kiosk access; ineligibility for educational, vocational, and rehabilitative programming, including all programming necessary for parole.

326.    Defendant's discrimination against Subclass Members is intentional because Defendant is deliberately indifferent in that it has persisted in its discriminatory conduct despite being aware its policies and procedures related to the STGMU make it substantially likely that disabled individuals will be denied their federally protected rights under the ADA.

327.    Defendant is also vicariously liable for the deliberate indifference of the individual Defendants and other DOC employees.

### COUNT IV: Rehabilitation Act – Disability Subclass and Disability Damages Subclass Claim for Violation of Section 504 of the Rehabilitation Act of 1973 – Against Defendant Pennsylvania Department of Corrections

328.    Plaintiffs incorporate by reference the allegations set forth in all of the preceding paragraphs as though set forth fully herein.

329.     Plaintiffs and Disability Subclass Members are qualified individuals with disabilities as defined in Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

330.     Defendant DOC receives federal funding within the meaning of the Rehabilitation Act.

331.     Defendant DOC violates Section 504 of the Rehabilitation Act by discriminating against people with mental health disabilities solely on the basis of their disabilities. *See supra* ¶ 324.

332.     Defendant DOC violates Section 504 of the Rehabilitation Act by failing to reasonably accommodate Plaintiffs and Disability Subclass Members with mental health disabilities in its programs, activities, and services. *See supra* ¶ 325.

333.     Defendant's discrimination against Subclass Members is intentional because Defendant is deliberately indifferent in that it has persisted in its discriminatory conduct despite being aware its policies and procedures related to the STGMU make it substantially likely that disabled individuals will be denied their federally protected rights under the ADA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

A.     Declare that the above-captioned matter is maintainable as a Class Action pursuant to Federal Rule of Civil Procedure 23;

B.     Adjudge and declare that the acts and omissions of Defendants as described herein are in violation of the rights of Plaintiffs and the Classes under the Eighth and Fourteenth Amendment to the U.S. Constitution, the Americans with Disabilities Act, and the Rehabilitation Act;

C.      Enjoin Defendants and all persons acting in concert with them, or acting as their agents, from continuing these unlawful acts, conditions and practices, as described in this Second Amended Complaint;

D.      Enjoin Defendants and all persons acting in concert with them, or acting as their agents, from placing Mental Health Subclass Members in solitary confinement in the STGMU or in any other SL5 unit.

E.      Enjoin Defendants and all persons acting in concert with them, or acting as their agents, from placing or retaining STGMU Class Members in the STGMU or other SL5 unit without procedural protections;

F.      Grant the individually named plaintiffs compensatory, punitive, and nominal damages to for violations of the Eighth and Fourteenth Amendments to the U.S. Constitution and compensatory and nominal damages for violations of the Americans with Disabilities Act and the Rehabilitation Act;

G.      Grant compensatory, punitive, and nominal damages to STGMU Damages Class Members for violations of the Fourteenth Amendment to the U.S. Constitution.

H.      Grant compensatory, punitive, and nominal damages to Mental Health Damages Subclass Members for violations of the Eighth Amendment to the U.S. Constitution;

I.      Grant compensatory and nominal damages to Disability Damages Subclass Members for violations of the Americans with Disabilities Act and the Rehabilitation Act;

J.      Grant attorneys' fees and costs;

K.      Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court and there is reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction;

L.     Award such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs request a trial by jury with respect to all matters and issues properly triable by a

jury.


Respectfully submitted,

*/s/ Bret Grote*
Bret Grote (PA 317273)
*/s/ Nia Holston*
Nia Holston (PA 327384)
*/s/ Rupalee Rashatwar*
Rupalee Rashatwar (PA 331085)
PO Box 16537
Philadelphia, PA 19122
(412) 654-9070
bretgrote@abolitionistlawcenter.org
nia@alcenter.org
rupalee@alcenter.org

*/s/ Matthew A. Feldman*
Matthew A. Feldman (PA 326273)
PENNSYLVANIA INSTITUTIONAL LAW PROJECT
718 Arch St., Suite 304S
Philadelphia, PA 19106
215-925-2966
mfeldman@pilp.org

*/s/ Alexandra Morgan-Kurtz*
Alexandra Morgan Kurtz (PA 321631)
PENNSYLVANIA INSTITUTIONAL LAW PROJECT
247 Fort Pitt Blvd, 4th Fl.
Pittsburgh, Pa 15222
412.434.6004
amorgan-kurtz@pilp.org

*/s/ Will W. Sachse*
Will W. Sachse (PA Bar No. 84097)
Noah Becker (PA Bar No.327752)
Stormie Mauck (PA Bar No. 328048)
Dechert LLP
Cira Centre

2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-2496
will.sachse@dechert.com
*noah.becker@dechert.com*
*stormie.mauck@dechert.com*