IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PAGAN, et al.,** | : | No. 2:22-CV-01516 |
| Plaintiffs, | : | |
| | : | Magistrate Judge Brown |
| v. | : | Electronically Filed Document |
| **ARMEL, et al.** | : | |
| Defendants. | : | |

**BRIEF IN SUPPORT OF DOC DEFENDANTS' MOTION TO LIMIT EXPERT OPTION OF DAN POLCHOLKE PURSUANT TO FED. R. CIV. P. 702**

**I. Relevant Procedural History**

The Plaintiffs commenced this case by filing it as a proposed class action regarding PA DOC's now defunct Security Threat Group Management Unit ("STGMU") at SCI-Fayette, asserting claims under the Eighth and Fourteenth Amendments as well as the Americans with Disabilities Act and the Rehabilitation Act.

In support of class certification, the Plaintiffs have proffered the report of Dan Pacholke, who performed a stint as Secretary of the Washington State Department of Corrections from 2015-2016, and since 2018, has been engaged in a corrections consulting business.

Pacholke has proffered five opinions, three of which the DOC moves to strike. Pacholke's report summarizes the opinions subject to the motion as follows: (1) The STGMU was not a program in accordance with industry practice or definition; (Exhibit A, ¶¶ 72-94); (2) Defendants knowingly placed and kept prisoners with histories of mental illness in the STGMU and failed to adequately address the mental health needs of those in the unit. Defendants knew that the conditions in the STGMU damaged Plaintiffs' mental health but failed to change those conditions (Exhibit A, ¶¶127-165) ;  and (3) Defendants knew staff were unnecessarily and excessively using

force on Plaintiffs but did not intervene to protect Plaintiffs from harm and hold staff accountable (Exhibit A, ¶¶ 166-198).

## II. Standard of Review

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. *F.R.E. 702*.

## III. Questions Presented

A. Should Pacholke's opinion that the STGMU was "not a program in accordance with industry standard or definition" be excluded because his reasoning and methodology is unreliable?

    Suggested Answer: Yes

B. Should Pacholke's opinions that Defendants knew staff were unnecessarily and excessively using force on Plaintiffs be excluded because there are no Eighth Amendment Use of Force claims in the Amended Complaint, and Pacholke's opinions are not supported by the evidence he recounts?

    Suggested Answer: Yes

C. Should Pacholke's opinions about the adequacy of mental health treatment in the STGMU be excluded because he is not qualified to render opinions related to mental health treatment?

    Suggested Answer: Yes

D. Should Pacholke's subjective value judgments that conditions or practices were cruel be stricken because they are not the proper expert testimony and opine on the ultimate legal issue?

Suggested Answer:  Yes

### III. ARGUMENT

A.  Pacholke's opinion that the STGMU was "not a program in accordance with industry standard or definition" should be excluded because the reasoning and methodology is unreliable.

Pacholke espouses an opinion that the STGMU was "not a program in accordance with industry standard or definition." Exhibit A, Pacholke Report p.22 Pacholke does not state what the industry standard or definition of a program is, or the methodology he uses to come to his conclusion.  Without any objective definition of "program", Pacholke's opinion is not the proper subject of expert testimony.

The STGMU policy (6.5.1, Section 4) clearly sets forth the nature and purpose of the STGMU, defining it as  "an area of a facility used to house and provide programming to inmates who exhibit certain behavior in connection with their affiliation with a Security Threat Group (STG). The STGMU program consists of five phases. Inmates confined in a STGMU generally will receive programming and privileges as set forth in the STGMU Privileges and Services Chart (Attachment 4-A)."  Exhibit B, Section 4.A.; POLICY00019.  Attachment 4A describes the 5 phases of the STGMU in detail, with expanding privileges and services at each of the five phases. Exhibit B, POLICY00034-POLICY00038.  Moreover, attachment 4E describes the programming options at all five phases.  POLICY00042.

When confronted with the policy  description of the STGMU during the deposition, Pacholke admitted that the "the policy as it is written here seems relatively clear."  Exhibit C Pacholke Deposition, p. 52 l. 10 - 53 l. 20.   To support his assertion that the STGMU was not a legitimate correctional program, Pacholke pointed to the incorrect assertion that James Barnacle, the head of the Bureau of Intelligence and Investigation testified that STG membership was not

required to be placed in the STGMU.  Exhibit C p. 53 l. 20-24.  Barnacle, in fact, never testified to the statement which Pacholke attributes to him.  Barnacle testified that some of the people designated to go to the STGMU "might not be necessarily a gang member, but they have people under them in a crew, or an informal type of gathering, where they have enough influence to direct other people to do things that could cause a problem."  Exhibit D, Barnacle deposition excerpt.  Barnacle's testimony is entirely consistent with the definition of STG in the policy 6.5.1 which is "[g]roups of individuals who have been identified as a possible threat to the security, safety, and/or operation of the facility."  Exhibit B, POLICY 00018. This definition encompasses informal groups, not just formal gangs.  Pacholke misinterpreted Barnacle's testimony because he incorrectly assumed a definition of "STG" that was entirely synonymous with a formal street gang, and did not account for informal groups that may be formed in prisons which represent similar threats to security.  Policy 6.5.1 accounts for such groups in its definition of STG, and leaders of those groups were eligible to be housed in the STGMU.

