**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BELL, et al.,** | : | **No. 2:22-CV-01516** |
| Plaintiffs, | : | **Magistrate Judge Brown** |
| v. | : | **Electronically Filed Document** |
| **ARMEL, et al.** | : | |
| Defendants. | : | |

**DOC DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## I.    STATEMENT OF THE CASE

Our Courts have long held that "prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that are needed to preserve internal order and to maintain institutional security." *Williams v. Wingard*, 2016 WL 4701495, at *2 (W.D. Pa. Sept. 8, 2016) citing *Bell v. Wolfish*, 441 U.S. 520, 527 (1979); *see also Rhodes v. Chapman*, 452 U.S. 337, 349 (1981) n.14 ("[A] prison's internal security is peculiarly a matter normally left to the discretion of prison administrators."). The Supreme Court extended this deference "to prophylactic or preventive measures intended to reduce the incidence of [violence] or any other breaches of prison discipline." *Whitley v. Albers*, 475 U.S. 312, 22, (1986). The Security Threat Group Management Unit ("STGMU") was one such attempt at addressing the intractable dangers posed by Security Threat Group ("STG") activity, and its constitutionality has been repeatedly upheld on the same claims Plaintiffs assert. SMF ¶¶1-2. The now-closed STGMU was "a non-punitive program…designated for inmates who have poor prison adjustment, numerous misconducts, and/or known gang affiliations…" *Imes v. Wingard*, 2017 WL 1400143, at *2 (W.D. Pa. Feb. 21, 2017), *report and recommendation adopted*, 2017 WL 1405794 (W.D. Pa. Apr. 18, 2017) (noting STGMU inmates were coded as AC[1] status, but received "increasing opportunities for out-of-cell and group activities and privileges" as they progressed). Inmates

---

[1] Inmates housed in Restricted Housing Units ("RHUs") for their own safety or that of others are coded Administrative Custody ("AC"), as opposed to Disciplinary Custody ("DC"). SMF ¶¶3-4.

advanced through the five phases of the program by demonstrating their ability to follow rules and meet expectations, and each phase removed restrictions and added privileges. SMF ¶¶8-9, 85. The STGMU was not indefinite restrictive housing: it was a blueprint facilitating inmates' return to General Population ("GP"). SMF ¶¶8, 111.

Putative class representatives (hereafter "Named Plaintiffs") are inmates who, for varying lengths of time in various phases, were previously housed in the STGMU at SCI-Fayette.[2] *ECF 75, generally.* They assert that their STGMU confinement violated the Eighth and Fourteenth Amendments, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA"). *Id.* The evidentiary record and ample case law demonstrate that placement and confinement in the STGMU did not violate any constitutional or statutory right. Germaine to this analysis are the threshold issues that 1) qualified immunity applies to compensatory damages in light of the total lack of notice of any established constitutional right; 2) closure of the STGMU and subsequent policy changes render all injunctive relief moot; and 3) failure to exhaust in accordance with the Prison Litigation Reform Act ("PLRA") bars suit and recovery of monetary damages as to all unexhausted claims including all claims under the ADA and RA. Entry of Summary Judgment in the DOC Defendants' favor is appropriate.

The undisputed material facts in support of DOC Defendants' Motion for Summary Judgment are set forth in Defendants' Concise Statement of Material Facts, which is being filed contemporaneously with this Motion per Local Rule 56 and hereby incorporated.

---

[2] The STGMU program existed at several institutions prior to SCI-Fayette. SMF ¶¶5-7; only the program as it existed at SCI-Fayette from Fall 2020 to Winter 2023 is presently at issue. *ECF 75.*

## II.    STANDARD OF REVIEW

Summary Judgement shall be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Threshold inquiry is conducted on the need for a trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Courts must ask whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251*, see also Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no genuine issue of material fact. *See Anderson*, 477 U.S. at 248. Rule 56(e) does not allow a non-moving party to rely on bare assertions or conclusory allegations. *See Fireman's Insurance Company of Newark v. DeFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

## III.    ARGUMENTS

### A.  Qualified Immunity Applies to All Constitutional Claims

Qualified immunity balances holding "public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably;" and accomplishes this goal by immunizing government officials from liability under 42 U.S.C. § 1983 for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), *see also Reichle v. Howards*, 566 U.S. 658, 664 (2012) (noting *Pearson*'s holding that "courts may grant qualified immunity on the ground that a purported right was not "clearly established" by prior case law, without resolving the often more difficult question whether the purported right exists at all.").

Summary judgment on the basis of qualified immunity is required where it is applicable: recently, the Third Circuit reversed denial of summary judgment, specifying that for a right to be clearly established "existing law must clearly establish that what *this* officer did in *these*

circumstances violated the plaintiff's rights." *Urda v. Sokso*, 146 F. 4th  311, 314 (3d Cir. 2025)(reversing)(emphasis original) citing *Anderson v. Creighton,* 483 U.S. 635, 639–41 (1987)*, see also Tice v. Prisk,* 2025 WL 2797156, at *9 (M.D. Pa. Sept. 29, 2025) ("the Third Circuit recently made clear, the lack of guiding law alone is grounds for determining there is no "robust consensus of cases of persuasive authority" sufficient to clearly establish a right) (citing *Urda*).

Qualified immunity -uncontrovertibly applicable to prison officials and to inmate housing decisions[3]- explicitly prohibits liability for reasonable mistakes, protecting "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Two independent questions determine applicability: whether an official's conduct violated a right, and whether the right was clearly established at the relevant time; courts are permitted discretion as to which prong to address first. *Saucier v. Katz*, 533 U.S. 194, 201 (2001)*, Pearson*, 555 U.S. at 236. "[T]he court may forego difficult constitutional issues and award qualified immunity if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. In fact, the Supreme Court has stressed "that lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim." *Rivera v. Redfern*, 2023 WL 2139827, at *7 (M.D. Pa. Feb. 21, 2023), *aff'd*, 98 F.4th 419 (3d Cir. 2024) quoting *D.C. v. Wesby*, 138 S. Ct. 577, 589 n.7 (2018) and *Camreta v. Greene*, 563 U.S. 692, 707 (2011). Though ample evidence confirms DOC Defendants' conduct did not violate any right at any time, this line of jurisprudence requires only consideration of the total lack of any clearly established right to apply qualified immunity.

