**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **T. MONTANA BELL,** *et al.*, | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 2:22-cv-1516-MJH-CBB** |
| **v.** | ) | |
| | ) | |
| **PENNSYLVANIA DEPARTMENT OF** | ) | |
| **CORRECTIONS,** *et al.*, | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs respectfully submit this response in opposition to Defendants' Motion for Summary Judgment (ECF No. 184).[1] For the reasons below, the motion should be denied.

## LEGAL STANDARD

Summary judgment is inappropriate unless the movants show there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law. *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014). The court "may not make credibility determinations or engage in any weighing of the evidence." *Montone v. City of Jersey City*, 709 F.3d 181, 191 (3d Cir. 2013). Instead, the Court must construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in their favor. *Thomas*, 749 F.3d at 222.

## ARGUMENT

**I.    Defendants are not entitled to qualified immunity.**

Qualified immunity does not shield government officials from personal liability for constitutional violations unless they demonstrate that "the state of the law" at the time of their actions did not provide them with "fair warning . . . that their alleged conduct was unconstitutional." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation modified). When analyzing a qualified-immunity defense, courts ask whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right," and "whether the right was clearly established." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (citations omitted). Defendants bear the burden of establishing they are entitled to qualified immunity. *E.D. v. Sharkey*, 928 F.3d 299, 306 (3d Cir. 2019). When considering qualified immunity at summary judgment, it is especially important that courts "draw[ ] inferences in favor

---

[1] Pursuant to L.R. 56, Plaintiffs are simultaneously filing a responsive statement of facts ("Pls.' CSMF"), responding to Defendants' Concise Statement of Material Facts ("Defs.' CSMF").

of the nonmovant" and "take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan*, 572 U.S. at 657.

The Third Circuit takes "a broad view of what makes a right clearly established." *Mack v. Yost*, 63 F.4th 211, 232 (3d Cir. 2023) (citation modified). Courts look first to applicable Supreme Court cases and then to precedential Third Circuit opinions. *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 449 (3d Cir. 2020). If binding authority does not exist, courts "turn to persuasive authority in the Courts of Appeals and district courts." *Peroza-Benitez*, 994 F.3d at 167. Officials can "'be on notice that their conduct violates established law even in novel factual circumstances' as long as the law gives [them] 'fair warning' that their treatment of the inmate is unconstitutional." *Porter*, 974 F.3d at 449 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).[2]

### A.    Defendants violated Plaintiffs' clearly established right not to be subjected to indefinite solitary confinement without due process.

The Due Process Clause of the Fourteenth Amendment "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Individuals serving criminal sentences have a well-established constitutionally protected liberty interest in avoiding "restrictive conditions of confinement" that "'impose[] atypical and significant hardship on [them] in relation to the ordinary incidents of prison life.'" *Wilkinson v. Austin*, 545 U.S. 209, 222–23 (2005) (quoting *Sandin v. Conner*, 515 U.S. 472, 483–84 (1995)). Prison officials thus violate the Fourteenth Amendment when they keep incarcerated people in such conditions without providing adequate procedural protections, including "the essential requirements of due process"—"notice and an opportunity to respond."

---

[2] Defendants briefly note the individualized nature of the qualified-immunity inquiry. Defs.' Br. 3–4, ECF No. 187 (citing *Urda v. Sokso*, 146 F.4th 311, 314 (3d Cir. 2025)). But they do not discuss any of the individual Defendants' roles or individualized bases for their entitlement to qualified immunity. So they have forfeited any argument that the qualified-immunity analysis here should vary by Defendant. *See Carpenter v. Vaughn*, 888 F. Supp. 635, 648 (M.D. Pa. 1994).

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985); *accord Wilkinson*, 545 U.S. at 225–26; *see Sourbeer v. Robinson*, 791 F.2d 1094, 1101 (3d Cir. 1986) (explaining that "the most fundamental right of due process" is "a ***meaningful*** opportunity to be heard").

> **1.    Plaintiffs had a clearly established liberty interest in avoiding solitary confinement in the STGMU.**

Binding precedent provided Defendants with the requisite fair notice that they could not place and retain Plaintiffs and others like them in the STGMU without adequate procedural protections. To determine whether restrictive conditions of confinement impose an "atypical and significant hardship," courts consider the totality of the conditions, their impact on the plaintiff, their duration, and how they compare to conditions in the prison's general population. *See Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 560, 563–64 (3d Cir. 2017). In *Wilkinson*, the Supreme Court held that solitary-confinement conditions including a lack of human contact, 24-hour in-cell lighting, only one hour of daily out-of-cell exercise time, and indefinite duration with only annual reviews, gave rise to a liberty interest. 544 U.S. at 223–24;[3] *see also Williams*, 848 F.3d at 566–69 (highlighting "[t]he robust body of scientific research on the effects of solitary confinement" as a further basis for a liberty interest in avoiding indefinite solitary confinement); *Shoats v. Horn*, 213 F.3d 140, 163–64 (3d Cir. 2000) (holding that "eight years in administrative custody, with no prospect of immediate release in the near future" easily gave rise to a liberty interest).

Conditions in the STGMU were analogous to those the Supreme Court and Third Circuit have found sufficiently harsh to give rise to a liberty interest. Plaintiffs and other STGMU-confined individuals were subjected to extreme isolation, Pls.' CSMF ¶¶ 149, 165–168, 202, 277, 278, 287–

---

[3] Loss of parole eligibility, which was also discussed in *Wilkinson*, is not a necessary condition for establishing a liberty interest. *See Williams*, 848 F.3d at 560, n.55; *Brathwaite v. Phelps*, No. 10-646, 2023 WL 2709737, at *6 (D. Del. Mar. 30, 2023) (Bibas, J.).

290. Individuals in the STGMU were confined to their cells per policy for 23 hours per day, only permitted one hour of daily out-of-cell exercise time, five days a week. *Id.* ¶ 287. Only on Phase 3 did policy allow a mere two hours per week for out-of-cell educational, counseling, or wellness activities. *Id*. ¶ 289. Phase 2 only allowed an additional 30 minutes per week of out-of-cell activities. *Id*. ¶ 290. Even these meager out-of-cell opportunities formally permitted in policy were not regularly allowed. *Id*. ¶¶ 149, 186, 279, 293. When they did leave their cells, STGMU-confined individuals were subjected to invasive and dehumanizing strip searches, *id.* ¶¶ 279, 294–302, and placed in handcuffs and other restraints, *id.* ¶¶ 288, 292, 303–312. There were disorienting and sleep-disrupting levels of noise and 24-hour in-cell lighting. *Id*. ¶¶ 188–189, 284–286. In addition, there was little to no programming, *id*. ¶¶ 152–153, 157, 291, and there were extreme restrictions on individuals' ability to communicate with loved ones outside prison, *id.* ¶¶ 164–168.

These conditions are essentially the same as—or even harsher than—those the Supreme Court and the Third Circuit have identified as imposing a significant hardship. *See Wilkinson*, 545 U.S. at 223–24; *Williams*, 848 F.3d at 554–55, 562–64; *Shoats*, 213 F.3d at 140. Indeed, in the Capital Case Unit ("CCU"), which the court found sufficiently harsh to trigger a liberty interest for the plaintiffs in *Williams*, one of the plaintiffs received more than two hours of daily out-of-cell time. *Williams*, 848 F.3d at 555; *see also Porter*, 974 F.3d at 436 (describing the CCU as permitting 2 hours of daily out-of-cell time).

Like the incarcerated individuals in *Wilkinson*, *Williams*, and *Shoats*, Plaintiffs' confinement in the STGMU was indefinite because there was "no maximum period for [their] placement" in the unit. *Williams*, 848 F.3d at 562; *accord Wilkinson*, 545 U.S. at 214–15; *see* Defs.' CSMF ¶ 108; Pls.' CMSF ¶¶ 109, 114–117. The indeterminate nature of STGMU confinement is reinforced by Plaintiffs' long durations in the unit. Plaintiff Bell was in the STGMU for 18 months;

4

Plaintiff Johnson for 15; Plaintiff Maldonado for 20 months; Plaintiff Pagan for 32 months; and Plaintiff Mazyck for 23 months (at which point he reached his maximum prison sentence and was released). *See* Defs.' CSMF ¶¶ 126–28, 130, 132; *see also* Pls.' CSMF ¶ 399 (stating an average length of time in the STGMU of 2.1 years and a maximum of 6.3 years).