Although Pacholke points to problems the named Plaintiffs had in progressing through the STGMU, Pacholke never considered the progression of any of the other potential class members who he acknowledged successfully completed the STGMU.  Exhibit C, p 48, l. 13-49, l. 2; p. 186 l. 11-15.  Therefore, he cannot reliably opine on the ability of inmates to progress through the program.  Pacholke may have criticisms over some of the STGMU's practices or its effectiveness, but he cannot opine that the STGMU was not a correctional program with the indicia of reliability required by Rule 704.

B.    <u>Pacholke's opines that Defendants knew staff were unnecessarily and excessively using force on Plaintiffs should be excluded because there are no Eighth Amendment Use of Force claims in the Amended Complaint, and Pacholke's opinions are not supported by the evidence he recounts.</u>

In his report, Pacholke reviewed multiple videos related to separate instances of use of force on inmates in the STGMU. Exhibit A, ¶166, *et. seq*. His opinions include that staff were "very quick to use force and made few attempts at deescalating before using OC" (*Id.,* ¶ 166); multiple strip searches occurred, often in OC contaminated cells (*Id.,* ¶¶ 167-168); decontamination procedures after OC spray were sometimes insufficient (*Id.*, ¶ 169); Pacholke had "concerns" about how the Intermediate Restraint system was applied (*Id.,* ¶ 170 ). Pacholke goes on to recount the videos he viewed and lists specific criticisms in each instance. None of the described instances involve the named Plaintiffs. There is no indication from Pacholke's report than any of the inmates mentioned in the report ever alleged that they were subjected to excessive force.

Federal Rule of Evidence 702 requires that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." The Supreme Court has found that "this condition goes primarily to relevance." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 591–92 (1993) "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (quotations and citation omitted). The proffered testimony must "fit" the facts of the case. *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 742–43 (3d Cir. 1994). "Fit" requires that the proffered testimony must in fact assist the jury, by providing it with relevant information, necessary to a reasoned decision of the case. *Id*.

Pacholke's opinions fail the relevancy and fit tests because there are no claims in the complaint related to excessive use of force against the Plaintiffs or any potential class members. Further, Pacholke's opinion that the Defendants knew staff were using excessive force is unreliable because it is unsupported by the evidence he recounts. The types of purported deficiencies identified by Pacholke are not constitutional violations. *See* e.g. *Gibson v. Flemming*, 837 F. App'x 860, 862 (3d Cir. 2020) (no constitutional violation when officer used OC spray to

prevent an inmate from harming himself; *Passmore v. Ianello*, 528 F. App'x 144, 148–49 (3d Cir. 2013) (twenty minute delay in decontaminating inmate after OC spray in order to assemble an extraction team did not violate the Eighth Amendment); *Brown v. Blaine*, 185 F. App'x 166, 169 (3d Cir. 2006) (no constitutional violation when inmate strip searched on three separate occasions when entering the RHU).  In fact, Pacholke does not recount a single instance where force was not applied in a good faith attempt to restore order.

Even if the complaint included a viable claim involving use of force, the Plaintiffs would have difficulty asserting them in a class action due to the fact-specific nature of such claims.  *See Black Lives Matter Los Angeles v. City of Los Angeles,* 113 F.4th 1249, 1260 (9th Cir. 2024) (protesters seeking class certification on use of force claim "will face an uphill challenge in showing that common questions exist, let alone predominate over individual ones.")

In summary, Pacholke's opinion that the Defendants knew staff were engaging in excessive force and failed to intervene must be excluded because it is both irrelevant to the allegations in the complaint and not supported by any evidence.

C. <u>Pacholke's opinions about the adequacy of mental health treatment in the STGMU should be excluded because he is not qualified to render opinions related to mental health treatment.</u>

It is undisputed that Pacholke is not an expert in mental health, as he has no mental-health related degrees.  . Pacholke admitted at his deposition that he is not versed on the details of what a provider has to do to treat a patient with mental illness.   Exhibit C, p. 179 , l. 19- 180, l. 3.  The parties have each retained separate mental health experts who have issued differing opinions on the adequacy of the Defendants' mental health treatment.   Pacholke, having no higher degree than a Bachelor of Arts, is not qualified to render such opinions. *See* Exhibit A, (CV appended to report), p. 6