A court must first define the right allegedly violated and frame its precise contours before

---

[3] *See Rogers v. NJ DOC*, 2022 WL 4533848, at *4 (3d Cir. Sept. 28, 2022)(affirming applying qualified immunity to prison housing decision), *Sykes v. Carroll*, 477 F. App'x 861, 863 (3d Cir. 2012)(same, noting caselaw postdating defendants' conduct cannot abrogate qualified immunity).

determining if it was clearly established. *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012), *see also Busanet v. Wetzel*, 2023 WL 5003573, at *9 (E.D. Pa. Aug. 4, 2023). The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015) (emphasis original). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."[4] *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (*per curiam*). The matter at bar is whether the following right has been established: for an inmate, determined to threaten facility security and determined by mental healthcare professionals to have no contraindications for placement in restrictive conditions, to not be placed in a phased RHU program with a built-in path to return to GP. It has not.

To determine if a right has been clearly established, a court may look to cases from the Supreme Court, controlling circuit precedent, or "a robust consensus of cases of persuasive authority" from other circuit courts. *Porter v. Pa. Dep't of Corrs.*, 974 F.3d 431, 449 (3d Cir. 2020), *see also Spotz v. Wetzel*, 2024 WL 4231202, at *8 (M.D. Pa. Feb. 1, 2024), *report and recommendation adopted*, , 2024 WL 4225548 (M.D. Pa. Sept. 18, 2024) (holding defendants entitled to qualified immunity where Third Circuit previously expressly declined to decide if similarly situated inmates had a 14th Amendment procedural due process interest and requiring analysis of precise date right was established to determine application of qualified immunity to 8th Amendment). "[T]here must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally

---

[4] The necessity of this effort is apparently from the lengths Courts have gone to analyze the Capital Case Unit ("CCU") jurisprudence, looking not at the rights of inmates generally or even the rights of the subsection of inmates convicted of capital crimes generally but drilling down to "inmates convicted of capital crimes whose sentences were later reversed,' etc. *See e.g. Williams v. Sec'y Pennsylvania Dep't of Corr.* ("*Williams I")*, 848 F.3d 549, 571 (3d Cir. 2017). This case is not about the concept of solitary confinement: it is about the Plaintiffs' specific STGMU confinement.

prohibited."[5] *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001).

The Supreme Court has held that where certain conduct was previously judicially determined not to violate a right, qualified immunity applies unless the conduct at-issue was materially different from the conduct in the prior case or a new "controlling authority or a robust consensus of cases of persuasive authority" had emerged. *Plumhoff v. Rickard*, 572 U.S. 765, 779–80(2014). The *Castro v. Glunt, Imes v. Wingard, Simmons v. Overmyer, Sanchez v. Silbaugh,* and *Whitaker v. SCI-Fayette* cases[6] make clear that no constitutional rights were established regarding STGMU placement and confinement as of 2016, 2017, 2019, 2023, or 2024 as discussed below.[7]

---

[5] The Supreme Court and the Third Circuit have both repeatedly emphasized the importance of the clearly established authority requirement in the context of applying qualified immunity to claims addressing the administration of prisons. *See e.g. Taylor v. Barkes*, 135 S.Ct. 2042, 2044-45 (2015), *Michtavi v. Scism*, 808 F.3d 203, 207 (3d Cir. 2015), *Wesby*, 138 Sc.D. 577, 589-91 (2018).

[6] *Castro v. Glunt*, 2016 WL 6956828 (W.D. Pa. Oct. 19, 2016), *report and recommendation adopted sub nom. Castro v. Glunt*, 2016 WL 6988854 (W.D. Pa. Nov. 28, 2016), *Imes*, 2017 WL 1400143, *Simmons v. Overmyer,* 2019 WL 7283318 (W.D. Pa. Dec. 27, 2019), *Smith v. Smith*, 2023 WL 12070598 (W.D. Pa. May 10, 2023), *Sanchez v. Silbaugh*, 2023 WL 8852004 (W.D. Pa. Aug. 21, 2023), *report and recommendation adopted*, 2023 WL 8851779 (W.D. Pa. Dec. 21, 2023), *Whitaker v. SCI-Fayette*, 2024 WL 4479842 (W.D. Pa. June 3, 2024).

[7] The situation at hand is analogous to the state of law regarding confinement in the CCU pre-2017, when the Third Circuit found that "the case law in existence during Plaintiffs' continued confinement on death row *did not* adequately inform Defendants that the policy ran counter to Plaintiffs' protected liberty interests. Indeed, the limited precedent that existed on the topic suggested the contrary." *Williams I* (emphasis added). Courts have repeatedly examined the constitutionality of the STGMU and found no violations; additionally, it is appropriate to consider the 2014 DOJ investigation, which found that changes were appropriate to aspects of other DOC housing units holding SMI inmates (as discussed extensively below no SMI inmates were placed or maintained in the STGMU) but noted the existence of the STGMU and did not identify any necessary changes to the STGMU program or how the unit was run. SMF ¶ 11. DOJ closed its investigation into DOC in 2016, without at any juncture finding modification necessary to the STGMU. SMF ¶ 12. To the extent previous DOJ findings letters have been deemed to put DOC on notice of a constitutional violation, conversely the opposite must hold true that DOC is entitled to rely upon the DOJ findings letter's confirmation of no constitutional problem existing with the STGMU. *See Busanet* 2023 WL 5003573, at *13 (holding that 2014 DOJ findings letter specifically informed the DOC Secretary that DOC's placement of individuals with severe mental illness in RHUs violated the Eighth Amendment) and *Williams v. Sec'y Pa. Dep't of Corr.* ("*Williams II"*), 117 F.4th 503, 512 (3d Cir. 2024) (holding the same).