While the combination of the duration and indefiniteness of Plaintiffs' STGMU confinement is sufficient on its own to trigger a clearly established liberty interest, further support for Plaintiffs' liberty interest comes from the amounts of time they spent in solitary confinement immediately prior to their placement in the STGMU. *See Stuart v. Pierce*, 587 F.Supp.3d 127, 139 n.5 (D. Del. 2022) (Restrepo, J.) (considering cumulative duration in solitary, not just the period at issue in the case). Immediately prior to their transfer to the STGMU at SCI Fayette, Plaintiffs Bell and Johnson spent 4 months in solitary, Plaintiff Maldonado 15 months, Plaintiff Pagan 14 months, and Plaintiff Mazyck 11 months. Pls.' CSMF ¶¶ 407, 412, 419, 421, 425. They thus had total durations in solitary confinement of 22, 19, 35, 46, and 34 months, respectively. So, while indefiniteness is sufficient on its own, Plaintiffs' total durations in solitary confinement reinforce that any reasonable prison official would have known they were entitled to due process. *See Brathwaite*, 2023 WL 2709737, at *7 (noting that, by 2007, it was clearly established that "around three years" in solitary confinement, even without indefiniteness, gave rise to a liberty interest).

In addition, STGMU confinement was surely "atypical." *Shoats*, 213 F.3d at 144. By any measure, placement in prolonged and indefinite solitary confinement in a unit like the STGMU "present[s] a dramatic departure from the basic conditions of the inmate's sentence." *Wilkinson*, 545 U.S. at 223 (citation modified). The unit only held up to 50 people, Defs.' CSMF ¶ 139, out

of a total incarcerated population within the DOC of approximately 38,000.[4] Thus, at any given time, only about 0.1 % of the DOC population was in the STGMU. In fact, the vast majority of individuals that the DOC suspects of being involved in security-threat-group activity were never placed in the STGMU. *See* Pls.' CSMF ¶ 314 (estimating "four- or five-thousand suspected and validated inmates"). Moreover, conditions in the STGMU were harsher than in the DOC's typical solitary-confinement units. *See id.* ¶¶ 280, 282, 285; *but see Williams*, 848 F.3d at 564 (holding the "baseline" is general population, not other solitary-confinement units).

Finally, Plaintiffs' mental-illness symptoms and their resulting increased vulnerability to the harms of solitary confinement, provide an additional basis for their liberty interest in avoiding STGMU placement. *See* Pls.' CSMF ¶¶ 18–23, 333–335, 349–354, 358–365, 367–398; *Finley v. Huss*, 102 F.4th 789, 815 (6th Cir. 2024); *see also Williams*, 848 F.3d at 569 (referring to the "deep and long-term psychic harm" caused by solitary confinement as "the essence of the atypical and significant hardship inquiry"). "[E]very court to reach the issue has endorsed the consideration of inmate-specific vulnerabilities" in the atypical-and-significant-hardship analysis. *Finley*, 102 F.4th at 814 (collecting cases); *see also Wilkinson*, 545 U.S. at 222 (focusing on whether conditions impose "atypical and significant hardship ***on the inmate***" (emphasis added) (citation omitted)). This "robust consensus of persuasive authority" is sufficient to clearly establish Plaintiffs' liberty interest. *El v. City of Pittsburgh*, 975 F.3d 327, 340 n.7 (3d Cir. 2020).

Defendants' counterarguments are easily disposed of. First, their reliance on a nearly 25-year-old case about New Jersey's STGMU misses the mark. *See* Defs.' Br. 17 (citing *Fraise v. Terhune*, 283 F.3d 506, 522–23 (3d Cir. 2002)). *Fraise* precedes the Supreme Court's decision in

---

[4] At any given time, the DOC held from roughly 36,501 to 38,942 people in state prisons from 2020 to 2023. *See* https://www.pa.gov/agencies/cor/about-us/research-and-statistics/reports-and-dashboards [https://perma.cc/4P7S-XZJM].

*Wilkinson*, so it cannot be relied on. In addition, the scientific understanding of the harms of solitary confinement is dramatically different from when *Fraise* was decided, detracting from its relevance. *See Porter*, 974 F.3d at 444 (explaining that, since "the research and caselaw have advanced considerably since" a prior case had been decided, the prior case "is not controlling here"). Second, the unreported district court cases on which Defendants attempt to rely are all distinguishable factually and, in any event, cannot trump binding precedent. Finally, Defendants' reference to the alleged "penological justification" of STGMU confinement has no place in the due-process analysis. *See Wilkinson*, 545 U.S. at 224; *Williams*, 848 F.3d at 566. "It is the conditions themselves that determine whether a liberty interest in implicated," not prison officials' reasons for subjecting incarcerated individuals to those conditions. *Williams*, 848 F.3d at 566.

Since Plaintiffs had a clearly established liberty interest in avoiding placement and retention in the STGMU, Defendants were required to provide them with due process.

### 2.    Binding precedent provided Defendants fair notice that STGMU placement and retention lacked the requisite procedural safeguards.

Before incarcerated individuals can be placed in units like the STGMU, they must be given "notice of the factual basis leading to consideration for . . . placement and a fair opportunity for rebuttal" because these "are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *Wilkinson*, 545 U.S. at 225–26. And once they are in prolonged or indefinite solitary confinement, it is clearly established that the Due Process Clause requires "regular and meaningful review of [their] continued placement . . . , including a statement of reasons for the continued placement, meaningful opportunity to respond to the reasons provided, and a hearing." *Porter*, 974 F.3d at 440 (citation modified); *see also Hewitt v. Helms*, 459 U.S. 460, 472, 477 n.9 (1983). "The kind of meaningful review *Hewitt* prescribes . . . contemplates that correction officers will use institutional safety and security (or another valid administrative

justification) as their guiding principles." *Thorpe v. Clarke*, 37 F.4th 926, 945 (4th Cir. 2022) (citation modified). This is necessary because "administrative segregation may not be used as a pretext for indefinite confinement." *Hewitt*, 459 U.S. at 477 n.9; *see Thorpe*, 37 F.4th at 945-46 (citing robust consensus of cases); *see also Wilkinson*, 545 U.S. at 229 (affirming continuing vitality of *Hewitt* with respect to appropriate level of procedural safeguards). The incarcerated individual must be provided a "statement of reasons" for the decision to place or retain them in solitary confinement, and that statement of reasons must be sufficient to "serve[] as a guide for future behavior." *Wilkinson*, 545 U.S. at 226.

The decision to place an individual in the STGMU was made by a group of officials pursuant to a confidential policy. Pls.' CSMF ¶¶ 431, 434, 456. Plaintiffs never saw the policy, did not know who made the decision, were not afforded the opportunity to review evidence or information being considered by the decisionmakers, and were never provided a hearing with the decisionmakers. *Id.* ¶¶ 431, 433–455. Critically, individuals being considered for placement in the STGMU were not told specific information that was the basis for the determination that they were involved in a security threat group, the supposed *sine qua non* for placement in the unit. *Id.* ¶¶ 429, 430, 436, 447. Evidence that remains secret from the individual it is being used against *ipso facto* violates the due process requirement to provide notice. *See Wilkinson*, 545 U.S. at 225–26.