Under the heading of his allegations that the Defendants failed to adequately address mental health needs, Pacholke criticizes the DOC's mental health employees for being "quick to label incidents of self-harm as behavioral or manipulative." Pacholke report, ¶133. Without proper qualifications, Pacholke is not able to make a judgment about whether a self-harm incident is behavioral or the product of mental illness. In another instance, Pacholke criticizes Dr. Saavedra's decision to place an inmate who engaged in self-harm in a camera cell rather than a psychiatric admission to the POC. ¶ 125. Again, Pacholke lacks the qualifications to determine whether or not a patient is appropriate for a POC admission. Pacholke makes a statement that "Based on my experience, having worked in and provided oversite of RHUs, prisoners in the STGMU displayed and described symptoms for which they received insufficient MH treatment or the treatment they did receive could not compensate for damaging impacts of the conditions they lived in." Report, ¶ 148. Pacholke is simply not qualified to render such opinions. *See Cox v. Glanz*, No. 11-CV-457-JED-FHM, 2014 WL 916644, at *3 (N.D. Okla. Mar. 10, 2014) ([T]o the extent that [corrections expert] would testify regarding *the adequacy of the medical/mental health care* at the Jail or opine that the medical records establish that [inmate] was properly treated at the Jail, [the corrections expert] has no medical training and no other qualifications that would provide a suitable basis for rendering a reliable opinion on medical or other matters outside of his field of expertise.") (emphasis added); *Bruner-McMahon v. Sedgwick Cnty. Bd. of Comm'rs*, No. 10-CV-1064-KHV, 2012 WL 33837, at *4–5 (D. Kan. Jan. 6, 2012) (corrections expert not qualified to give opinions regarding the adequacy of medical treatment).

Even if Pacholke was an expert in mental health, he does not cite the professional mental health standards for which he alleges that the Defendants fail short. While most employees in a prison system have some rudimentary mental health training, that training or experience is not

sufficient to make the kind of judgments that Pacholke makes in his report. *Algarin v. New York City Dep't of Correction,* 460 F.Supp.2d 469, 477 (S.D.N.Y.2006) ("An anecdotal account of one expert's experience, however extensive or impressive the numbers it encompasses, does not by itself equate to a methodology, let alone one generally accepted by the scientific community.")

D.  Pacholke's subjective value judgments that conditions or practices were  cruel should be stricken because they are not the proper expert testimony and opine on the ultimate legal issue.

Throughout his report, Pacholke makes numerous subjective value judgments, referring to restrictions or practices as cruel, without any regard as to whether courts have held those practices to be cruel and unusual in violation of the Eighth Amendment. Pacholke writes that "[d]epriving people locked in a cell with very little to help pass the time of something with which they could engage is cruel and a deviation from correctional norms." Exhibit A, ¶ 86. Pacholke calls Defendant Armel's grievance response unprofessional and cruel. Exhibit A, ¶ 101. Pacholke states it was "hard to appreciate the cruelty" of commissary restrictions; (*Id.* ¶ 105); and phone and visit restrictions were "cruel" (*Id.* ¶ 113); strip searching inmates before decontaminating their cells after OC use was cruel; (*Id.* ¶ 168, ¶ 171, ¶ 190) ; multiple strip searches were cruel, dehumanizing, and inappropriate, *Id.* ¶ 197). Such subjective value-judgements are not the subject of proper expert testimony. Courts have held that "the opinions of experts are entitled to little weight in determining whether a condition is 'cruel and unusual punishment' under the Eighth Amendment. *Madrid v. Gomez*, 889 F. Supp. 1146, 1159 (N.D. Cal. 1995). Pacholke subjectively opining about the cruelty of conditions or practices is a round-about way of trying to opine on the ultimate legal issue of whether a practice violates the Eighth Amendment. These opinions go beyond describing the effects of a condition on inmates. Pacholke cannot offer value judgments that conditions "are cruel" because such determinations constitute ultimate legal conclusions reserved exclusively for the fact-finder under the Eighth Amendment.

## IV. CONCLUSION

Based on the forgoing, the DOC Defendants request an order striking or limiting Pacholke's opinions as described herein.

Respectfully submitted,

Office of General Counsel

*/s/ Jeffrey M. Paladina*
Jeffrey M. Paladina
Assistant Counsel
Attorney ID # 81542
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050
Phone: 717-728-7763
Email: jpaladina@pa.gov

Date: December 17, 2025

*Counsel for Defendants former Superintendent Eric Armel, James Barnacle, Laurel Harry, Lucas Malishchak, Christopher Oppman, Scott Riddle, Tina Walker, and Trevor Wingard, all of the Pennsylvania Department of Corrections ("DOC" or "Department")*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PAGAN, et al.,** | : | No. 2:22-CV-01516 |
| Plaintiffs, | : | |
| | : | **Magistrate Judge Brown** |
| v. | : | **Electronically Filed Document** |
| **ARMEL, et al.** | : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

I, Jeffrey M. Paladina, hereby certify that on December 17, 2025, I caused to be served a true and correct copy of the foregoing document to the following:

<u>VIA ELECTRONIC FILING</u>

All counsel of record

*/s/ Jeffrey M. Paladina*
Jeffrey M. Paladina, Assistant Counsel