**B. Qualified Immunity Applies to Eighth Amendment Claim**

The Third Circuit has repeatedly examined the Eighth Amendment's contours regarding restrictive confinement and never found a violation in circumstances analogous to Plaintiffs'. In *Porter,* the Court specifically noted that non-analogous cases were not useful comparators, finding *Palakovic* "unavailing" because *Porter* dealt with a capital case inmate and *Palakovic* did not. *Porter* 400 U.S. at 450 (3d Cir. 2020), *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017). DOC was informed by the Courts time and again the STGMU did *not* violate the Eighth Amendment: in 2017, before any inmate was placed into the STGMU at SCI-Fayette, the DOC was notified through the *Imes* decision that placement of an inmate into the STGMU was within constitutional bounds. *Imes*, 2017 WL 1400143, at *6 (no Eighth Amendment violation arising out of STGMU placement). The same holding was reached repeatedly in subsequent years.[8]

At the outset, no claim can arise solely from placement in an RHU, as "the federal and state Pennsylvania courts unanimously have found that the harsh conditions of confinement in the various restrictive housing units in the Pennsylvania state institutions, including the most restrictive [units], without more, does not violate the Eighth Amendment." *Norris v. Davis*, 2011 WL 5553633, at *6 (W.D. Pa. Nov. 15, 2011) (collecting cases, specifically noting that in similar programs run out of RHUs including the SMU, SHU, and LTSU "it is within Plaintiff's own ability to earn his way out of restricted housing by modifying his behavior accordingly."); *see also Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997)(no 8th Amendment violation when administrative segregation not accompanied by denial of basic human needs, i.e. food, clothing, shelter,

---

[8] *See, e.g. Castro* 2016 WL 6956828, at *6 (granting summary judgment on 8th Amendment claim arising from STGMU confinement), *Whitaker* 2024 WL 4479842 at *12 (same), *Sanchez* 2023 WL 8852004 at *7 (same, specifically noting that inmate plaintiff's complaints were manifestations of his desire to be removed from the STGMU and were inconsistent with hallucinations or SMI), *Simmons*, 2019 WL 7283318 at *9 (same), *Smith* 2023 WL 12070598 at *4(dismissing 14th and 8th Amendment claims based solely on placement in the STGMU).

sanitation, medical care, personal safety), and *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992) (segregated detention "is not cruel and unusual punishment per se, as long as the conditions of confinement are not foul, inhuman[,] or totally without penological justification."). Some additional factor—a specific subset of inmate (e.g. who is seriously mentally ill ("SMI") or a capital case convict), extended duration, or particular circumstances of the condition—must be present to create an Eighth Amendment cause of action. *See Clark v. Coupe*, 55 F.4th 167 (3d Cir. 2022) (solitary confinement does not per se violate the Constitution); *Johnson v. Wetzel*, 209 F. Supp. 3d 766 (M.D. Pa. 2016) (same). The gradual establishment of rights associated with *Palakovic, Porter, Clark* and *Williams II* is not sufficient to demonstrate notice that confinement in the STGMU ran afoul of the 8th Amendment. *See Palakovic* 854 F.3d 209 (not determining clearly established right under Eighth Amendment for mentally ill inmate not to be incarcerated in solitary confinement for duration of stay), *Porter*, 974 F.3d at 449 (3d Cir. 2020) (finding qualified immunity applied to 8th Amendment claim where, prior to 2020, there was no previously established right for death row inmates not to be housed in solitary confinement indefinitely), *Williams II* 117 F.4th 503, and *Clark*, 55 F.4th at 182. Plaintiffs were not known or suspected to be SMI, nor confined for a length of time previously found unduly extended, nor confined under unconstitutional conditions: furthermore, their placements had valid penological justification.

i. **Plaintiffs Were Assessed Not to be Seriously Mentally Ill**

"Lest there be any confusion, we reiterate that we hold that individuals with a *known* history of *serious* mental illness have a clearly established right not to be subjected to prolonged, *indefinite* solitary confinement—*without penological justification*—by an official who was aware of that history and the risks that solitary confinement pose to someone with those serious health conditions." *See Williams II*, 117 F.4th at 524–25(emphasis original), *see also Clark*, 55 F.4th at 180 (defining the at-issue right as "the right of a prisoner known to be seriously mentally ill to not

be placed in solitary confinement for an extended period of time by prison officials who were aware of, but disregarded, the risk of lasting harm posed by such conditions"). Consistent with the jurisprudence that corrections officials' awareness of an inmate's status as SMI was key, *Palakovic* denied qualified immunity where it found both that the plaintiff was SMI and that his SMI status was known to the defendants prior to his placement in restricted housing. *Palakovic*, 854 F.3d at 234. In stark contrast, Plaintiffs were not known to be SMI or at risk from STGMU confinement.

DOC Defendants relied upon policy-required mental health screenings before and after STGMU placement and input from mental health professionals' frequent subsequent contacts with Plaintiffs, all of which determined that Plaintiffs were not SMI and possessed no contraindications to placement in the STGMU. SMF ¶¶18-61. DOC utilizes a mental health roster system[9] to ensure appropriate care for inmates, designating those with SMI as D code: roster designations were made by contracted psychiatric staff, not DOC Defendants. SMF ¶¶14-17. D roster inmates were not placed in the STGMU. SMF ¶30. Bell, Johnson, and Maldonado were at all times C roster, Pagan was moved from the B roster to the C roster, and Mazyck moved from the A roster to the C roster. SMF ¶18. Our Courts have repeatedly held that corrections officials are justified in relying upon health care providers' professional judgment. *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993)("Additionally, prison officials who are not physicians are entitled to defer to the medical judgment of staff physicians that they know are treating a prisoner."); *Spruill v. Gillis*, 372 F.3d 218, 236-37 (3d Cir. 2004)(holding that non-medical personnel may be held liable only if they

---

[9]DOC's mental health roster system places every inmate into one of four categories: 'A' roster refers to individuals without history of mental health treatment or current mental health treatment needs; 'B' roster refers to individuals who have received mental health treatment in the past but have no current treatment needs; 'C' roster refers to individuals who have current mental healthcare treatment needs but are not SMI; and 'D' roster refers to SMI inmates. SMF ¶¶14-16. No inmate placed in the STGMU was ever a D code, and the only inmate who became a D code during his placement in the STGMU was promptly removed from the unit. SMF ¶¶30, 62-67.

have a reason to believe that the medical personnel are mistreating or not treating a prisoner), and *Montanez v. Price*, 154 F.4th 127 (3d Cir. 2025)(citing *Spruill* to reaffirm that when a "prisoner is under the care of medical experts ..., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."*)*. Plaintiffs had frequent contact with mental healthcare providers. SMF ¶¶43-51. DOC Defendants had no reason to doubt the adequacy of the mental healthcare Plaintiffs received or the accuracy of their roster designations. SMF ¶¶18-61. Dr. Saavedra testified that he did not have any concerns about psychiatric harm in the STGMU and therefore did not raise concerns with correctional staff. SMF ¶¶56-57. This Court recently granted summary judgment on identical grounds where the record did not show defendants knew facts from which they could have inferred that program placement was not appropriate. *Blount v. Ackrom*, No. 22-1040, ECF 82 slip op. at *16-17 (W.D. PA Oct. 14, 2025); *see also Nifas v. Beard,* 374 Fed. Appx. 241, 245 (3d Cir. 2010) (where nothing in treatment plan indicated inmate's mental health would be seriously affected by AC confinement, "no reasonable juror could conclude from the record evidence that AC placement posed a substantial risk of serious harm to [inmate] or that the defendants were deliberately indifferent to his psychological condition"); *Farmer v. Brennan*, 511 U.S. 825, 845 (1994) ("prison officials who act reasonably cannot be found liable" under the 8th Amendment). Mental health professionals determined that the Plaintiffs were not SMI, such that caselaw pertaining to SMI inmates in restricted housing is non-analogous.