Regarding continued confinement in the STGMU, unlike in the cases cited by Defendants that involve PRC reviews for those held in the RHU, the PRC did not have the authority to remove individuals from the STGMU. Pls.' CSMF ¶ 456. The decision to remove somebody from the STGMU, and therefore from solitary confinement altogether, could only be made by the Regional Deputy Secretary, not the PRC. *Id.* Although PRC could move people from one phase to another, at best that could lead to minor alterations in privileges or restrictions afforded within the unit. But

this phase progression within the STGMU did not—and could not—result in removal from solitary confinement. Even these movements between phases, however, were subject to arbitrary decision making, as individuals could be prevented from advancing through the phases even if they complied with all institutional rules. *See id.* ¶¶ 457–466. Moreover, the STGMU policy permitted extending phases or sending individuals back to earlier phases based on vague and subjective criteria, leaving them with no guidance on what they could do to advance. *See id.* ¶¶ 8, 9, 103, 109–113, 126. That individuals could be denied advancement (and thus the possibility of release from solitary confinement) for these sorts of vague and arbitrary reasons is at odds with the clearly established requirements that safety and security be the basis for decision making, *see Thorpe*, 37 F.4th at 945 (citing *Hewitt*, 459 U.S. at 477 n.9), and that individuals be provided with sufficiently specific reasons for their continued placement to guide their future behavior, *Wilkinson*, 545 U.S. at 226. Defendants are therefore not entitled to qualified immunity on Plaintiffs' Fourteenth Amendment claim.

**B.    Defendants violated Plaintiffs' clearly established Eighth Amendment rights.**

Defendants violated Plaintiffs' clearly established Eighth Amendment rights by placing and keeping them in prolonged solitary confinement in the STGMU despite their obvious symptoms of serious mental illness, including suicidality and self-injurious behavior. Plaintiffs Bell, Johnson, and Pagan had histories of mental illness prior to their placement in the STGMU. Pls.' CSMF ¶¶ 358–365. Defendants knew this but placed them there anyway and then kept them there despite their decompensation. *Id.* ¶¶ 18, 19, 21, 23, 349–350, 352 367–373, 385–393. Plaintiffs Maldonado and Mazyck began exhibiting symptoms of serious mental illness while in the STGMU, but Defendants kept them there anyway. *Id.* ¶¶ 20, 22, 351, 353, 354, 374–384, 394–398. Since Defendants were aware of the grave risks solitary confinement poses to individuals with mental illness, they violated Plaintiffs' clearly established Eighth Amendment rights. *Id.* ¶¶ 327–348, 355.

Properly framed, the Eighth Amendment right at issue here is the right of incarcerated individuals exhibiting symptoms of serious mental illness not to be placed in prolonged solitary confinement by officials aware of the risk such conditions posed to them. Unlike Defendants' definition of the right, *see* Defs.' Br. 5, this framing: (1) is specific to Plaintiffs' Eighth Amendment claim; (2) includes Defendants' knowledge of Plaintiffs' symptoms and the risks solitary posed to them, *see Clark v. Coupe*, 55 F.4th 167, 182 (3d Cir. 2022); and (3) properly omits Defendants' purported reasons for placing Plaintiffs in solitary, *see id.* (defining the right without reference to the reasons defendants placed the individual in solitary); *Williams v. Sec'y Pa. Dep't of Corr.*, 117 F.4th 503, 517 (3d Cir. 2024) (same).

The "touchstone of an Eighth Amendment analysis has long been . . . the health of the inmate," not the reason he was placed in the conditions he is challenging. *Williams*, 117 F.4th at 522 (citation modified); *see also Clark*, 55 F.4th at 177 n.9 ("Why a prisoner is placed in solitary confinement is not an element in challenging that condition."). Moreover, focusing on Defendants' purported reasons for placing Plaintiffs in the STGMU presumes that the STGMU was a viable program that served a valid penological purpose. *But see* Pls.' CSMF ¶¶ 1, 9, 111, 153, 157, 179,

291. Since those are disputed facts, they have no place in the court's framing of the right. *Tolan*, 572 U.S. at 657.[5]

The Third Circuit's decisions in *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017), and *Clark* conclusively establish that Defendants are not entitled to qualified immunity on Plaintiffs' Eighth Amendment claim.

In *Palakovic*, the court held that allegations that DOC officials were aware of Brandon Palakovic's serious mental illness, but nonetheless permitted him to be repeatedly placed in solitary confinement, were "more than sufficient" to state an Eighth Amendment conditions-of-confinement claim, especially "in light of the increasingly obvious reality that extended stays in solitary confinement can cause serious damage to mental health." 854 F.3d at 226. Mr. Palakovic, who had a known history of mental illness, suicide attempts, and suicidality, was placed in solitary confinement for "multiple 30-day stints" over the course of thirteen months. *Id.* at 216–17. The court vacated the dismissal of the Eighth Amendment claim against the DOC Secretary and other "supervisory officials" because their roles with respect to "policies and practices" made them "indirectly responsible" for Mr. Palakovic's repeated solitary confinement. *Id.* at 225–26.

In *Clark*, the court held that prison officials who, in 2016, kept a man "in solitary confinement for seven months despite knowing of his serious mental illness" were not entitled to qualified immunity on his Eighth Amendment conditions-of-confinement claim because "the

---

[5] This is the exact error the court made in *Watson v. Wetzel*. *Contra* Defs.' Br. 14. When the *Watson* court was analyzing the merits of the plaintiff's Eighth Amendment claim, it held that a reasonable jury could find that keeping him in prolonged solitary confinement was not justified by a penological purpose. *Watson v. Wetzel*, No. 23-3246, 2024 WL 5096209, at *8 (E.D. Pa. Dec. 12, 2024). But them, contrary to *Tolan*, the court resolved that factual dispute in the defendants' favor when it defined the right at issue for qualified-immunity purposes. *See id.* at *13 ("This framing incorporates . . . any penological justification for keeping him in restricted confinement.").

circumstances of his time spent in solitary confinement violated rights long protected by Eighth

Amendment jurisprudence." 55 F.4th at 173, 181, 182. Prison officials placed and retained the

plaintiff in solitary confinement in response to his behavior. *Id.* at 173. Nonetheless, the court held

that his solitary confinement served "[n]o penological purpose," given the damage it inflicted on

his mental health. *Id.* at 183.

These precedents provided DOC Defendants with the requisite fair notice that placing and

keeping Plaintiffs in prolonged, indefinite solitary confinement in the STGMU violated their

rights.[6] Indeed, Plaintiffs were in solitary for far longer than the individuals in *Palakovic* and *Clark*.

While *Palakovic* and *Clark* dealt with individuals in solitary for, respectively, multiple 30-day

stints in a thirteen month period and seven months, *Palakovic*, 854 F.3d at 217; *Clark*, 55 F.4th at

173, Plaintiffs here were all in the STGMU for well over a year, with their durations in the STGMU

ranging from nearly 18 to 32 months. *See* Defs.' CSMF ¶¶ 126–28, 130, 132. Moreover, as

Defendants knew, each of the Plaintiffs was transferred to the SCI Fayette STGMU from another

solitary-confinement unit, meaning their total durations in solitary were even longer. Pls.' CSMF

¶¶ 407, 412, 419, 421, 426. *See Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992) (emphasizing

the importance of duration when evaluating the constitutionality of solitary confinement); *Stuart*,

587 F.Supp.3d at 139, n. 5. And, just like Plaintiffs here, the individuals in *Palakovic* and *Clark*

---

[6] The unreported district court cases regarding the STGMU on which Defendants attempt to rely do not alter this conclusion. Defs.' Br. 6 n.6. Neither *Imes* nor *Castro* involved individuals with mental illness. *Sanchez v. Sillbaugh* addressed an adequacy-of-care claim against a psychiatrist, not a conditions-of-confinement claim against prison officials. No. 20-1005, 2023 WL 8852004, at *6–7 (W.D. Pa. Aug. 21, 2023). The Eighth Amendment claim in *Whitaker v. SCI-Fayette* was not premised on allegations that STGMU confinement deleteriously affected the plaintiff's mental health. No. 22-38, 2024 WL 4479842, at *3–5, 11–12 (W.D. Pa. Jun.13, 2024). And, in *Simmons v. Overmyer*, the court **denied** the defendants' motion to dismiss the plaintiff's Eighth Amendment claim based on the STGMU conditions' deleterious effects on his mental health. No. 18-201, 2019 WL 7283318, at *9 (W.D. Pa. Dec. 27, 2019).