### ii. Finite Duration of Plaintiffs' Confinement

"There is no bright line defining where the duration of segregation becomes atypical." *Blount v. Mason*, 2023 WL 6276680, at *7 (M.D. Pa. Sep. 26, 2023). Instead, Courts turn to cases of like circumstances as guideposts in this determination. *See, e.g., Mitchell v. Horn*, 318 F.3d 523, 532 (3d Cir. 2003) (string citation comparing durations). Courts consistently use multiyear stints

in restrictive housing as the litmus test for Eighth Amendment claims asserting 'solitary confinement,' often citing the 33 years in *Porter* and the 20 years in *Noble*.[10] *See e.g. Washington v. Wetzel*, 2022 WL 1782509, at *8 (W.D. Pa. June 1, 2022), *aff'd*, 2024 WL 5154024 (3d Cir. Dec. 18, 2024). Viable claims asserting solitary confinement are rarely measured in months. *See e.g. Griffin*, 112 F.3d at 703 (fifteen months confinement did not violate 8th Amendment).

Housing in the STGMU was not indefinite. SMF ¶¶112-125. The path through the program to GP, (which was clearly defined and communicated to inmates) was meant to take roughly 360 days: the average number of days spent in the STGMU was 397 with an average of 87.8 days in Phase 5. SMF ¶¶114-119. Unlike CCU confinement which was based on criminal conviction rather than post-incarceration actions such that inmates were entirely unable to influence their housing short of criminal sentence modification, each inmate was confined in the STGMU only as long as it took him to successfully complete the phased program which he controlled via his behavior. SMF ¶111. Even if an inmate had remained in the SCI-Fayette STGMU "indefinitely"[11] they would still not have experienced a violation of their Eighth Amendment rights, since in this context 'indefinite confinement' only amounted to three years. SMF ¶¶108-125.

Bell was in the STGMU in Phase 5 for 538 days, Johnson for 504 days, and Maldonado for 518 days: all less than eighteen months. SMF ¶¶126-128. Mazyck was in the STGMU at SCI-Fayette for 704 days total with 155 days in Phase 5 and the rest in less restrictive phases, and Pagan

---

[10] *Noble v. Wetzel*, 2021 WL 6071490, at *3 (W.D. Pa., Dec. 21, 2021) (nearly twenty years of solitary confinement satisfied the objective Eighth Amendment standard)

[11] "A claim of indeterminacy is available to every inmate placed in administrative custody without a pre-established release date. To accord procedural due process protection on that basis without more would be inconsistent with *Sandin* 's formulation of "atypical and significant hardship," which is a retrospective inquiry. The actual time spent in segregation must be the threshold consideration when the duration itself is claimed to transgress a liberty interest." *Johnston v. Vaughn*, 2000 WL 1694029, at *2 (E.D. Pa. Nov. 13, 2000)

was in the STGMU for 1157[12] days total with 215 days in Phase 5 with the rest in less restrictive phases. SMF ¶129-132. Bell, Johnson, and Maldonado did not participate in programing and did not progress to lower phases with more privileges, but Maldonado and Pagan participated and progressed: Pagan successfully graduated to GP. SMF ¶¶126-132. No constitutional violation would have occurred even if Plaintiffs were held in the RHU for that entire time period without a pathway to release, but certainly did not where there was an achievable path back to GP: indeed, 76% of STGMU inmates successfully completed the STGMU program and returned to GP. SMF ¶134. The duration of Plaintiffs' STGMU confinement did not violate any clearly established right.

### iii. Conditions of Plaintiffs' Confinement in the STGMU

Only conditions depriving prisoners of life's necessities, i.e. food, water, clothing, shelter, and medical care, are violative of the Eighth Amendment. *Dongarra v. Smith*, 27 F.4th 174, 178 (3d Cir. 2022) (quoting *Rhodes*, 452 U.S. at 347-48). Plaintiffs' fulsome generalizations regarding "dreadful conditions" are simply not borne out by the factual record and indeed concretely contradicted. Every Plaintiff testified to his own ability to communicate with other inmates, as evidenced by their collaboration in the initial filing of this suit. SMF ¶¶193-195. Plaintiffs had consistent access to an exercise yard first five days a week then seven: other out of cell opportunities included thrice weekly showers, law library access, opportunities to speak with corrections counselors and mental health providers, and group programming in lower phases. SMF ¶¶147-154, 186. Nothing in the record demonstrates inadequate bedding, clothing, plumbing, ventilation, or temperature. SMF¶¶138-141. As discussed above the record unequivocally shows Plaintiffs had ample access to psychology and psychiatry care. SMF ¶¶34-55. Plaintiffs were not

---

[12] For several months of this period Pagan was actually not at SCI-Fayette at all, having been transferred elsewhere for court appearances. SMF ¶132.

deprived of food,[13] nor hygiene or personal property. SMF ¶¶138, 142-146, 190-192.  Plaintiffs had access to religious materials and regular chaplain visits, reading materials, mail, and telephone and visits privileges which increased as they progressed to lower phases.[14]SMF ¶¶ 157-178. STGMU inmates had access to educational programming and employment. SMF ¶¶158-160.  The use of security lighting at night has never been found unconstitutional,[15] nor is there an entitlement to quiet cell blocks.[16] SMF ¶¶187-189, 151. Additionally, as the typicality of the conditions of confinement is a key factor requiring comparison to less restrictive housing units, it is crucial to recall that for much of the at-issue time period no inmates in DOC in any housing unit, or the majority of corrections settings globally, had access to communal gatherings, meals, or in-person visits due to COVID mitigation restrictions. SMF ¶¶196-204.

---

[13] Even accepting Plaintiffs' assertions of occasional food tampering as fact, at no time has occasional deprivation of meals or isolated incidents of food contamination been held to rise to the level of a constitutional violation. *See e.g. Lindsey v. O'Connor*, 327 F. App'x 319, 321 (3d Cir. 2009)(only a substantial deprivation of food to a prisoner sets forth a viable Eighth Amendment claim), *Murray v. Allen*, 2010 WL 4159261 (E.D. Pa. Oct. 21, 2010) (collecting cases).