were placed in solitary confinement due to allegations of misbehavior in prison. *Palakovic*, 854 F.3d at 216; *Clark*, 55 F.4th at 17; *see also Toussaint v. McCarthy*, 801 F.2d 1080, 1093 (9th Cir. 1986) ("The Eighth Amendment is not a 'maybe' or a 'sometimes' proposition. . . . The right does not vary depending on the threat that the individual prisoner presents to institutional security.").[7]

While *Palakovic* and *Clark* are sufficient on their own to defeat Defendants' qualified-immunity defense, further support comes from the United States Department of Justice's 2014 findings letter about the DOC's use of solitary confinement on individuals with serious mental illness. Defs' Ex. N at 1–28; *see Williams*, 117 F.4th at 519–22 (relying on same DOJ letter to deny former DOC Secretary qualified immunity); *id.* at 531–55 (complete DOJ letter appended to opinion). This letter, which was sent to the DOC Secretary and every state-prison superintendent in the state (including Defendants Harry and Wingard), Defs.' Ex. N at 25–28, informed the DOC, relying on precedent, case studies, and statistics, that its "practice of knowingly holding seriously mentally ill prisoners in solitary confinement for extended periods of time was cruel and unusual," *Williams*, 117 F.4th at 519–20.

"The significance of the 2014 DOJ report simply cannot be ignored." *Id.* at 521. That the letter may not have explicitly called for changes to the STGMU specifically is of no moment. *See*

---

[7] Cases that, Defendants claim, "confirm[] justification for the STGMU's existence," are not on point and do not support their alleged entitlement to qualified immunity. Defs.' Br. 14. *Fraise* concerned a STGMU in an entirely different prison system and did not even address an Eighth Amendment claim. 283 F.3d at 520–23. The Third Circuit's nonprecedential decision in *Jackson v. Knapp* concerned "a different phased DOC program," Defs.' Br. 15, and addressed PLRA exhaustion, COVID exposure, and cold temperatures, not solitary confinement. No. 24-3183, 2025 WL 1895543, at *2–3 (3d Cir. Jul. 9, 2025). *Williams v. Stickney* was not about mental illness and lacked detail about the conditions of plaintiff's confinement. No. 22-214, 2025 WL 2200911, at *12–15 (E.D. Pa. Jul. 31, 2025). And, in *Rosario v. Wetzel*, the court did not address the impact the conditions had on the plaintiff in light of his mental illness and placed great weight on the plaintiff's assaultive behavior while he was in solitary, making it easily distinguishable. No. 23-966, 2025 WL 755516, at *3–5 (W.D. Pa. Mar. 10, 2025).

Defs.' Br. 6 n.7. The letter addressed the placement of individuals with serious mental illness in solitary-confinement units, generally, and it explicitly included the STGMU as an example of one such unit, noting that all except for "a small minority" of STGMU-confined individuals received just as little out-of-cell time as individuals in other solitary-confinement units. *See* Defs.' Ex. N at 2–5 & n.6. The remedial measures the DOJ prescribed were targeted at "solitary confinement" and "isolation," generally, not any one particular unit. *See id.* at 22–24. The letter did not identify the Capital Case Unit ("CCU") by name either as a unit in need of reform. But that did not stop the court in *Williams* from holding that the letter provided notice to the DOC Secretary that he could not keep the seriously mentally ill death-sentenced plaintiff there in prolonged solitary confinement. The letter even noted that CCU-confined individuals had recently started receiving an additional hour of daily out-of-cell time. Defs.' Ex. N at 5 n.6. The court in *Williams* **still** relied on the letter in denying the DOC Secretary qualified immunity. *Williams*, 117 F.4th at 519–22.

Defendants' attempt to sidestep the relevance of *Palakovic*, *Clark*, and the DOJ letter is at odds with binding precedent. *See* Defs.' Br. 8–10. Defendants dispute the severity of Plaintiffs' mental illness, relying on Plaintiffs' Mental Health Roster designations, evaluations by DOC staff, and their expert's conclusions. *See id.* But these are disputed facts, so they have no place in the court's qualified-immunity analysis at summary judgment. *Tolan*, 572 U.S. at 657; *see* Pls.' CSMF ¶¶ 18–23, 349–354, 358–365, 367–398. Indeed, in *Williams*, the plaintiff had a "C" designation on the Mental Health Roster, meaning the DOC did not consider him to have a serious mental illness. 117 F.4th at 516. But that was "not dispositive" because there was a genuine dispute of fact as to whether he had serious mental illness. *Id.* at 516 n.81; *see also id.* at 521 (applying the DOJ letter's conclusions to the plaintiff because he "had a history of serious mental illness"). And, while Third Circuit precedents may under some circumstances entitle prison

14

officials to defer to the judgment of medical professionals regarding ***medical treatment***, the cases on which Defendants rely say nothing about deference regarding ***housing decisions***. *Contra* Defs.' Br. 9–10. Moreover, there was ample reason for Defendants to doubt the adequacy of the mental health treatment Plaintiffs were receiving in the STGMU. *See* Pls.' CSMF ¶¶ 37, 52.

Defendants are therefore not entitled to qualified immunity on Plaintiffs' Eighth Amendment claim.

## II. Defendants are not entitled to summary judgment on exhaustion grounds.

Defendants have failed to meet their burden of establishing that Plaintiffs did not exhaust administrative remedies. Failure to exhaust administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), is an affirmative defense, which must be pleaded and proved by defendants. *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020); *see Ramirez v. Collier*, 595 U.S. 411, 422 n.* (2022) (recognizing that defendants can forfeit exhaustion arguments).

Summary judgment on exhaustion grounds should be denied.[8] Defendants' "name all defendants" argument and their suggestion that ADA and RA claims are subject to different

---

[8] The day after the summary-judgment deadline, Defendant Saavedra filed a "joinder" in support of DOC Defendants' motion, in which he asserts, among other things, that he, too, is entitled to summary judgment on exhaustion grounds. ECF No. 189. Since neither the Federal Rules of Civil Procedure nor the Western District of Pennsylvania's Local Rules contemplate such a filing, Defendant Saavedra arguably forfeited his present entitlement to summary judgment on exhaustion grounds when he opted not to file a timely motion for summary judgment of his own. In any event, he presents no actual arguments and concedes that he is only entitled to summary judgment on exhaustion grounds to the extent the court holds that all Plaintiffs have completely failed to exhaust administrative remedies, "barring their claims in this lawsuit." *Id.* at 2.

exhaustion rules are meritless—and also forfeited. The exhaustion requirement does not apply to Plaintiff Mazyck's claims, and all other Plaintiffs exhausted available administrative remedies.[9]

### A.    Defendants' "name all defendants" argument is forfeited and meritless.

The court should reject Defendants' suggestion that a properly exhausted grievance must identify every defendant who is ultimately sued.[10] *See* Defs.' Br. 24. The PLRA does not have a "'name all defendants' requirement." *Jones v. Bock*, 549 U.S. 199, 217 (2007). This is because the "primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued." *Williams v. Beard*, 482 F.3d 637, 640 (3d Cir. 2007) (quoting *Jones*, 549 U.S. at 219). The only potential source of such a rule is the DOC's grievance policy, DC-ADM 804. *Jones*, 549 U.S. at 218. Defendants have failed to meet their burden of demonstrating that such a rule exists or, if it does, that it should foreclose any of Plaintiffs' claims.

***First***, Defendants have forfeited their "name all defendants" argument—even as to Plaintiffs Maldonado and Johnson. "A litigant who fails to press a point by supporting it with pertinent authority or by showing why it is a good point despite a lack of authority forfeits the point." *Carpenter v. Vaughn*, 888 F. Supp. 635, 648 (M.D. Pa. 1994). Defendants make only a passing reference to their "name all defendants" argument in their brief, fail to point to any relevant provision of DC-ADM 804, and rely solely on an opinion that interprets language that does not

---

[9] At issue in this motion is whether the named Plaintiffs have exhausted administrative remedies, not other members of the putative classes. Plaintiffs are not relying on "vicarious exhaustion" at this juncture, so that issue is not ripe for disposition. *Contra* Defs.' Br. 23–24.