[14] *Henry v. DOC*, 131 Fed. Appx. 847, 850 (3d Cir 2005) (restriction to non-contact visitation does not "violate civilized standards of humanity and decency" for an 8th Amendment violation) citing *Overton v. Bazzetta*, 539 U.S. 126 (2003)), *see also Fantone v. Herbik*, 528 Fed. Appx. 123, 128 n.5 (3d Cir. 2013) ("denial of telephone and television privileges does not amount to cruel and unusual punishment").

[15] As noted by the Third Circuit in 2015 "[g]iven the general consensus among courts that some minimal level of constant lighting does not violate the Eighth Amendment, it would not be fair to say that the lighting [in the RHU] posed any obvious risk to inmate health and safety generally." *Spencer v. Sec'y DOC.,* 618 F. App'x 85, 89 (3d Cir 2015)(finding no 8th Amendment violation to arise from security lights that served legitimate penological interests of enabling corrections officers to identify and account for inmates in their cells, to monitor inmates' health and safety, and to monitor any threats to officers' own safety), *see also Easley v. Tritt,* 2021 WL 978815, at *9 (M.D. Pa. Mar. 16, 2021).

[16] *Whitney v. Wetzel*, 649 Fed.Appx. 123 (3d Cir. 2016) (allegation that banging on toilets and sinks in RHU caused excessive noise prevented plaintiff from sleeping and exposure to inmates throwing urine and feces does not meet objective criteria of conditions of confinement claim) (non-binding) cited by *Graziano v. Pa. Dep't of Corr.,* 2023 WL 6389756, at *19 (W.D. Pa. Sept. 30, 2023) (reaffirming Whitney holding that the noise has to be so excessive and pervasive that it posed a serious risk of injury).

Our Courts have repeatedly informed DOC Defendants that administrative confinement supported by penological justification may be "unpleasant," but that "so long as the conditions of that confinement are not foul or inhuman, and are supported by some penological justification, they will not violate the Eighth Amendment." *Thomas v. Tice*, 948 F.3d 133, 139 (3d Cir. 2020) cited in *Williams v. Poborsky*, 2024 WL 873671, at *9 (W.D. Pa. Feb. 7, 2024), *report and recommendation adopted,* WL 866867 (W.D. Pa. Feb. 29, 2024). At no time were DOC Defendants on notice that any conditions in the STGMU gave rise to an Eighth Amendment violation. As such, DOC Defendants are entitled to qualified immunity.

### iv.  Penological Justification for Plaintiffs' STGMU Housing

Our Courts have repeatedly affirmed that evaluation of Eighth Amendment claims may consider "whether officials 'had a legitimate penological purpose' behind their conduct." *Porter* 974 F.3d at 446 (quoting *Ricks v. Shover*, 891 F.3d 468, 475 (3d Cir. 2018))." "[L]egitimate penological justification can support prolonged detention of an inmate in segregated or solitary confinement…even though such conditions create an objective risk of serious emotional and psychological harm. Put simply, prison officials tasked with the difficult task of operating a detention center may reasonably determine that prolonged solitary detention of the inmate is necessary to protect the well-being of prison employees, inmates, and the public or to serve some other legitimate penological objective.") *Watson v. Wetzel*, 2024 WL 5096209, at *7–8 (E.D. Pa. Dec. 12, 2024)(granting summary judgement on 8th Amendment claim where conditions and duration of confinement were penologically justified)(internal citation omitted).

Precedent confirms justification for the STGMU's existence: in 2002, the Third Circuit explicitly found that New Jersey's STGMU  "meets the specific and legitimate penological interest of reducing the increased risk of violence presented by certain inmates." *Douglas v. McAnany*, 2012 WL 6763586, at *3 (W.D. Pa. Dec.21, 2012), *report and recommendation adopted sub nom.*

14

*Reid-Douglas v. McAnany*, 2013 WL 42377 (W.D. Pa. Jan. 3, 2013) citing *Fraise v. Terhune*, 283 F.3d 506, 520–523, (3d Cir.2002), *see also Shoats v. Horn*, 213 F.3d 140, 146 (3d Cir. 2000) (administrative custody appropriate where inmates prior actions "reasonably foreshadow future misconduct"). Recently the Third Circuit considered a different phased DOC program, finding no Eighth Amendment claim where the inmate's stay in restrictive housing was prolonged by his inability to advance through the phases.[17] *Jackson v. Unit Manager Knapp*, 2024 WL 4630195, at *9 (M.D. Pa. Oct. 30, 2024), *aff'd sub nom. Jackson v. Knapp*, 2025 WL 1895543 (3d Cir. July 9, 2025). Last year the Eastern District held that there was *no* clearly established right under the Eighth Amendment for a prisoner, even one known to be SMI, to not be placed in restricted confinement for an extended period of time by prison officials who were aware of the risk posed by such conditions but mindful of the prisoner's substantial and continuing disciplinary record. *Watson* 2024 WL 5096209 at *13(noting dissimilarity to *Porter* and *Williams II* fact patterns and stating "the Court's own research yields no Supreme Court precedent, controlling authority in the Third Circuit or robust consensus of cases of persuasive authority in the Courts of Appeals with a sufficiently similar fact pattern. And likely for good reason. Weighing any justification for restrictive confinement is a judgment call balancing the inmate's rights with the safety of all who occupy the prison."), *see also Williams v. Stickney*, 2025 WL 2200911, at *15 (E.D. Pa. July 31, 2025)(granting summary judgment on 8th amendment claim where restrictive housing placement had legitimate penological purpose), *Rosario v. Wetzel*, 2025 WL 755516, at *5 (W.D. Pa. Mar. 10, 2025), *aff'd*, 2025 WL 2452464 (3d Cir. Aug. 26, 2025)(same).

As for each individual's specific placement into the STGMU, housing decisions were based

---

[17] As discussed above the duration of STGMU confinement was within Plaintiffs' own control as there was a clear path for them to return to GP, unlike CCU confinement. SMF ¶¶83-85, 92-103.

on DOC Defendants' observations of their behaviors and choices, namely their active involvement in STG activities. SMF ¶¶68-76. In addition to their known affiliation in the Bloods, Plaintiffs had engaged in institutional disruptions including participating in and orchestrating assaults, extortion of other inmates, and possession of contraband: the risks each Plaintiff personally posed to institutional safety and security were severe and well documented. SMF ¶72, 77-81.