[10] Defendants only make this argument with respect to Plaintiffs Maldonado and Johnson. *See* Defs.' Br. 24. So they have forfeited this argument with respect to the other Plaintiffs. *See Ramirez*, 595 U.S. at 422 n.*.

appear in the relevant version of the policy. *See* Defs.' Br. 24 (citing *Spruill v. Gillis*, 372 F.3d 218, 234 (3d Cir. 2004)); *see generally* Defs.' Ex. V, ECF No. 186-27 at 116–145.

**Second**, DC-ADM 804 does not require incarcerated individuals to identify in their grievances everyone whom they ultimately sue. "[A]nalysis of a prison's grievance policy is 'essentially a matter of statutory construction.'" *Downey*, 968 F.3d at 306 (quoting *Spruill*, 372 F.3d at 232); *see also Miles v. Anton*, 42 F.4th 777, 780–81, 782 (7th Cir. 2022) (applying tools of statutory interpretation to a prison grievance policy and stating that "[i]f textualism is for anyone, it must be for everyone, including those who are incarcerated."). The only potentially pertinent provision of the relevant version of DC-ADM 804 is Section 1.A.11.b, which states: "The inmate shall identify individuals directly involved in the event(s)." Defs.' Ex. V, ECF No. 186-27 at 117. It does not say "all individuals" or "every individual," or even "any individuals," like the earlier version of the policy. *See Spruill*, 372 F.3d at 234 (quoting the then-operative, now-obsolete, version of DC-ADM 804: "The inmate should identify ***any*** persons who may have information that could be helpful in resolving the grievance." (emphasis added)). An incarcerated individual who identifies some, but not all, of the individuals involved in the events he is grieving has thus fully complied with Section 1.A.11.b of DC-ADM 804.[11]

**Third**, even if the DOC's grievance policy were interpreted as generally requiring the naming of all future defendants in grievances, the requirement would not apply to Plaintiffs' claims. When, as here, an incarcerated individual grieves decisions that were made and approved by high-ranking prison officials, and well documented in prison records, no practical purpose

---

[11] The change from "should," in the earlier version of the policy, to "shall," in the current version, is consistent with this analysis. *Compare Spruill*, 372 F.3d at 234, *with* Defs.' Ex. V, ECF No. 186-27 at 117. The difference in verb choice reflects a reasoned decision by the DOC to change from requiring inclusion of all individuals involved—but only "to the extent practicable"—to fully mandating the inclusion of ***only some*** individuals involved. *See Spruill*, 372 F.3d at 233.

would be served by a "name all defendants" rule. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other ***critical procedural rules***[.]" (emphasis added)). Moreover, the policy that governed Plaintiffs' placement in the STGMU was withheld from them, meaning they could not have been expected to know who all the relevant decisionmakers were. Pls.' CSMF ¶ 431. *Cf. Robinson v. Johnson*, 343 F. App'x 778, 781–82 (3d Cir. 2009). If they were required to name all future defendants in their grievances, administrative remedies would be unavailable to them. *See Ross v. Blake*, 578 U.S. 632, 642 (2016).

As long as the officials responding to the grievance have access to prison records that would reveal the identities of the individuals involved, the incarcerated individual's failure to name them must be excused. *See, e.g.*, *Chaney v. Bednaro*, No. 19-05, 2020 WL 7864202, at *5–6 (W.D. Pa. Dec. 31, 2020); *Merritt v. Fogel*, No. 07-1681, 2010 WL 3489152, at *3 (W.D. Pa. July 23, 2010), *report & recommendation adopted*, 2010 WL 3448618 (W.D. Pa. Aug. 31, 2010). Sometimes prison officials make this apparent by identifying the relevant individuals in their response to the grievance, either by name or department. *See, e.g.*, *Spruill*, 372 F.3d at 234; *Williams*, 482 F.3d at 640; *Diaz v. Palakovich*, 448 F. App'x 211, 217 (3d Cir. 2011); *Abney v. Basial*, No. 16-350, 2018 U.S. Dist. LEXIS 15819, at *22 (M.D. Pa. Jan. 30, 2018), *report & recommendation adopted*, 2016 U.S. Dist. LEXIS 61618 (M.D. Pa. Mar. 30, 2018).[12] But that is not required. Courts interpreting the version of DC-ADM 804 applicable here, as well as the previous version, which included stricter language regarding naming individuals, have repeatedly deemed administrative remedies exhausted as to defendants not named in grievance submissions "where it was clear that prison officials knew of [a] defendant's involvement from the context of

---

[12] To the best of undersigned counsel's knowledge, this case does not appear on Westlaw.

the grievance," *Doe v. Pa. Dep't of Corr.*, No. 20-23, 2021 WL 1583556, at *21 (W.D. Pa. Feb. 19, 2021) (citation omitted) (collecting cases).

**B.    All Plaintiffs subject to the PLRA's exhaustion requirement exhausted available administrative remedies.**

All Plaintiffs whose claims are subject to the PLRA's exhaustion requirement exhausted available administrative remedies because they all filed and exhausted grievances concerning their placement in the STGMU and its detrimental effects on their mental health. *See Mack v. Loretto*, 839 F.3d 286, 296 (3d Cir. 2016) ("Exhaustion merely requires inmates to provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." (citation modified)); *Jackson v. Ivens*, 244 F. App'x 508, 513 (3d Cir. 2007) ("As long as there is a shared factual basis between the two, perfect overlap between the grievance and a complaint is not required by the PLRA.").

***Plaintiff Mazyck*** was not incarcerated when the operative complaint was filed. Pls.' CSMF ¶ 251. Thus, the PLRA's exhaustion requirement does not apply to his claims. *See Downey*, 968 F.3d at 308–09 (discussing *Garrett v. Wexford Health*, 938 F.3d 69 (3d Cir. 2019)); *Freeman v. Lincalis*, 158 F.4th 166, 178 n.58 (3d Cir. 2025).

***Plaintiff Bell*** exhausted administrative remedies by appealing Grievance #974140 to the final level of review before this lawsuit was filed. *See* Pls.' CSMF ¶ 469. In this grievance, Mr. Bell alleged violations of the Eighth and Fourteenth Amendments, Title II of the ADA, and Section 504 of the RA. *Id.* ¶ 470. He alleged that being held in solitary confinement was causing him psychological and physical harm, that he was suffering from serious mental illness, and that he was misdiagnosed. *Id.* ¶ 471. Among other things, he sought transfer out of the STGMU and twenty hours of weekly out-of-cell time. *Id.* ¶ 472. Indeed, the DOC's responses recognized that Mr. Bell's grievance was challenging his placement in the STGMU. *See id.* ¶¶ 473–474 (stating

19

he was "housed appropriately"). This grievance is more than sufficient to exhaust all of Mr. Bell's claims. *See Mack*, 839 F.3d at 296; *Jackson*, 244 F. App'x at 513. Defendants' bald assertion that Mr. Bell "failed to exhaust . . . as to any relevant claim" should therefore be rejected.[13]

**Plaintiff Johnson** exhausted administrative remedies by appealing Grievances #976498 and #985251 to the final level of review before this lawsuit was filed. Pls.' CSMF ¶¶ 476, 482. As Defendants acknowledge, in Grievance #976498, Mr. Johnson challenged his initial placement in the STGMU **and** his ongoing conditions of confinement. Defs.' CSFM ¶ 275; Pls.' CSMF ¶ 477. He discussed the effects of the conditions on his mental health and his ability to sleep, and he said he needed therapy. Pls.' CSMF ¶¶ 478–479. His grievance mentioned Defendants Riddle and Armel and the then-Secretary of the DOC. *Id* ¶ 480. The initial response identified "DOC management" as having made the STGMU-placement decision. *Id.* ¶ 481.