### C. Qualified Immunity Applies to Fourteenth Amendment Claim

A liberty interest under the Fourteenth Amendment has never been established for inmates in situations analogous to the Plaintiffs. Even if an interest existed, DOC Defendants had no notice that the process provided was insufficient such that qualified immunity applies.

### a. STGMU Placement Has Never Been Found to Create Liberty Interest

No Court has found a liberty interest for an inmate to be housed in any area or program: transfer "to a less amenable and more restrictive housing unit is well within the terms of confinement normally contemplated by a prison sentence and do not trigger a liberty interest." *Jackson* 2024 WL 4630195, at *12 citing *Wilkinson v. Austin*, 545 U.S. 209 (2005).[18]  Put simply, "an inmate does not have a right to be confined in any particular housing unit in a prison[;] absent certain atypical and significant hardship, when an inmate is placed in a restrictive custody unit, his

---

[18] It is clear that "confinement in administrative or punitive segregation will rarely be sufficient, without more, to establish the kind of 'atypical' deprivation of prison life necessary to implicate a liberty interest." *Blount v. Ackrom*, No. 22-1040, ECF 82 slip op. at *16-17 (even where PRC reports were allegedly inaccurate or incomplete, deficiencies did not deny inmate notice of the reason for his continued placement nor the opportunity to appeal) citing *Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002), *see also Mackey v. Smith*, 249 Fed. Appx. 953, 954 (3d Cir. 2007) (RHU placement not "considered an atypical and significant hardship if it is what a prisoner 'may reasonably expect to encounter as a result of his or her conviction."); *Rosa- Diaz v. Oberlander*, 2023 WL 6795805, at *3 (W.D. Pa. Oct. 10, 2023) (inmates "generally have no recognized liberty interest in particular programming" or in privileges such as structured out of cell time, kiosk or phone use, or employment); *Miskovitch v. Hostoffer*, 2010 WL 2404424, at *22 (W.D. Pa. May 19, 2010)("Using restrictions to promote social behavior falls within the parameters of a sentence imposed."), *report and recommendation adopted*, 2010 WL 2402934(W.D. Pa. June 10, 2010).

liberty interests have not been infringed." *Fantone v. Latini*, 780 F.3d 184, 186 (3d Cir. 2015), *see also Minor v. Overmyer*, 2022 WL 2826437, at *2 (3d Cir. July, 20, 2022).

Furthermore, our Courts repeatedly examined the liberty interest implications of placement into the STGMU program specifically. In 2017, the *Imes* Court specifically found that placement in the STGMU program was not an atypical or significant hardship relative to the ordinary incidents of prison life and did not create a liberty interest protected by the Due Process Clause, noting that the Third Circuit "has repeatedly found that placement in the New Jersey STGMU, a much stricter program than the STGMU program [in PA DOC], does not implicate a liberty interest." *See Imes* 2017 WL 1400143,  at *5 citing *Harris v. Ricci*, 595 Fed.Appx. 128, 131 (3d Cir. 2014)("transfer to [NJ DOC's] STGMU does not give rise to a protected liberty interest"). This holding was repeatedly reiterated: *Washington* 2022 WL 1782509, at *12; *Castro* 2016 WL 6956828 (granting summary judgment on Due Process claim where placement in STGMU did not create a liberty interest); *Whitaker v. SCI-Fayette*, 2024 WL 4479842, at *9 (same), *Martin v. Wetzel*, 2015 WL 8775610, at *2 (Pa. Commw. Ct. Dec. 15, 2015)(dismissing claim that housing in STGMU caused parole injury, finding no violation of 14th  Amendment), *Fraise v. Terhune*, 283 F.3d 506, 522-23 (3d Cir. 2002) ("Although inmates who are transferred to the [New Jersey] STGMU face additional restrictions, we hold that the transfer to the STGMU does not impose an atypical and significant hardship in relation to the ordinary incidents of prison life."); *Noble v. Wetzel* 2019 WL 4279975, at *5 (W.D. Pa. Aug. 1, 2019), *report and recommendation adopted*, 2019 WL 4279016 (W.D. Pa. 2019), *aff'd,* 2022 WL 16707071 (3d Cir. Nov. 4, 2022)(dismissing 8th and 14th  Amendment claims where PA STGMU restrictions not alleged to have been greater than those in *Fraise*); *Douglas* 2012 WL 6763586 (collecting cases finding no liberty interest).

The STGMU stands in stark contrast to the CCU, where a liberty interest was found to arise due to placement that was both indefinite and a function of criminal conviction rather than post-incarceration actions[19], such that penological justification was arguably lacking. Conversely, STGMU placement was not indefinite and was predicated on correctional adjustment, demonstrating penological justification. The duration of Plaintiffs' respective STGMU placements was comparatively brief: stays in disciplinary confinement (which is more restrictive than the AC custody Plaintiffs were held in) of as long as 930 days have been found not to give rise to a liberty interest. *Walton v. Harkleroad*, 2016 WL 11480713, at *9 (W.D. Pa. Mar. 3, 2016), *report and recommendation adopted sub nom. Walton v. Harkleroad*, 2016 WL 3963214 (W.D. Pa. July 21, 2016), citing *Young v. Beard*, 227 F. App'x 138, 141 (3d Cir. 2007); *Mearin v. Vidonish*, 450 Fed. App'x 100, 102 (3d Cir. 2011); *Smith v. Mensinger*, 293 F.3d 641, 652 (3d Cir. 2002); *Abney v. Walker*, 2007 WL 1454265, *3 (W.D. Pa. May 17, 2007). Confinement for seven[20] or six[21] years has been held to trigger a liberty interest: confinement for 7 months[22] or 15 months[23] has not. Accordingly, there has never been notice to the DOC Defendants that a liberty interest triggering due process existed concerning placement in the STGMU or confinement for the at-issue duration: therefore, qualified immunity applies.

### b. Process Received by Plaintiffs Has Never been Found to Be Insufficient

Where there was no liberty interest triggering due process, it is quite clear that no process was required under the Fourteenth Amendment. *See Imes* 2017 WL 1400143, at *4 ("Only if a plaintiff establishes that the nature of the interest is one within the contemplation of the liberty or

---

[19] *Porter* 974 F.3d 431, at 441 *and Williams I* 848 F.3d 549
[20] *Huertas v. Sec'y Pennsylvania Dep't of Corr.,* 533 F. App'x 64 (3d Cir. 2013).
[21] *Williams I* 848 F.3d 549.
[22] *Smith v. Mensinger*, 293 F.3d 641, 654 (3d Cir.2002).
[23] *Griffin* 112 F.3d 703.

property language of the Fourteenth Amendment, is the second step, i.e., determining what process is due, necessary."). However, assuming *arguendo* that a liberty interest could be found, our Courts have repeatedly held that the initial placement and review process Plaintiffs received and the appeal procedure available to them was sufficient under the Fourteenth Amendment such that qualified immunity would still apply.