In Grievance #985251, while Mr. Johnson alleged that Defendants Wingard and Walker falsified a document, he **also** described the effects of STGMU placement on his mental health and sought "out of cell structured group therapy." *Id.* ¶¶ 483–485. The officials who responded to Mr. Johnson had no difficulty understanding the thrust of his grievance. The initial response stated that "Central Office" directed that Mr. Johnson be placed in the STGMU. *Id.* ¶ 485. The final response expressly acknowledged Mr. Johnson's contention that keeping him in the STGMU despite his

---

[13] Even if Defendants had not forfeited the argument that Mr. Bell had to identify all the future defendants in his grievance, *but see supra* n.10, and even if such an argument could ever have merit, *but see supra* § II.A, the argument would still fail. Defendant Riddle responded to Mr. Bell's initial grievance, and he noted that "Central Office" had approved Mr. Bell's placement in the STGMU. Pls.' CSMF ¶ 473. At the second level of review, Defendant Armel responded. *Id.* ¶ 474. At the final level of review, Mr. Bell's grievance was referred to Defendant Malishchak. *Id.* ¶ 475. Under any rule, this would be sufficient to exhaust as to Defendants Riddle, Armel, and Malishchak and all Central Office Defendants. *See, e.g.*, *Diaz*, 448 F. App'x at 217.

mental illness was disability discrimination and stated that "nothing in policy" "exempt[ed]" him from the STGMU. *Id.* ¶ 486.

Defendants concede that Mr. Johnson exhausted, at least in part. *See* Defs. Br. 24. While Defendants imply that he did not exhaust as to certain "conditions or processes," they do not specify what aspects of Mr. Johnson's claim they contend are unexhausted. *Id.* So this argument is forfeited. But even if it were not, the two grievances discussed here are plainly sufficient. And Defendants' contention that Mr. Johnson cannot proceed against Secretary Harry and other Central Office Defendants, *see id.*, is belied by Mr. Johnson's express mention of the DOC Secretary in Grievance #976498 and prison officials' references to "Central Office," "DOC management," and "policy" in their responses. *See Diaz*, 448 F. App'x at 217 (holding response that identified "Mailroom staff" sufficient to excuse any alleged default by plaintiff in failing to name specific mailroom employees); *Robinson*, 343 F. App'x 778 at 782 (holding response that mentions "policies" excused any alleged default based on failure to name policymakers in grievance); *Abney*, 2018 U.S. Dist. LEXIS 15819, at *22 (deeming response's mention of the Office of Attorney General ("OAG") sufficient to excuse any alleged default by plaintiff in failing to identify the defendant, who was an OAG employee); *see also supra* § II.A.

***Plaintiff Maldonado*** exhausted available administrative remedies by appealing Grievances #971675, #972500, and #975722 to the final level of review. *See* Pls.' CSMF ¶¶ 487, 492, 498. Grievances #971675 and #972500 are both sufficient for Mr. Maldonado's due-process claim regarding his STG validation and placement in the STGMU. *Id.* ¶¶ 488–491, 493–497. In the latter grievance, Mr. Maldonado noted that he had been in administrative custody for fifteen months prior to his STGMU placement, and he sought transfer from the STGMU to general population. *Id.* ¶ 493. Indeed, when he responded to Mr. Maldonado's appeal of a different

grievance, Defendant Armel expressly described Grievance #972500 as "present[ing] the issue of being placed on AC status and [Maldonado's] placement in the STGMU." *Id.* ¶ 496.

To the extent these grievances are not sufficient to exhaust Mr. Maldonado's Eighth Amendment and disability-discrimination claims, Grievance #975722 plainly is, as Mr. Maldonado stated that prolonged solitary confinement in the STGMU has caused him "serious psychological harm." *Id.* ¶¶ 499–500.

As with Mr. Johnson, Defendants fail to specify what "conditions or processes" they contend Mr. Maldonado failed to grieve, so they have forfeited that argument. *See* Defs.' Br. 24. Likewise, Defendants' contention that Mr. Maldonado has not exhausted as to the Central Office Defendants is defeated by prison officials' reference in their grievance responses to "Central Office" as the decisionmaker with respect to his STGMU placement. *See* Pls.' CSMF ¶¶ 490, 491, 497; *Diaz*, 448 F. App'x at 217; *Abney*, 2018 U.S. Dist. LEXIS 15819, at *22; *supra* § II.A

***Plaintiff Pagan*** exhausted available administrative remedies when the DOC rendered administrative remedies unavailable to him by improperly rejecting Grievance #982671. In this grievance, which Mr. Pagan filed on May 31, 2022, while he was housed in the STGMU, Mr. Pagan challenged his conditions of confinement and "the lack of meaningful review or a meaningful opportunity to be heard." Pls.' CSMF ¶¶ 502–504. He alleged violations of the Eighth and Fourteenth Amendments, Title II of the ADA, and Section 504 of the RA. *Id.* ¶ 505. The next day, however, the Facility Grievance Coordinator rejected Mr. Pagan's grievance based on a "failure to comply with the provisions of the DC-ADM 804," stating that "[t]he grievance was not submitted within fifteen (15) working days after the events on which claims are based." *Id.* ¶¶ 506–507. But Mr. Pagan's grievance is about ongoing conditions to which he was being subjected. *See,*

*e.g.*, *Id.* ¶ 503 (stating the grievance is against staff "involved in my ***continued placement in the STGMU***" (emphasis added)). Indeed, it does not mention any specific events.

The rejection of Mr. Pagan's grievance on bogus procedural grounds rendered administrative remedies unavailable to him because the DOC failed to follow its own policy. "Whenever a prison fails to abide by [its] procedural rules, its administrative remedies have become unavailable, and inmates are deemed to have successfully exhausted their remedies for purposes of the PLRA." *Shifflett v. Korszniak*, 934 F.3d 356, 367 (3d Cir. 2019); *accord Hardy v. Shaikh*, 959 F.3d 578, 586–87 (3d Cir. 2020); *Downey*, 968 F.3d at 305. The Facility Grievance Coordinator is only permitted to reject a grievance when it "is not properly submitted according to [DC-ADM 804]." Defs.' Ex. V, ECF No. 186-27 at 122, §1.C.4. But there is no provision of DC-ADM 804 with which Mr. Pagan's grievance fails to comply. DC-ADM 804 requires grievances to be submitted "within 15 working days after the event upon which the claim is based." *Id.* at 117, § 1.A.8. Since Mr. Pagan's grievance was plainly about an ongoing state of affairs, his grievance was timely. *See, e.g.*, *In v. Stroup*, No. 19-224, 2021 WL 5922331, at *6 (W.D. Pa. Dec. 15, 2021) (collecting cases applying continuing-violations doctrine to prison grievances).[14] The moment his grievance was rejected in contravention of the DOC's grievance policy, Mr. Pagan "exhausted his remedies and acquired the right to come into federal court."[15] *Shifflett*, 934 F.3d at 359; *see also Ross*, 578 U.S. at 644 (holding administrative remedies unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination").

---

[14] The fact that the other Plaintiffs' grievances about their ongoing placements in the STGMU were not rejected as untimely is further evidence that Mr. Pagan's grievance was improperly rejected.

[15] It is of no moment that Mr. Pagan "continue[d] working through the prison's internal system in good faith" or that one of his subsequent appeals of this grievance allegedly failed to include some of the required documents. *Shifflett*, 934 F.3d at 366.

In the alternative, if the rejection of Mr. Pagan's grievance as untimely was actually required by DOC policy, then administrative remedies were still unavailable to Mr. Pagan. This would either mean that there is no way to grieve ongoing circumstances disconnected from specific "events" or that the DOC's "administrative scheme" is "so opaque" as to be "practically speaking, incapable of use." *Ross*, 578 U.S. at 643.

### C. Defendants' undeveloped suggestion that ADA and RA claims are subject to special exhaustion rules is forfeited and meritless.