At no time have DOC Defendants had notice that the process utilized to initially place inmates in the STGMU violated any constitutional right, as the voluminous line of cases regarding placement on the RRL has never found a Fourteenth Amendment due process violation in analogous matters, even though there is ostensibly a greater interest in not being on the RRL (which does not have a built-in pathway to GP) than in not being in a phase program designed for return to GP. SMF ¶¶82-85, *see e.g., Bowen v. Ryan*, 248 F. App'x 302 (3d Cir. 2007)(no due process violation in RRL placement). Inmates were able to appeal their placement. SMF ¶¶86-91.

Similarly, at no time have DOC Defendants had notice that the placement review process Plaintiffs received violated any constitutional right. All STGMU inmates were reviewed every 30 days by unit staff and reviewed at every 90 days by the Program Review Committee ("PRC"), and the record is clear that each Plaintiff received this process. SMF ¶92-103. The Third Circuit has held that on multiple occasions that "the periodic review offered to Pennsylvania inmates who are indefinitely confined in administrative confinement comports with procedural due process." *Bracey v. Sec'y Pa. Dep't of Corr.*, 686 F. App'x 130, 135-36 (3d Cir. 2017)(review every 90 days constituted sufficient due process), citing *Shoats v. Horn,* 213 F.3d 140, 144 (3d Cir. 2000), *see also e.g. Rivera v. Wetzel*, 2025 WL 388920, at *10–11 (W.D. Pa. Feb. 4, 2025) (same); *Harris v. Little*, 2025 WL 720089, at *8 (E.D. Pa. Mar. 6, 2025), *Williams v. Stickney* 2025 WL 2200911, at *10-11 (even if annual review of RRL status was not meaningful, no defendant could be found

liable in light of inmate's failure to present evidence that any defendant personally caused review to be perfunctory); *Huertas*, 533 Fed. Appx. at 67 (inmate "may disagree with prison officials' evaluation that ongoing administrative custody is justified by continuing security concerns, but he must show that the periodic reviews he receives are constitutionally inadequate"); *Wayne v. Wetzel,* 2024 WL 3696467, at *10 (E.D. Pa. Aug. 7, 2024).

Where case law establishes neither that STGMU placement triggered a liberty interest nor that the due process Plaintiffs received was insufficient, qualified immunity must apply.

### D. Mootness Prevents Any Form of Injunctive Relief

Injunctive relief is moot since no inmates are currently confined in the STGMU or have any reasonable expectation to ever be again, as the unit closed permanently at the end of 2023. SMF ¶10, 213-214. Our Courts have repeatedly held that "[a] claim for injunctive relief becomes moot when the underlying issue has been resolved or circumstances have changed such that there is no longer a need for the court to provide a remedy." *See Harris v. Thompson*, 2025 WL 1615954 (W.D. Pa. June 6, 2025); *Wayne* 2024 WL 3696467, at *4, *Hartnett v. Pa. State Educator Ass'n*, 963 F.3d 301, 308 (3d Cir. 2020) (noting that where there is no continuing injury, declaratory judgment is tantamount to an impermissible advisory opinion), *and Abdul-Akbar v. Watson*, 4 F.3d 195, 206-07 (3d Cir. 1993)(prisoner's transfer generally moots injunctive relief because he is no longer subject to challenged conditions).

Though voluntary cessation may not render a matter moot in and of itself, a plaintiff must have a reasonable expectation that the alleged violation will recur. *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 243 (2024) (voluntary cessation moots a case if there is no reasonable expectation that the alleged violation will recur). Government actors in their sovereign capacity and in exercise of their official duties are accorded a presumption of good faith when indicating that they have changed a policy and will not return to the old policy. *Sossoman v. Lone Star State*

*of Texas*, 560 F.3d 316, 325-26 (5th Cir. 2009)(holding that affidavit from prison administrator asserting that Department ended policy of preventing GP inmates on cell restriction from attending religious gatherings mooted out the case challenging that policy). Without evidence to the contrary, courts will assume that formally announced changes to official governmental policy are not mere litigation posturing for purpose of deciding whether policy change renders lawsuit against government moot. *Id; see also Richardson v. Bledsoe*, 829 F.3d 273, 278 (3d Cir. 2016)(holding that in order to obtain prospective injunctive relief, a plaintiff must "show that he is likely to suffer future injury from the defendant's conduct." )(citing *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012)).

The STGMU will never reopen, and DOC's RHU policy has been changed such that no current or hypothetical future unit could be identical to the conditions and parameters of the STGMU. SMF ¶207-215. Even if a unit opened with any comparable characteristics to the STGMU, inmates who were previously in the STGMU at SCI-Fayette would not necessarily be placed into it because housing determinations are based on current factors for each individual. SMF ¶¶217-218. There is no factual or legal support for the contention that Plaintiffs' claims are not entirely moot. *Wayne* 2024 WL 3696467, at *4 (finding mootness requires dismissal of suit where issues presented are no longer live).

Furthermore, permanent injunctive relief is impermissible as remedies respecting prison conditions are explicitly governed by 18 U.S.C.A. § 3626, which states

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a

criminal justice system caused by the relief.

18 U.S.C.A. § 3626(a).

Such relief is terminable upon the motion of any party "2 years after the date the court granted or approved the prospective relief; [or] 1 year after the date the court has entered an order denying termination of prospective relief…." 18 U.S.C.A. § 3626(b)(i-ii). If Plaintiffs were entitled to any form of injunctive relief, it would expire and not serve as an indefinite shield against hypothetical future restrictions. The STGMU has been closed for over two years and there is no credible basis to assert a reasonable belief that it will ever reopen, or that any Plaintiff would be placed there if it did. As such, all requests for injunctive relief are moot and must be dismissed.