Defendants hint at an argument that proper exhaustion of an ADA or RA claim requires the submission of a disability-accommodation request as well as a subsequent exhausted grievance. Defs.' Br. 24–25. But they do not point to any language in their policies, or cite to any pertinent authority, to support this argument. The argument is therefore forfeited. *See Carpenter*, 888 F. Supp. at 648.[16] Even were it not forfeited, Defendants' argument about exhaustion of disability-discrimination claims would fail because it has no basis in their policies and because the disability-accommodation-request process was not available to Plaintiffs.

Nowhere in DC-ADM 804 does it say that disability-related claims must first be raised through the disability-accommodations-request process. *See generally* Defs.' Ex. V, ECF No. 186-27 at 116–145. The DOC knows how to create alternative paths for exhaustion or impose additional requirements for specific types of issues. When it wants to do so, it makes it explicit in the text of DC-ADM 804. *See, e.g., id.* at 116, § 1.A.2; *id.* at 117, § 1.A.6; *id.* at 118, §§ 1.A.17–19. Indeed, DC-ADM 804 repeatedly uses broad language about the range of issues that can be addressed

---

[16] With respect to Plaintiffs Bell and Johnson, this argument is waived for an additional reason: When prison officials responded on the merits to Plaintiffs' grievances asserting violations of the ADA and RA, rather than rejecting them on procedural grounds, they waived the argument that Plaintiffs had procedurally defaulted. *See Rinaldi v. United States*, 904 F.3d 257, 271 (3d Cir. 2018); *Kretchmar v. Beard*, No. 05-6108, 2006 WL 2038687, at *5 (E.D. Pa. July 18, 2006).

through the grievance process. *See id.* at 116, § 1.A.2; *id.* at 118, § 1.A.13. An incarcerated person would have no reason to think that all disability-related concerns were subject to a separate, **mandatory** process, especially since not all claims of disability discrimination concern requests for disability accommodations. *See id.* at 116, § 1.A.3 (encouraging, but not requiring, attempts at informal resolution prior to filing a grievance); *Lane v. Tavares*, No. 14-991, 2019 U.S. Dist. LEXIS 29583, at *34 (M.D. Pa. Feb. 22, 2019) (referring to the disability-accommodation-request process as an "informal resolution").

The absence of any language in DC-ADM 804 requiring a disability-accommodation request to be filed in addition to a grievance is fatal to Defendants' argument. *See, e.g.*, *Bennett v. Pa. Dep't of Corr.*, No. 22-1591, 2025 WL 2712213, at *8 (E.D. Pa. Sep. 22, 2025) ("Plaintiff filed and exhausted a grievance addressing the facts underlying his ADA claim pursuant to ADM 804 and we conclude that the grievance was sufficient to exhaust Plaintiff's administrative remedies with respect to Plaintiff's ADA claim."). Defendants' reliance on *Zamichieli* is misplaced because, there, the court held that "the plaintiff had failed to exhaust his ADA claim . . . only because [he] had not filed **either** a request for accommodation . . . **or** a grievance." *Id.* (discussing *Zamichieli v. Pa. Dep't of Corr.*, No. 19-3305, 2022 WL 777201 (3d Cir. Mar. 14, 2022)).

Finally, even if incarcerated individuals in the DOC were generally required to submit disability-accommodation requests, in addition to grievances, to exhaust ADA and RA claims, Plaintiffs here were not. The accommodation-request process was not available, *i.e.*, "capable of use to obtain relief," for ADA and RA claims like Plaintiffs' here. *Ross*, 578 U.S. at 643; *see* Pls.' CSMF ¶¶ 467,468 (DOC designee stating that the disability-accommodation process was not available to obtain accommodations that would alleviate the harmful effects of solitary confinement on individuals with mental illness); *but see Williams v. Sec'y Pa. Dep't of Corr.*, 117

F.4th 503, 529 (3d Cir. 2024) (holding that the ADA requires the DOC "to modify its practices to ameliorate the harms of prolonged solitary confinement" on individuals with known mental illness).

Plaintiffs' ADA and RA claims are therefore subject to the same exhaustion requirements—and have been exhausted by the same grievances—as their other claims.

## III.  Plaintiffs' prospective-relief claims are not moot.

The closure of the STGMU does not moot Plaintiffs' claims for injunctive and declaratory relief.[17] Defendants have not met their formidable burden of establishing that their voluntary closure of the STGMU moots Plaintiffs' claims. Indeed, the DOC currently operates a "fairly equivalent program" in the same physical location that previously housed the STGMU. Pls.' CSMF ¶¶ 316–318. Moreover, the prospective relief Plaintiffs are seeking is not limited to their potential future placement in the STGMU. So even if Defendants could meet their heavy burden under the voluntary-cessation doctrine, Plaintiffs' prospective-relief claims would still not be moot.[18]

### A.  Defendants' voluntary closure of the STGMU does not moot Plaintiffs' claims.

A defendant cannot "moot a case by the simple expedient of suspending its challenged conduct after it is sued." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (citation modified). If it could,

---

[17] Defendants only argue that Plaintiffs' claims for injunctive relief are moot, not their request for a declaratory judgment. *See* Defs.' Br. 2, 20; *see also* Defs.' Mot. for Summ. J. ¶ 3, ECF No. 184; Defs.' Proposed Order, ECF No. 184-1. Mootness of requests for declaratory relief is subject to a distinct analysis from mootness of requests for injunctive relief. *Banks v. Sec'y Pa. Dep't of Corr.*, 601 F. App'x 101, 103 (3d Cir. 2015); *see Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 306 (3d Cir. 2020) ("When a plaintiff seeks declaratory relief, a defendant arguing mootness must show that there is no reasonable likelihood that a declaratory judgment would affect the parties' future conduct.").

[18] Defendants do not argue the whole case is moot. *See* Defs.' Br. 20–22. Nor could they, given Plaintiffs' request for damages. *See Rd.-Con, Inc. v. City of Phila.*, 120 F.4th 346, 356 (3d Cir. 2024) Since all parties agree the court has jurisdiction over Plaintiffs' claims, the court need not even reach Defendants' mootness argument at this time.

"courts would be compelled to leave the defendant free to return to his old ways." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citation modified). So a "defendant claiming that its voluntary compliance moots a case bears the ***formidable burden*** of showing that it is ***absolutely clear*** the allegedly wrongful behavior could not reasonably be expected to recur." *Rd.-Con, Inc. v. City of Phila.*, 120 F.4th 346, 357 (3d. Cir. 2024) (citation omitted). This standard applies to "governmental defendants no less than . . . private ones." *Fikre*, 601 U.S. at 241; *accord Rd.-Con*, 120 F.4th at 357; *contra* Defs.' Br. 20–21 (relying on nonbinding authority contrary to binding precedent). For Defendants' mootness argument to fail, the court "need not conclude it is likely that" Defendants will subject Plaintiffs to "the ***exact same***" conditions they faced when they were in the STGMU. *Clark v. Governor of N.J.*, 53 F.4th 769, 777 (3d Cir. 2022). Rather, Defendants need to demonstrate "it is not reasonably likely" that they will subject Plaintiffs or putative class members to conditions sufficiently similar to the STGMU "to present substantially the same legal controversy as the one presented here." *Id.*[19]

Defendant Harry's declaration is not sufficient to carry Defendants' formidable burden under the voluntary-cessation doctrine.

***First***, her statement that she will not reopen the STGMU includes a crucial, and completely unexplained, caveat. She says only that she "will not approve of the reopening of the STGMU ***as it existed from 2020 to 2023***." Defs.' CSMF ¶ 216 (emphasis added). That Defendant Harry has committed to not reopen "the exact same" unit does not moot Plaintiffs' claims. *Clark*, 53 F.4th at

---

[19] Even if any of Plaintiffs' ***individual*** prospective-relief claims were moot, that would not moot the putative class claims, and Plaintiffs would still be able seek class certification and serve as class representatives. *See Richardson v. Dir. Fed. Bureau of Prisons*, 829 F.3d 273, 279 (3d Cir. 2016).