### E. FAILURE TO EXHAUST UNDER THE PLRA

Entry of summary judgment is appropriate as to all claims which were not properly exhausted pursuant to the PLRA. It is well established that an inmate must exhaust his administrative remedies prior to filing litigation. 42 U.S.C. § 1997e(a); *see also Spruill at* 230 (3d Cir. 2004) (holding that PLRA's exhaustion requirement contains a procedural default component), *Ross v. Blake*, 578 U.S. 632, 635 (2016)(specifically barring carving out exceptions to exhaustion for special circumstances), *Woodford v. Ngo*, 548 U.S. 81, 84-85 (2006) (PLRA's exhaustion requirement is mandatory). Exhaustion is not excused "regardless of the relief offered by the administrative procedures." *Booth v. Churner*, 532 U.S. 731, 741 (2001); *see also Nyhuis v. Reno*, 204 F.3d 65, 78 (3d Cir. 2000) (noting no futility exception to the PLRA: "exhaustion of all administrative remedies [is] mandatory–whether or not they provide the inmate-plaintiff with the relief he says he desires"). The relevant requirements for exhaustion under DOC policy are well known to this Court and described at SMF¶¶219-231, *see also Jones v. Bock*, 549 U.S. 199, 218 (2007)("it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.") *and Obey v. Colley*, 2024 WL 4589227, at *2 (3d Cir. Oct. 28, 2024) (administrative

regulations govern inmate grievances for PLRA purposes).

The raison d'être of the PLRA's exhaustion requirement is to enable resolution of prison issues without court involvement, thus requiring notice of each individual's grievance. *Spruill*, 372 F.3d at 227 (Congress intended to give "correctional officials time and opportunity to address complaints internally before allowing the initiation of a federal case."), *see also Jones* 549 U.S. 199 at 204. To that end, DOC policy explicitly mandates individual notice by prohibiting the filing of a grievance on behalf of another inmate or a group of inmates. SMF ¶229. Every inmate must exhaust his own grievance to be entitled to relief. One inmate's exhaustion of his administrative remedies cannot vicariously exempt another's obligation under the PLRA, even when grieving the same issue or policy, since such a scheme would strip prison officials of the individualized notice the PLRA undoubtedly intended for them to receive prior to litigation. In some instances, District Courts[24] have found *-solely in the injunctive relief context-* that a single inmate's grievance may "vicariously exhaust" other inmates' grievances on the same topic. The nature of injunctive relief makes vicarious exhaustion practical on issues such as changing institution-wide policy or shuttering entire housing units, since such relief is not individualized and would apply equally apply to all inmates: this is not true of monetary damages. Other courts have required inmates who

---

[24] *Chimenti v. Wetzel*, 2018 WL 11412457, at *1 (E.D. Pa. Aug. 20, 2018), *Remick v. City of Philadelphia*, 2022 WL 742707, at *13 (E.D. Pa. Mar. 11, 2022). To date, the Third Circuit has not addressed vicarious exhaustion. Other circuits have held that vicarious exhaustion may be permitted in limited civil rights cases where the prisoner plaintiffs are certified as a class under Federal Rule of Civil Procedure 23(b)(2) and only for purposes of *injunctive* relief. *See, e.g.*, *Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004) (holding that "a class of prisoner-plaintiffs, certified under Rule 23(b)(2) *and seeking only injunctive and declaratory relief*, satisfies the PLRA's administrative exhaustion requirement through 'vicarious exhaustion,' i.e., when 'one or more class members ha[s] exhausted his administrative remedies with respect to each claim raised by the class.'") (alteration in original); *Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004) (addressing only *injunctive* relief under Rule 23(b)(2) and concluding that one plaintiff's exhaustion of administrative remedy was "enough to satisfy the requirement for the class").

seek damages in a class action lawsuit to file separate lawsuits. *See, e.g.*, *Jones v. Berge*, 172 F. Supp. 2d 1128, 1133–34 (W.D. Wis. 2001).

Each Plaintiff may recover damages or other relief only as to the claims that he individually grieved and administratively exhausted. Bell, Pagan, and Mazyck failed to exhaust their administrative remedies as to any relevant claim and therefore are not entitled to any form of relief. SMF ¶¶241-253. The subject matter of grievances not at issue in this civil action can be disregarded. *See Spruill*, 372 F.2d at 234. To the extent Maldonado and Johnson exhausted any grievances enabling them to bring any claims, their ability to potentially recover damages does not enable any other individual to do so. The only relevant grievances exhausted by Maldonado concern challenging his STG affiliation (971675) and not receiving a DC-ADM 802 form related to his placement in the STGMU (972500). SMF ¶¶254-265. The only relevant grievances exhausted by Johnson concern his placement in the STGMU by non-defendants (976498) and alleged falsification of a DC-702 by Wingard, Armel, and Walker and denial of programming by Riddle (985251). SMF ¶¶266-276. If qualified immunity and mootness did not already require dismissal of their claims Maldonado and Johnson could potentially proceed on each of their own individually exhausted claims, however Eighth and Fourteenth Amendment claims regarding any conditions or processes not grieved and exhausted must be dismissed as to all Plaintiffs, as must claims against all defendants not identified in any relevant exhausted grievance (Barnacle, Harry, Malischak, Oppman). *See Spruill* at 234.

The PLRA's exhaustion requirements apply not only to Section 1983 claims but also to "any other Federal law," including the ADA and RA. 42 U.S.C.A. § 1997e (West), *Porter v. Nussle*, 534 U.S. 516, 532 (2002). *Zamichieli v. Pa DOC*, 2022 WL 777201, at *2 (3d Cir. Mar. 14, 2022) *and Nickens v. Dep't of Corr.*, 277 F. App'x 148, 150 (3d Cir. 2008). SMF ¶233-235.

Bell, Maldonado, and Johnson[25] filed requests for disability accommodations but did not exhaust subsequent grievances related to those requests. SMF ¶¶236-240. No Plaintiff exhausted claims under the ADA or RA, therefore both claims must be dismissed entirely.

## IV.    CONCLUSION

Qualified immunity bars all of Plaintiffs' constitutional claims, and failure to exhaust under the PLRA bars most constitutional claims and all claims under the ADA and RA. Additionally, mootness prevents any injunctive relief. Summary Judgment should therefore be entered in favor of DOC Defendants.

Respectfully submitted,

Office of General Counsel
*/s/ Sarah J. Simkin*

Sarah J. Simkin, Assistant Counsel
Attorney ID #320646
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050
Phone: 717-873-0415
Email: ssimkin@pa.gov

Date: December 17, 2025              *Counsel for DOC Defendants*

---

[25] Johnson filed one grievance referencing the RA which was unconnected to his disability accommodation request and thus did not constitute proper exhaustion. SMF ¶¶240, 276.