777. Indeed, the closure of the STGMU coincided with the reopening of a very similar unit in the same physical location at SCI Fayette. Pls.' CSMF ¶¶ 316–319.[20]

**Second**, Defendant Harry, who serves at the pleasure of the Governor,[21] has only stated that **she** will not reopen the STGMU (as it previously existed), not that **the DOC** will not do so. Courts regularly find such nonbinding statements insufficient to demonstrate mootness. *See, e.g.*, *Porter v. Clarke*, 923 F.3d 348, 365 (4th Cir. 2019); *Sourovelis v. City of Phila.*, 103 F. Supp. 3d 694, 702 (E.D. Pa. 2015); *Prison Legal News v. Columbia Cnty.*, 942 F. Supp. 2d 1068, 1080 (D. Or. 2013). Even "the repeal of a challenged ordinance does not necessarily moot a challenge to [its] constitutionality." *People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 231 n.2 (3d. Cir. 2008). It follows that less formal, voluntary decisions by state actors do not either. *See, e.g.*, *Bowers v. City of Phila.*, No. 06-3229, 2007 U.S. 5804, at *106–09 (E.D. Pa. Jan. 25, 2007).

**Third**, Defendant Harry does not disclaim the likelihood that, "if a unit opened in the future with any comparable characteristics to the previous STGMU," Plaintiffs and putative class members would be placed there. Defs.' CSMF ¶ 217. She merely says they "would not **necessarily** be placed" there. *Id.* (emphasis added). That does not come close to demonstrating that it is "absolutely clear" that Defendants "could not reasonably be expected to" subject Plaintiffs and putative class members to the same unlawful conditions again. *Rd.-Con*, 120 F.4th at 357. Indeed, at least one putative class member is currently in the Special Management Unit ("SMU"), the similar phased solitary-confinement unit that operates in the STGMU's old location. Pls.' CSMF

---

[20] Plaintiffs request that the court take judicial notice of the DOC's long history of opening and closing solitary-confinement units, often with new names. *See, e.g.*, Defs.' Ex. N at 5 (discussing the previous incarnation of the SMU); *Banks v. Beard*, 399 F.3d 134, 136–38 (3d Cir. 2005) (discussing the Long Term Segregation Unit); *Thomas v. Little*, No. 22-2246, 2024 WL 3295584, at *1–2 (E.D. Pa. Jul. 3, 2024) (discussing the Intensive Management Unit).

[21] *See* Pa. Const. art. VI, § 7; 71 P.S. § 67.1(d)(1).

¶ 322; *see also id.* ¶ 321 (Defendant Harry testifying as the DOC's designee that individuals can be repeatedly placed in units like the STGMU and SMU); *id.* ¶¶ 323–324 (noting Plaintiffs Bell and Johnson were previously in the SMU).

**Fourth**, the timing of Defendants' closure of the STGMU suggests it was related to this litigation. Plaintiffs filed their *pro se* complaint in October 2022. ECF No. 1-1. But it was not until over a year later, shortly after Plaintiffs' counseled Second Amended Complaint was filed, that Defendants closed the STGMU. Defs.' CSMF ¶ 10. This raises the inference that it was, at least in part, for the purpose of mooting Plaintiffs' claims and, therefore, calls into question its permanence. *See DeJohn v. Temple Univ.*, 537 F.3d 301, 310–11 (3d Cir. 2008); *Burns v. Pa. Dep't of Corr.*, 544 F.3d 279, 284 (3d Cir. 2008); *Bowers*, 2007 U.S. 5804, at *106–07.

**Fifth**, Defendant Harry's assertions about changes in the DOC's use of restrictive housing have little bearing on the mootness analysis. Her statements are vague and not directed specifically at the housing of Plaintiffs and putative class members. Moreover, her statement about increased out-of-cell time in restrictive housing is disputed. Pls.' CSMF ¶¶ 207, 212; *see Paladino v. Newsome*, 885 F.3d 203, 209–10 (3d Cir. 2018).

**Sixth**, Defendants are still vigorously defending the legality of the STGMU. This, too, militates against a finding of mootness. *See Knox v. SEIU, Local 1000*, 567 U.S. 298, 307 (2012); *DeJohn*, 537 F.3d at 311; *Porter*, 923 F.3d at 365–66.

Contrary to Defendants' suggestion, the PLRA's prospective-relief provisions have no bearing on the mootness inquiry. *See* Defs.' Br. 21–22. To the extent Defendants mean to imply that the PLRA categorically makes "permanent injunctive relief . . . impermissible," *id.* at 21, they are plainly mistaken, *see, e.g.*, *Porter*, 923 F.3d at 353 (affirming permanent injunction in PLRA-governed case); *Thomas v. Bryant*, 614 F.3d 1288, 1295 (11th Cir. 2010) (same); *Victory v. Berks*

*Cnty.*, No. 18-5170, 2020 WL 236911, at \*34 (E.D. Pa. Jan. 15, 2020) (granting permanent injunction in PLRA-governed case). It is true that the PLRA permits a party to ***request*** that the court terminate an injunction after two years. 18 U.S.C. § 3626(b)(1). But the court need not grant this request. *See id.* § 3626(b)(3). So, while an injunction issued in this case could potentially be terminable after two years, it would not "expire." *Contra* Defs.' Br. 22. To the extent Defendants' argument is that the PLRA forecloses an injunction here because of their voluntary cessation, they are again mistaken. *See Porter*, 923 F.3d at 366–68; *Thomas*, 614 F.3d at 1319–20; *Victory*, 2020 WL 236911, at \*16–19.

### B. The injunctive relief Plaintiffs seek is not limited to the STGMU.

A claim "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox*, 567 U.S. at 307. The injunctive relief Plaintiffs seek is not limited to preventing their and putative class members' future placement in the STGMU. *See* 2d Am. Compl., Prayer for Relief ¶¶ C–E. Among other things, Plaintiffs seek injunctive relief targeted at the future placement of them and those similarly situated to them in ***any*** solitary-confinement unit in the DOC. *Id.* ¶¶ D, E. Moreover, the injunctive relief the court can award at the end of the case is not limited to the precise relief Plaintiffs requested in their complaint. *United States v. Cardaci*, 856 F.3d 267, 270 n.1 (3d Cir. 2017) (citing Fed. R. Civ. P. 54(c)). Plaintiff Bell remains in solitary confinement to this day, Pls.' CSMF ¶ 410, and the other Plaintiffs and putative class members remain at risk of being placed back in solitary confinement, *see id.* ¶¶ 322, 411–414, 416–428. Thus, even were it absolutely clear the STGMU would never reopen, it would still be possible for the court to grant effectual injunctive relief.

### CONCLUSION

For these reasons, the court should deny Defendants' motion for summary judgment.

Respectfully submitted,

*/s/ Matthew A. Feldman*
Matthew A. Feldman (PA 326273)
PA INSTITUTIONAL LAW PROJECT
718 Arch St., Suite 304S
Philadelphia, PA 19106
215-925-2966
mfeldman@pilp.org

Bret Grote (PA 317273)
Nia Holston (PA 327384)
Rupalee Rashatwar (FL 1011088)
Dolly Prabhu (PA 328999)
ABOLITIONIST LAW CENTER
PO Box 16537
Philadelphia, PA 19122
(412) 654-9070
bretgrote@abolitionistlawcenter.org
nia@alcenter.org
rupalee@alcenter.org
dprabhu@alcenter.org

Alexandra Morgan-Kurtz (PA 312631)
PA INSTITUTIONAL LAW PROJECT
247 Fort Pitt Blvd, 4th Fl.
Pittsburgh, PA 15222
412.434.6004
amorgan-kurtz@pilp.org

Will W. Sachse (PA 84097)
Noah S. Becker (PA 327752)
Stormie Mauck (PA 328048)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
215-994-2496
will.sachse@dechert.com
noah.becker@dechert.com
stormie.mauck@dechert.com

DATED: February 6, 2026