**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**
**PITTSBURGH DIVISION**

| | |
|---|---|
| T. MONTANA BELL, RONNIE E. JOHNSON, ANGEL MALDONADO, KAREEM MAZYCK, and XAVIAR PAGAN, on their own behalf and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>PENNSYLVANIA DEPARTMENT OF CORRECTIONS, et al.,<br><br>Defendants. | Civil Action No. 2:22-cv-01516<br><br>United States District Judge Marilyn J. Horan<br><br>United States Magistrate Judge Christopher B. Brown |

**REPORT AND RECOMMENDATION**
**ON DOC DEFENDANTS' MOTION FOR SUMMMARY JUDGMENT,**
**ECF NO. 184**

**Christopher B. Brown, United States Magistrate Judge**

## I. Recommendation

This putative class action was initiated by five individuals, individually and on behalf of all others similarly situated, who had been housed in the Security Threat Group Management Unit ("STGMU") at SCI-Fayette. The case centers on Plaintiffs' placement and prolonged detention in that unit. *See* ECF No. 75, ¶¶ 288-293.

Pending is the DOC Defendants' motion for summary judgment, with brief in support, on three threshold issues: exhaustion, qualified immunity, and mootness. ECF Nos. 184 and 187. Defendant Dr. Saavedra filed a Joinder in support of the DOC Defendants' motion for summary judgment. ECF No. 189. Plaintiffs oppose

the summary judgment motion, ECF No. 202, and the DOC Defendants filed a reply brief in response to Plaintiffs' opposition. ECF No. 212. The motion for summary judgment is fully briefed and ripe for consideration.[1]

After reviewing the motion, the extensive material in support and in opposition, the parties' memoranda, the relevant case law, and the summary judgment record as a whole, it is respectfully recommended the motion be granted in part and denied in part, as follows:

1. Summary judgment be denied on failure to exhaust grounds;

2. Summary judgment be denied on Plaintiffs' Fourteenth Amendment procedural due process claims raised in Count I of the Second Amended Complaint;

3. Summary judgment be granted on Plaintiffs' Eighth Amendment conditions of confinement claims raised in Count II of the Second Amended Complaint, as DOC Defendants are entitled to qualified immunity as the "right" was not clearly established at the time of the alleged violative conduct; and

4. Plaintiffs' claims for injunctive relief be dismissed as moot.

## II. Report

### A. Procedural History and Relevant Factual Background[2]

---

[1] This matter has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b).

[2] The factual summary is derived from the DOC Defendants' statement of material facts, Plaintiffs' responsive statement of material facts, and the exhibits submitted by the parties in support of their respective positions. ECF Nos. 186, 206, and 213.

This case has stopped and started several times since its inception in 2022. First, in October 2022, twelve prisoners, individually and on behalf of others similarly situated, initiated this case by filing *pro se* a Complaint. ECF No. 1. Two months later, in December 2022, several of those prisoners withdrew from the case and then four prisoners filed *pro se* an amended complaint, individually and on behalf of others similarly situated. ECF No. 34. Five months later, in May 2023, counsel entered their appearances for Plaintiffs, and after being granted a number of extensions of time in which to file a Second Amended Complaint ("SAC"), a SAC was filed in September 2023, naming five lead plaintiffs, individually and on behalf of others similarly situated. ECF No. 75. The SAC remains Plaintiffs' operative pleading. *Id.*

The five named plaintiffs, T. Montana Bell, Ronnie E. Johnson, Angel Maldonado, Kareem Mazyck, and Xavier Pagan are individuals who, at all relevant times, were confined in the STGMU at SCI-Fayette. ECF No. 75, ¶¶ 14-20. The named defendants can be grouped into two categories: (1) the Pennsylvania Department of Corrections ("DOC"), five individuals employed at the DOC Central Office,[3] and three individuals employed at SCI-Fayette,[4] collectively, the "DOC

---

[3] These individuals are Laurel Harry, Secretary of Corrections; Christopher Oppman and Trevor Wingard, current and former Regional Deputy Secretaries of Corrections for the Western Region of the Commonwealth of Pennsylvania; James Barnacle, Director of the Bureau of Investigations and Intelligence; and Lucas Malishchak, Director of Psychology. All are sued in their individual and official capacities, other than Defendant Wingard who is sued only in his individual capacity. *See* ECF No. 75, ¶ 22.

[4] These individuals are Tina Walker, Acting Superintendent of SCI-Fayette; Eric Armel, former Superintendent of SCI-Fayette; and Scott Riddle, Unit Manager for the STGMU program at SCI-Fayette. *See* ECF No. 75, ¶¶ 25 – 27, inclusive. All are sued in their individual and official

Defendants," *id.*, ¶¶ 19 – 24, and (2) Dr. Peter Saavedra, a private contract psychiatrist who worked at SCI-Fayette. *Id.*, ¶ 28.[5]

Plaintiffs assert violations of their constitutional rights guaranteed by the Eighth and Fourteenth Amendments, as well as violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794. In doing so, they have organized the SAC into four counts: In Count I, Plaintiffs assert, individually and on behalf of the STGMU Class,[6] a Fourteenth Amendment procedural due process claim against the individual DOC Defendants contending,

> STGMU placement occurs without any hearing whatsoever. Defendants do not provide STGMU Class Members with notice of the basis for considering them to be members of Security Threat Groups, meaning neither description of the information relied upon nor evidence are provided.
>
> Once in the STGMU, vague, arbitrary criteria are used to deny advancement through the phases of the unit and/or set Class members back to previous phases. Decisions to freeze or set back Class members' phase are not subject to

---

capacities, other than Defendant Armel who is sued only in his individual capacity. *See* ECF No. 75, ¶ 26.

[5] Defendant Saavedra is sued in his individual and official capacities. *See* ECF No. 75, ¶ 28.

[6] The STGMU class is defined as "All individuals who (a) currently are or in the future will be confined in the STGMU, or (b) were previously confined in the STGMU and have remained in the Level-5 custody since leaving the STGMU. ECF No. 75, ¶ 288. The uncontroverted summary judgment record reflects the STGMU at SCI-Fayette housed a total of 106 individuals. ECF No. 186, ¶ 134. According to the DOC Defendants' Answer, as of December 11, 2023, the STGMU held "three or fewer prisoners," as the unit was being closed. ECF No. 95, ¶ 1.

> any procedural protections, involving neither a hearing nor an opportunity to challenge the decision.

*Id.*, ¶¶ 312 and 313.

In Count II, Plaintiffs, individually and on behalf of a Mental Health Subclass,[7] assert an Eighth Amendment claim against the individual DOC Defendants and against Defendant Saavedra contending, Defendants were aware the "Mental Health Subclass Members' mental health conditions place them at risk of substantial harm when placed in solitary confinement" and Defendants acted with deliberate indifference in placing or retaining them in solitary confinement. *Id.*, ¶¶ 317 – 318.

In Count III, Plaintiffs, individually and on behalf of a Disability Subclass,[8] assert a claim for a violation of the ADA against the DOC, contending it discriminated against the Disability Subclass members by

> (a) placing and/or retaining Subclass Members in solitary confinement on the basis of their psychiatric disabilities and manifestations thereof[;]
>
> (b) failing to make reasonable modifications to policies and procedures to account for and reduce the known deleterious effects of solitary confinement on individuals with psychiatric disabilities, and
>
> (c) failing to make reasonable modifications to its policies and procedures to enable Subclass Members to derive the same benefits from the DOC's programs, services, and

[7] The Mental Health Subclass is defined as "All individuals within the STGMU Class who have or will receive any mental health treatment during their incarceration in the DOC." ECF No. 75, ¶ 289.

[8] The Disability Subclass is defined as "All individuals within the STGMU Class who have a mental health condition that substantially limits one or more major life activities." ECF No. 75, ¶ 290.

activities as similarly situated individuals without psychiatric disabilities.

*Id.*, ¶ 323 (a)-(c).

And in Count IV, Plaintiffs, again individually and on behalf of the Disability Subclass, assert a claim for a violation of Section 504 of the RA against the DOC contending, among other things, the DOC discriminated against people with mental health disabilities based only on their disabilities and failed to reasonably accommodate Plaintiffs and the Disability Subclass Members with mental health disabilities in its programs, activities, and service. *Id.*, ¶ 331-32.

Plaintiffs seek compensatory, punitive, and nominal damages for violations of the Eighth and Fourteenth Amendments to the U.S. Constitution and compensatory and nominal damages for violations of the ADA and Section 504 of the RA, as well as injunctive relief. *See id.*, ¶¶ 9-10; Prayer for Relief at pp. 50-51, ¶¶ A – I.

The DOC Defendants and Defendant Saavedra each filed Answers with affirmative defenses to the SAC. ECF Nos. 95 and 96. Defendant Saavedra then filed a motion for judgment on the pleadings arguing he did not make housing assignments and the allegations of the SAC failed to show he was deliberately indifferent to Plaintiffs' serious medical needs. ECF No. 140. His motion was denied in March 2025, with the Court finding material disputes of fact existed as to whether Dr. Saavedra was involved in housing decisions and whether Dr. Saavedra provided constitutionally adequate mental health care to Plaintiffs. ECF No. 165.

The original Case Management Order ("CMO") was entered on January 31, 2024. ECF No. 102. At the request of the parties, the CMO was amended several times to allow the parties the opportunity to complete fact and expert discovery. *See* ECF Nos. 124, 150, 161, 167, 169, and 171.

On October 15, 2025, the DOC Defendants informed the Court for the first time they intended to assert their entitlement to judgment on three threshold issues: qualified immunity, mootness, and failure to exhaust under the Prison Litigation Reform Act ("PLRA"). ECF No. 172, ¶ 4. In light of that representation, a Sixth Amended CMO was entered on November 20, 2025, directing any motion(s) seeking summary judgment on the three identified threshold issues be filed by December 17, 2025. ECF No. 177, ¶ 3.[9]

The DOC Defendants timely filed the instant motion for summary judgment with a brief in support. ECF Nos. 184 and 187. They also filed a concise statement of material facts (comprised of 42 pages with 276 paragraphs) and extensive exhibits, totaling approximately 1708 pages. ECF No. 186. Defendant Saavedra filed a Joinder in support of the DOC Defendants' motion for summary judgment (1) "as to qualified immunity as a basis for dismissal of the claim against him so that it may be preserved for review on appeal, if necessary[;][10] (2) to the extent Plaintiffs'

[9] Deadlines for filing Plaintiffs' Motion for Class Certification and responses will be set after the resolution of the instant motion. ECF No. 177, ¶ 4.

[10] As Dr. Saavedra notes, the Court of Appeals for the Third Circuit has not extended qualified immunity to private healthcare providers who provide healthcare services in state prisons. *See Montanez v. Price*, 154 F.4th 127, 139 n.4 (3d Cir. 2025), *cert. denied sub nom. Pennsylvania v.*

claims for injunctive relief are moot, and (3) to the extent Plaintiffs failed to exhaust their administrative remedies. ECF No. 189 at 1.

Plaintiffs filed a brief in opposition to the summary judgment motion and an extensive responsive concise statement of material facts, comprised of 81 pages with 507 paragraphs. ECF Nos. 202 (Errata at ECF 207) and 206. The exhibits filed in support of Plaintiffs' position, total approximately 4,073 pages. ECF No. 210 and Sealed ECF No. 211. In response, the DOC Defendants filed a reply brief and a reply to Plaintiffs' concise statement of material facts, comprised of 79 pages. ECF Nos. 212 and 213.

The parties agree on very little other than the STGMU opened at SCI-Fayette in late 2020, ECF No. 186, ¶ 7, and DOC Central Office made the decision to end the STGMU program closing it the end of 2023, *id.*, ¶ 10.[11] *See also* ECF 95, ¶ 1. The STGMU is a five phase step-down program in which prisoners began at the more restrictive Phase 5 and progressed down to Phase 1. *Id.*, ¶ 8.

---

*Montanez*, No. 25-1073, 2026 WL 1718015 (U.S. June 15, 2026). Dr. Saavedra is named as a defendant only in Count II of the SAC in which Plaintiffs challenge their conditions of confinement.

[11] The STGMU program existed at several institutions before opening at SCI-Fayette. ECF No. 186, ¶ 6. Only the program as it existed at SCI-Fayette from 2020 to 2023 is at issue in this lawsuit.

**1. Facts Relating to Plaintiffs' Fourteenth Amendment Due Process Claim (Count I)**

"STGMU" refers both to the program and to the physical location of the Restrictive Housing Unit ("RHU")[12] at SCI-Fayette used to house and provide programming to prisoners "who exhibited certain patterns of behavior" as Security Threat Group ("STG") members.[13] *Id.*, ¶ 5. All STGMU prisoners were in Administrative Custody, unless they received a misconduct resulting in disciplinary time in Disciplinary Custody status. *Id.*, ¶ 4.

Plaintiffs contend STGMU prisoners were not informed of the reasons why they were being referred to the STGMU and were not provided with a meaningful opportunity to challenge the referral process for their placement in the STGMU or any procedural mechanism to seek transfer out of the STGMU. *Id.*, ¶¶ 101, 102. The DOC Defendants dispute this arguing the STGMU prisoners were provided due process in the referral and placement process and in their continued detention in the STGMU.

---

12 RHUs are areas or groups of cells housing inmates assigned to Disciplinary Custody ("DC") as the result of a misconduct or Administrative Custody ("AC") for the purpose of removing them from general population either for their own safety or the safety of other inmates and staff. *Id.*, ¶ 4.

13 STGs were identified as possible threats to the security, safety, and/or operation of DOC facilities. *Id.*, ¶ 1.

### 2. Facts Relating to Plaintiffs' Eighth Amendment Conditions of Confinement Claim (Count II)

Plaintiffs, individually and on behalf of the Mental Health Subclass,[14] contend Defendants' operation and the conditions of confinement of STGMU at SCI-Fayette were unconstitutional. *See id.*, ¶¶ 105-147. For example, "individuals in the STGMU are subjected to indefinite solitary confinement, without a clear path to be removed from the unit," *id.*, ¶ 105, and received grossly inadequate mental health treatment or none at all, *id.*, ¶ 148. Plaintiffs contend they were placed and kept in the STGMU "despite their obvious symptoms of serious mental illness, including suicidality and self-injurious behavior." ECF No. 202, at 10.

The DOC Defendants, not surprisingly, disagree with Plaintiffs' contentions. According to them, "[t]he phased nature of the STGMU provided inmates with a clear path back to [general population][.]" ECF No. 186, ¶¶ 8, 111.[15] The five phases are explained in the STGMU Inmate Handbook:

> 1. You will be given the opportunity to progress through specific phases within the STGMU based upon your behavior and ability to adjust under reduced levels of supervision. Each phase shall offer progressively more privileges and services.
>
> 2. Movement between phases is based upon [the prisoner's] ability to meet certain criteria. Upon reception to the STGMU, [the prisoner] will begin at Phase 5.

---

14 *See* footnote 7 above for the definition of the Mental Health Subclass.

15 Plaintiffs dispute there was a clear path back to general population noting (1) their expert, Dan Pacholke, testified "there was 'no clear path out' of the STGMU[;]" (2) Plaintiff Bell testified he did not know what needed to be done when he was on Phase 5; and (3) Plaintiff Maldonado testified "he couldn't engage with the program because he was daunted by having been in the program four times and by seeing other people be sent back multiple times." ECF No. 206, ¶ 111.

> Phases 4 through 2 shall each be a minimum of three months in duration to deliver the proper programming; however, there is no maximum time limit on the phases. . . .
>
> > **Phase 5:** This is the starting point for the STGMU. You shall remain in Phase 5 until appropriate staff has assessed your progress through programming, your STG Program Plan has been developed, and you have remained disciplinary action free for a sufficient period. . . .[16]
> >
> > **Phase 4:** In this phase, you will be eligible for in-cell activity and "individual treatment cell" activity. This may include, but is not limited to, in-cell treatment and standardized programming and individual dayroom. You may also be eligible for increased privileges and property.[17]
> >
> > **Phase 3**: In Phase 3, with continued progress on your STGMU Program Plan, you will be eligible for a combination of in-cell and out-of-cell activities, including, but not limited to: meals, treatment, activities, and education programming. At this phase, you will be able to attain additional personal property and may be permitted to have an on-unit employment.[18]
> >
> > **Phase 2:** More intensive treatment and programming are included in this phase, including increased out-of-cell activities. The STGMU treatment team, with input from the PRC, will begin reviewing you for Phase 1 aftercare. This may include program completion, transfer, RRL

---

[16] Phase 5 prisoners were allowed commissary from the DC commissary list only - $15.00 weekly limit. One initial phone call on arrival. One non-contact visit per month, immediate family and religious advisor only. Attorney visits were excluded from the count. ECF No. 186-29 at 12.

[17] Phase 4 prisoners were allowed commissary from the AC commissary list - $20.00 weekly limit. One phone call per month. Two non-contact visits per month, immediate family and religious advisor only. Attorney visits were excluded from the count. *Id.*

[18] Phase 3 prisoners were allowed commissary from the AC commissary list - $20.00 weekly limit. Radio / tablet / kiosk access. Two phone calls per month. Three non-contact visits per month with any approved visitor. *Id.*

> status, and housing needs. During Phase 2, the final decision for region and institutional placement will be at the discretion of [the Office of Population Management].[19]
>
> **Phase 1:** Phase 1 is a minimum of 180 days with General Population Privileges. During phase 1, you will meet weekly with your unit team. The Unit Team and Security will monitor your behaviors to determine if general population is appropriate. If you complete Phase 1 and do not engage in any Class 1 disciplinary actions or STG activity, you shall be considered for successful discharge from the STGMU program. If your progress shows negative behaviors, the phase 1 institution may extend your Phase 1.
>
> 3. Participation in the STGMU Treatment is based on a phase system. Changes in status from one phase to another is based on your behavior, STG activity, information received from the security office, misconduct, program participation, ability to follow institutional rules, attendance at 30 day reviews and support of administrative staff.

ECF No. 186-29, at 3-4.

## B. Jurisdiction and Venue

The Court has federal question jurisdiction as the claims are brought under 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202; Title II of the ADA, and Section 504 of the RA. ECF No. 75, ¶ 11; *see* 28 U.S.C. §§ 1331, 1343(a)(3)-(4). Venue is proper as the events and omissions giving rise to this lawsuit occurred in Fayette County,

---

[19] Phase 2 prisoners were allowed commissary from the AC commissary list - $35.00 weekly limit. One phone call per week. One non-contact visit per week with any approved visitor. Attorney visits were excluded from the count. *Id.*

which is within the territorial boundaries of the United States District Court for the Western District of Pennsylvania.

### C. Standard of Review – Fed. R. Civ. P. 56

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Id.* at 248. A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). When the movant is the defendant, it has the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of [his] or her case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). If the moving party sustains its initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and 'come forward with specific facts showing that there is a genuine issue for trial.'" *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (cleaned up) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).

At the summary judgment stage, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In doing so, the court must construe the facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587. But "conjecture and speculation" cannot create a genuine issue of material fact. *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 328 (3d Cir. 2016). And the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

With this standard of review in mind, the Court now turns to the DOC Defendants' motion for summary judgment.

### D. Discussion

The DOC Defendants move for summary judgment on three grounds: *First,* they argue they enjoy qualified immunity as to all constitutional claims. ECF No. 184, ¶ 2. *Second*, they argue any prospective injunctive relief is moot based on the closure of the STGMU and subsequent policy changes. *Id.*, ¶ 3. And *third*, they argue that Plaintiffs failed to properly exhaust their administrative remedies in accordance with the requirements of the PLRA. *Id.*, ¶ 4.

Plaintiffs respond arguing (1) the DOC Defendants are not entitled to qualified immunity as genuine issues of material fact exist, (2) the DOC Defendants

are not entitled to summary judgment on exhaustion grounds, and (3) Plaintiffs' prospective-relief claims are not moot. ECF No. 202. The DOC Defendants filed a Reply Brief addressing each argument raised by Plaintiffs in their opposition brief. ECF No. 212.

The analysis begins with the threshold issue of whether Plaintiffs have exhausted their administrative remedies. If needed, the analysis then will move to whether the DOC Defendants are entitled to qualified immunity on Plaintiffs' constitutional claims. And last, the analysis will address whether Plaintiffs' claims for injunctive relief are moot.

### 1. Exhaustion Under the PLRA[20]

The PLRA, 42 U.S.C. § 1997e(a), provides "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." As explained by the Court of Appeals for the Third Circuit:

> The exhaustion mandate is a "centerpiece" of the statute, *see Woodford v. Ngo*, 548 U.S. 81, 84 (2006), that serves three important statutory goals: "(1) to return control of the inmate grievance process to prison administrators; (2) to encourage development of an administrative record, and perhaps settlements, within the inmate grievance process; and (3) to reduce the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits, *Spruill [v. Gillis],* 372 F.3d [218,] 230 [3d Cir. 2004]. The PLRA requires "proper exhaustion," *Woodford,* 548 U.S. at 92, which means "complet[ing] the administrative review

---

20 To the extent the DOC Defendants are arguing exhaustion should not be permitted on "vicarious exhaustion" grounds, ECF No. 187 at 23-24, Plaintiffs respond "they are not relying on 'vicarious exhaustion' at this juncture, so that issue it not ripe for disposition." ECF No. 202, at 17 n.9. Therefore, "vicarious exhaustion" will not be addressed in this R&R.

> process in accordance with the applicable procedural rules." *Downey v. Pennsylvania Dep't of Corrections*, 968 F.3d 299, 305 (3d Cir. 2020) (quoting *Woodford*, 548 U.S. at 88). The only limit on § 1997e(a)'s mandate is that "administrative remedies must be available to the prisoner" as both a formal and practical manner. *Id*. (citing *Ross v. Blake*, 578 U.S. 632, 641-42 (2016)).

*Talley v. Clark*, 111 F.4th 255, 262 (3d Cir. 2024). The Supreme Court has repeatedly observed the PLRA's exhaustion requirement "is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 578 U.S. 632, 638 (2016) (citing *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) and *Jones v. Bock*, 549 U.S. 199, 211 (2007)). Failure to substantially comply with the procedural requirements of the prison's grievance system will result in a procedural default of the claim. *Spruill v. Gillis,* 372 F.3d 218, 227-32 (3d Cir. 2004).

Because exhaustion is an affirmative defense, it is defendant's burden to "plead and prove." *Paladino v. Newsome*, 885 F.3d 203, 207 (3d Cir. 2018) (citation omitted). If a defendant shows administrative remedies were not exhausted, the plaintiff then bears the burden of demonstrating such administrative remedies were, in effect, unavailable. *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018). The district court may resolve exhaustion-related factual disputes so long as the parties were given notice and sufficient opportunity to be heard, *Paladino*, 885 F.3d at 210–11 (quotation omitted), and the exhaustion issue is not "intertwined with the merits of a claim that falls under the Seventh Amendment." *Perttu v. Richards*, 605 U.S. 460, 468 (2025); *Paladino*, 885 F.3d at 210-11 (quotation

omitted).[21] "Exhaustion is . . . a non-jurisdictional prerequisite to an inmate bringing suit and, for that reason, . . . it constitutes a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time." *Rinaldi,* 904 F.3d at 265 (internal quotations omitted).

In Pennsylvania, the general grievance process applicable to facilities operated by the DOC is set forth in DC-ADM 804. *See* ECF No. 186-27, at 116 – 145.[22] *See generally Moore v. Lamas*, No. 22-1007, 2023 WL 371397, at *2 (3d Cir. Jan. 24, 2023) ("DC-ADM 804 provides a general, though rigorous, mechanism for inmate grievances."). The United States Court of Appeals for the Third Circuit has summarized the policy's relevant procedures as follows:

> ADM 804 creates the three-step Inmate Grievance System. First, an inmate must submit a grievance to the Facility Grievance Coordinator. The grievance must include the relevant facts, individuals involved, claims alleged, and relief sought. A different official—the Grievance Officer—reviews the grievance and submits an initial response. The inmate may appeal the initial response to the Facility Manager, who reviews it and issues a decision. The inmate may file a final appeal to the Secretary of Corrections' Office of Inmate Grievances and Appeals . . . . ADM 804 requires an inmate to specify in his grievance any alleged violation of department regulations or other law as well as specify the compensation or legal relief the inmate desires.

---

21 The Supreme Court's decision limiting the circumstances in which courts may act as the factfinder is inapplicable here as the exhaustion issue is not intertwined with the merits of any claim Plaintiffs raise. *Perttu v. Richards*, 605 U.S. 460, 468 (2025) (holding "that parties have a right to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of a claim that falls under the Seventh Amendment").

22 For ease of reference, the R&R cites to the page numbers from the CM/ECF headers.

*Prater v. Dep't of Corr.*, 76 F.4th 184, 203-04 (3d Cir. 2023). *See also* ECF No. 186, ¶¶ 220-222. "[P]rison grievance procedures supply the yardstick" for determining what steps are required for exhaustion." *Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007); *see also Jones,* 549 U.S. at 218.

The version of DC-ADM 804 applicable to this case was issued by the DOC in January 26, 2016, effective February 16, 2016, and requires "the text of the grievance must be legible [and] understandable," it must "include a statement of the facts . . . that gave rise to the grievance[,]" "shall *identify individuals directly involved in the event(s)*[,]" and provides "the [prisoner] shall specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law." DC-ADM 804 § 1(A)(11) (emphasis added); ECF No. 186-27 at 117. While the PLRA does not require a prisoner to "name all defendants," DC-ADM 804 requires *identification* of individuals directly involved in the events at issue in the grievance.

The Court of Appeals for the Third Circuit has held "in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constitute[s] a failure to properly exhaust his administrative remedies under the PLRA." *Williams v. Pennsylvania Dep't of Corr.*, 146 F. App'x 554, 557 (3d Cir. 2005). The purpose of this requirement is "to put the prison officials on notice of the persons claimed to be guilty of wrongdoing." *Spruill,* 372 F.3d at 234. *See also Doe v. Pennsylvania Dep't of Corr.*, No. No. 1:20-23, 2021 WL 1583556, at *21 (W.D. Pa. Feb. 19, 2021), *report and recommendation adopted*, 2021 WL 1115373 (W.D. Pa.

Mar. 24, 2021) (deeming administrative remedies exhausted as to defendants not named in grievance documents "where it was clear that prison officials knew of defendant's involvement from the context of the grievance.") (citations omitted); *Martin v. Sec'y of Corr.*, No. 3:16-cv-2060, 2018 WL 115829, at *4 (W.D. Pa. Mar. 5, 2018) ("Because it was not practicable for Martin to identify the Defendants, he has not [failed to exhaust] his claims.").

The Supreme Court has noted "the primary purpose of a grievance is to alert prison officials to a *problem*, not to provide personal notice to a particular official that he may be sued; the grievance is not a summons and complaint that initiates adversarial litigation[.]" *Jones,* 549 U.S. at 219 (emphasis added) (quoting *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004)). And to that end, "exhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievance." *Id.*

The DOC Defendants argue they are entitled to summary judgment "on most constitutional claims and all claims under the ADA and RA" as none of the five-named plaintiffs properly exhausted their relevant claims under the PLRA. ECF No. 187 at 25.[23] Further, they argue all claims against DOC Defendants who were not identified in an exhausted grievance must be dismissed as those claims are procedurally defaulted. ECF No. 212 at 9-10; 24. Plaintiffs disagree responding,

---

[23] The DOC Defendants seem to suggest proper exhaustion of an ADA or RA claim also requires an individual to submit a disability-accommodation request under DC-ADM 006. *See* ECF No. 187 at 25; ECF No. 186, ¶ 36. Because the DOC Defendants do not point to any language in their policies or cite any case law to support this argument, it will not be addressed in the R&R.

"[a]ll plaintiffs whose claims are subject to the P.L.R.A's exhaustion requirement exhausted available remedies because they all filed and exhausted grievances concerning their placement in the STGMU and its detrimental effects on their mental health." ECF No. 202 at 19.

The analysis now turns to the DOC Defendants' exhaustion arguments as they pertain to each named plaintiff. The uncontroverted summary judgment reflects the five named Plaintiffs filed numerous prison grievances about their placement and/or continued confinement in the STGMU. Those grievances were all unsuccessful.

**i. T. Montana Bell**

The summary judgment record reflects Bell filed 12 grievances that were appealed to final review. *See* ECF Nos. 186-23, at 4-25; and 186-24 at 1–28. The DOC Defendants argue Bell failed to exhaust his administrative remedies as to *any* relevant claim. ECF No. 187 at 24. The undersigned finds this argument lacks merit for several reasons. *First*, the undisputed summary judgment record reflects Bell filed Grievance #974140 on April 1, 2022, while housed in the STGMU. ECF No. 186-24 at 24. In the grievance, he asserts his rights under the "8th, 14th Amend, Title II of the ADA and Sec. 504 of Rehabilitation Act" have been violated. *Id*. He states he was misdiagnosed by mental healthcare providers, was experiencing hallucinations for the last three weeks, and was housed in the STGMU – solitary confinement – 24 hours a day in his cell. He requested his mental health

stability code be changed to a stability "D"[24] and he be transferred to a Secure Residential Treatment Unit. This grievance contains claims relevant to this lawsuit.

*Second*, the DOC Defendants argue Bell has not exhausted his administrative remedies because he did identify any DOC Defendant. ECF No. 186, ¶ 244. This argument also fails. Named in the grievance are Dr. Saavedra, Ms. Jeffries, and LPM Ms. Dunken. *Id.* The DOC Defendants do not deny Jeffries and Dunkin are DOC employees ("Jeffries and Dunkin are psychology, not psychiatry, and do not diagnose"), but argue no DOC Defendant was named in the grievance. ECF No. 186, ¶ 244.

In this grievance, Bell not only complained about his mental healthcare, he also complained that being held in solitary confinement was causing him psychological and physical harm *and* he sought transfer out of the STGMU. And in fact, the DOC response to the grievance recognizes Bell was also challenging his placement in the STGMU. When Defendant Riddle responded to Bell's initial grievance, he noted "Central Office" had approved Bell's placement in the STGMU. ECF No. 186-24 at 25. *See also* ECF No. 186-24 at 20 (Final Appeal Decision)

---

24 The parties agree individuals with mental health roster "D" designations were not eligible for placement in the STGMU and, according to the DOC Defendants, the only inmate who became a D code during his placement in the STGMU was promptly removed from the unit. ECF No. 186, ¶¶ 30, 62-67.

(stating, "his diagnosis and roster placement are deferred to the institutional psychiatrist and PRT. Your housing is appropriate.").

The primary purpose of Bell's grievance was to alert prison officials to a *problem*. *See Jones,* 549 U.S. at 219. Bell's complaints of solitary confinement and a request to transfer out of the STGMU were minimally sufficient enough to put DOC prison officials on notice that Bell was challenging his continued placement in the STGMU. *See Robinson v. Johnson*, 343 F. App'x 778, 782 (3d Cir. 2009) (quoting *Spruill*, 372 F.3d at 234) ("[E]ven if Robinson had procedurally defaulted his claims against [Defendants] by failing to identify them in his grievance, the prison's grievance process excused those procedural defaults. . . . [The grievance responses] 'evidenc[ed] knowledge on the part of prison officials . . . that there was a problem and acknowledging that the relevant policymakers, [Defendants], were 'fairly within the compass' of Robinson's grievance."). And because Grievance #974140 was sufficient to place prison officials on notice about his placement in the STGMU, it was adequate to satisfy the identification requirement of DC-ADM 804 § 1(A)(11). Given that Grievance #974140 alleged violations of the Eighth and Fourteenth Amendments, Title II of the ADA, and Section 504 of the RA, the grievance sufficiently exhausted all of Bell's claims in this lawsuit.

**ii. Ronnie E. Johnson**

The summary judgment record reflects Johnson filed 24 grievances that were appealed to final review by SOIGA. ECF No. 186, ¶ 266. *See also* ECF Nos. 186-24

at 29-125; 186-25 at 1–123. The DOC Defendants state only two are relevant: Grievances #976498 and #985251. ECF No. 187 at 24.

In Grievance #976498, dated April 18, 2022, Johnson stated he was not notified of the reason he was placed in the STGMU and challenged his ongoing conditions of confinement. ECF 186-24 at 36-37. While the grievance mentions Defendants Armel[25] and Riddle, the DOC Defendants argue it makes claims against two non-defendants, then-Secretary George Little and Tammy Ferguson. ECF No. 186, ¶ 275. Plaintiffs respond the grievance expressly mentions "[a]ll of the within mentioned officials are liable for operating a fraudulent program where no treatment exist only punishment[,]" ECF No. 186-24 at 41; ECF No. 206, ¶ 275, and the SCI-Fayette initial response identified "DOC management" as having made the STGMU-placement decision. ECF No. 186-24 at 38. The DOC Defendants reply "[n]o named Defendants had placed [Johnson] in the STGMU. Plaintiffs chose who to name in the operative complaint and elected not to name Little or Ferguson, who were responsible for Johnson's placement in the STGMU." ECF No. 213, ¶ 275.

The undersigned finds the DOC Defendants' arguments unpersuasive because, like Bell, Johnson was complaining about a *problem* of being placed in the STGMU without notification. This is sufficient for exhaustion purposes. *See Jones,* 549 U.S. at 219.

---

[25] The grievance indicates Johnson spoke to Defendant Superintendent Armel who stated Johnson was "housed (confined) in the right place at this time." ECF No. 186-24.

In Grievance #985251, filed June 16, 2022, Johnson stated he was in the STGMU and had not received any programming or treatment, had suffered the hardship of manic depression/bipolar affective disorder and insomnia, described the symptoms of his mental health crisis, and asked for out-of-cell structured group therapy. ECF No. 186-25 at 2-3. He stated the denial of programming violates, Section 504 of the Rehabilitation Act due to his "handicap." *Id.* at 3. The DOC Defendants argue "[t]o the extent that Johnson did make any claim about a lack of programming in the grievance, staff understood his grievance to be requiring the *STGMU's specific programming*, and not the DOC's *mental health programming*." ECF No. 212 at 10 (emphasis in original).

The undersigned finds Grievance #976498 and Grievance #98251 are both sufficient to find Johnson has exhausted his claims in this lawsuit. *See Robinson,* 343 F. App'x at 782.

**iii. Angel Maldonado**

The summary judgment record reflects Maldonado filed 30 grievances that were appealed to final review by SOIGA. ECF Nos. 186-25 at 124-125; 186-26 at 1-125; 186-27 at 1-69. In Grievances #971675 and #972500, Maldonado challenged his STG validation and placement in the STGMU. ECF No. 186-26 at 35-36. Both are sufficient for exhaustion purposes of Maldonado's Fourteenth Amendment due process claim.

In Grievance #975722, Maldonado complained of the psychological harm he was suffering as a result of long-term solitary confinement, including his addition to the mental health roster,[26] and being prescribed psychotropic medications. ECF No. 186-26 at 95. This is sufficient for exhaustion purposes of Maldonado's Eighth Amendment claim.

The DOC Defendants argue though that any claim against the Central Office Defendants should be dismissed as they are not identified in Maldonado's grievances. ECF No. 187 at 24. This argument lacks merit. As with the grievance responses Johnson received, Maldonado was told "Central Office" was the decisionmaker with his respect to his placement in the STGMU. *See Robinson*, 343 F. App'x at 782.

**iv. Kareem Mazyck**

The DOC Defendants argue Mazyck failed to exhaust his administrative remedies as to *any* relevant claim. ECF No. 187 at 24. *See also* ECF No. 186-27, at 70– 98. Plaintiffs respond the PLRA's exhaustion requirement does not apply to Mazyck's claims as he was not incarcerated when the SAC was filed. ECF No. 206, ¶ 251.

The law is clear in this Circuit "that plaintiffs who have been released from incarceration may prospectively exempt themselves from the PLRA's strictures . . . by filing an amended or supplementary post-release complaint[,]" so long as the

---

[26] The summary judgment record reflects Maldonado's mental health designation was changed while he was in the STGMU from "A" to "C." ECF No. 186, ¶ 18.

amended or supplemental complaint relates back to the initial complaint "even one that simply recapitulates their original complaint)." *Freeman v. Lincalis*, 158 F.4th 166, 178 n.58 (3d Cir. 2025) (citations omitted). *See also Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 308 (3d Cir. 1999) ("an amended or a supplemental complaint filed post-incarceration cures a former inmate's failure to exhaust administrative remedies while imprisoned . . . so long as the amended or supplemental complaint relates back to the initial complaint."); *Garrett v. Wexford Health*, 938 F.3d 69, 84 (3d Cir. 2019) ("When he filed the TAC, Garrett was no longer a prisoner and therefore was not subject to the PLRA's administrative exhaustion requirement.").

The SAC sets forth identical facts and nearly the same claims as those raised in the original complaint. *Garrett* squarely fits the facts presented here. As such, Mazyck is not subject to the PLRA's administrative exhaustion requirement.

**v. Xavier Pagan**

The DOC Defendants argue Pagan failed to exhaust his administrative remedies as to *any* relevant claim, as his final appeal of Grievance #982671 was dismissed due to Pagan not attaching required documentation. ECF No. 187 at 24, ECF No. 186, ¶ 250. *See also* ECF No. 186-27 at 99 - 115. Plaintiffs respond "the DOC rendered administered remedies unavailable to him by improperly rejecting Grievance #982671." ECF No. 202 at 23. In their Reply, the DOC Defendants supplement the summary judgment record by providing evidence that was not

contained in the summary judgment record. ECF No. 212-2.[27] Attached to their Reply is the Declaration of Danielle Burkholder which indicates after Grievance #982671 was initially rejected, Pagan resubmitted the grievance. The resubmitted grievance was denied by the Facility Grievance Officer and denied on initial appeal by the Facility Manager. ECF No. 212-2, ¶ 6. Pagan then appealed to SOIGA and his final appeal was dismissed for failure to provide necessary documentation. *Id.*, ¶ 8.

Plaintiffs argue Grievance #982671 "was rejected in contravention of the DOC's grievance policy." ECF No. 202 at 23. The Facility Grievance Officer rejected the grievance stating "[t]he grievance was not submitted within fifteen (15) working days *after the events which claims are based*." ECF No. 210-53 at 4 (emphasis added). Pagan's grievance, however, was not about an "event" but was about ongoing conditions to which he was being subjected. The DOC Defendants do not dispute the initial grievance was improperly rejected. Instead, they argue in their Reply,

> Here, per policy, an inmate may refile a rejected grievance or appeal the rejection. ECF 186-27 at 119. Indeed, Pagan chose to refile and obtained an initial review response and response from the facility manager, which he appealed to SOIGA. The SOIGA appeal was dismissed due to a failure to attach documentation, as required by

---

[27] Our Court of Appeals has stated it is advisable to grant leave to file a sur-reply when "new arguments or evidence [are presented] for the first time in a summary judgment reply brief." *Alston v. Forsyth*, 379 F. App'x 126, 129 (3d Cir. 2010). Here, though, the Court need not do that. First, Plaintiffs have not objected to the DOC Defendants' supplementing the record in this fashion. And further, as explained in the R&R, once the DOC rejected the first grievance on improper grounds, it does not matter whether Pagan failed to attach the proper documents to his secondary appeal.

> policy. In no way was the grievance procedure unavailable to Pagan[.]

ECF No. 212 at 11.

The summary judgment record supports Plaintiffs' position that Pagan's initial grievance was rejected improperly as Pagan was not complaining about one event, but was complaining about ongoing conditions he was experiencing in the STGMU. And the summary judgment record reflects grievances filed by other individuals about the ongoing conditions they faced while in the STGMU were not rejected as untimely. At the time Pagan's initial grievance was rejected for improper reasons, he "obtained the right to come into federal court." *Shifflett v. Korszniak*, 934 F.3d 356, 366 (3d Cir. 2019).

In sum, for all these reasons, it is recommended the motion for summary judgment based on failure to exhaust administrative remedies be denied. Plaintiffs Bell, Johnson, Maldonado, and Pagan each sufficiently exhausted administrative remedies. And the PLRA's exhaustion requirement does not apply to Mazyck's claims.

### 2. Qualified Immunity[28]

#### i. Legal Standard

The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). *See also Urda v. Sokso*, 146 F.4th 311, 313 (3d Cir. 2025) ("Qualified immunity protects [government officials] who make wrong but reasonable judgment calls absent clearly established law."). A claim of qualified immunity requires a two-prong inquiry. *Anglemeyer v. Ammons*, 92 F.4th 184, 188 (3d Cir. 2024). The first prong is whether the plaintiff has established the violation of a constitutional right. *Id.* The second prong is whether the constitutional right at issue was clearly established at the time of the defendant's alleged misconduct. *Id.* For the constitutional right to be clearly established the law must have been sufficiently "clear to a reasonable person that [his or] her conduct was unlawful." *Williams v. Sec'y Pennsylvania Dep't of Corrs.*, 848 F.3d 549, 557 (3d Cir.) ("*Williams I*"), *cert. denied*, 583 U.S. 932 (2017); *see also Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The Court of Appeals for the Third Circuit has emphasized the importance of "defin[ing] the right 'at the appropriate level of specificity,'" because "only then can

---

[28] Defendant Saavedra filed a joinder on this issue preserving the issue for review on appeal. As noted in footnote 10, the Court of Appeals for the Third Circuit has not extended qualified immunity to private healthcare providers who provide healthcare services in state prisons. *See* Montanez, 154 F.4th at 139 n.4. Therefore, qualified immunity as it applies to Dr. Saavedra will not be addressed in this R&R.

we determine whether 'the violative nature of the [officials'] particular conduct is clearly established.'" *Clark v. Coupe*, 55 F.4th 167, 182-83 (3d Cir. 2022) (quoting *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012), and *Mullenix*, 577 U.S. at 12)). "[T]he central question is whether the existing law gave the officer 'fair warning' that his *particular* conduct was unlawful." *Anglemeyer*, 92 F.4th at 191 (emphasis in original) (citing *Schneyder v. Smith*, 653 F.3d 313, 329 (3d Cir. 2011)).

The DOC Defendants assert neither of the constitutional rights Plaintiffs claim were violated were "clearly established" during the period in question. Each is addressed in turn.

#### ii. Count I - Fourteenth Amendment Procedural Due Process Claims – Genuine Disputes As To Material Facts Exist Which Preclude Summary Judgment

Count I is brought by Plaintiffs, individually and on behalf of members of the STGMU Class.[29] SAC, ¶ 288. Plaintiffs contend "[b]inding precedent provided Defendants with the requisite fair notice that they could not place and retain Plaintiffs and others like them in the STGMU without adequate procedural protections." ECF No. 202 at 3, 8.

The DOC Defendants argue (1) "a liberty interest under the Fourteenth Amendment has never been established for inmates in situations analogous to Plaintiffs" and (2) even if such an interest existed, "DOC Defendants had no notice

[29] *See* footnote 6 for the definition of the "STGMU" class.

that the process provided was insufficient such that qualified immunity applies." ECF No. 187 at 16.

The Due Process Clause of the Fourteenth Amendment provides no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. When reviewing a procedural due process claim, courts follow a two-step process. First, the court determines whether the plaintiff asserts an interest protected by the Fourteenth Amendment. *See Renchenski v. Williams*, 622 F.3d 315, 325 (3d Cir. 2010) (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)). Second, "[i]f the court concludes that such an interest exists, the next issue is whether the procedures provided to the plaintiff afforded that individual due process of law." *Id. See also Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000) (holding plaintiff must plead prison officials deprived him or her of a protected liberty or property interest *and* provided a "constitutionally deficient" procedure though which to challenge the deprivation).

**a. Protected Liberty Interest**

Convicted and sentenced prisoners have no inherent constitutional right to any particular security classification or to any particular housing assignment. *See Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) ("We have held that the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement."). Even so, these individuals do have a protected liberty interest in remaining free from "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Allah v. Bartkowski*, 574 F. App'x 135, 139 (3d

Cir. 2014) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). "[C]onfinement in administrative or punitive segregation will rarely be sufficient, *without more*, to establish the kind of 'atypical' deprivation of prison life necessary to implicate a liberty interest." *Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002) (emphasis added) (quoting *Sandin*, 515 U.S. at 486).

When deciding whether conditions present an atypical and significant hardship for purposes of establishing a legally cognizable liberty interest, a court must consider "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life." *Williams I*, 848 F.3d at 560. If "a liberty interest . . . has been adversely affected by administrative segregation . . . the prison meets its due process obligations if it provides meaningful, periodic reviews of the prisoner's placement in segregation." *Carter v. Beard*, 392 F. App'x 82, 84 (3d Cir. 2010) (citing *Shoats*, 213 F.3d at 145-47). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (cleaned up); *see also Kadakia v. Rutgers*, 633 F. App'x 83, 88 (3d Cir. 2015) ("The essence of a procedural due process claim, of course, is notice and an opportunity to be heard.") (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)).

**b. Did the Conditions of Confinement Pose An Atypical and Significant Hardship?**

In determining whether a hardship is atypical or significant under the Fourteenth Amendment, courts in this Circuit routinely use the conditions experienced by prisoners in general population as the relevant comparator. *See Williams I*, 848 F.3d at 564.[30] The DOC Defendants argue Plaintiffs did not endure the conditions or duration of confinement necessary to establish a liberty interest and "it is crucial to recall that for much of the at-issue time period no inmates in DOC in any housing unit, or the majority of corrections settings globally, had access to communal gatherings, meals, or in-person visits due to COVID mitigation restrictions." ECF No. 187 at 13 (citing SMF ¶¶196-204).[31]

Plaintiffs maintain the STGMU cells measured eight feet by ten feet, with some cells as small as six feet by eight feet. ECF No. 206, ¶ 140. Additionally,

> [i]ndividuals in the STGMU were confined to their cells per policy for 23 hours per day, only permitted one hour of daily out-of-cell exercise time, five days a week. [ECF 206,] ¶ 287. Only on Phase 3 did policy allow a mere two hours per week for out-of-cell educational, counseling, or wellness activities. *Id.* ¶ 289. Phase 2 only allowed an additional 30 minutes per week of out-of-cell activities. *Id.* ¶ 290. Even these meager out-of-cell opportunities formally permitted in policy were not regularly allowed. *Id.* ¶¶ 149, 186, 279, 293. When they did leave their cells, STGMU-confined individuals were subjected to invasive and dehumanizing strip searches, *id.* ¶¶ 279, 294–302,

---

30 Compared to an Eighth Amendment conditions of confinement challenge where the evaluation is based on whether the deprivation denies "the minimal civilized measure of life's necessities," measured against society's standards, not just the prison system's standards.

31 While Plaintiffs generally agree with this representation, they assert "there is no evidence in the record that COVID restrictions for individuals in the STGMU were removed at the same rate or to the same extent as those for the general population." ECF No. 206, ¶ 202.

> and placed in handcuffs and other restraints, *id.* ¶¶ 288, 292, 303–312. There were disorienting and sleep-disrupting levels of noise and 24-hour in-cell lighting. *Id.* ¶¶ 188–189, 284–286. In addition, there was little to no programming, *id.* ¶¶ 152–153, 157, 291, and there were extreme restrictions on individuals' ability to communicate with loved ones outside prison, *id.* ¶¶ 164–168.

ECF No. 202 at 5. Plaintiffs contend "[t]hese conditions are essentially the same as – or even harsher than – those the Supreme Court and the Third Circuit have identified as imposing a significant hardship." *Id.* (citing *Wilkinson*, 545 U.S. at 223-24; *Williams I*, 848 F.3d at 554-55, 562-64; *Shoats*, 212 F.3d at 140).[32]

**c. Was The Duration Prolonged and Indefinite?**

Plaintiffs must also show the duration of the conditions were "prolonged and indefinite." *Porter v. Department of Corrections*, 974 F.3d 431, 450 (3d Cir. 2020). "There is no bright line defining where the duration of segregation becomes

---

[32] In *Wilkinson*, the Supreme Court found the prisoners housed in an Ohio's "Supermax" facility had a liberty interest under the Fourteenth Amendment's Due Process clause in not being subjected to highly restrictive conditions absent procedural protections that ensure the confinement was appropriate as such an assignment "impose[d] an atypical and significant hardship under any plausible baseline." *Wilkinson*, 545 U.S. at 223-24.

In *Williams I*, the Court of Appeals for the Third Circuit concluded "Plaintiffs had a due process liberty interest in avoiding the extreme sensory deprivation and isolation endemic in confinement on death row after their death sentences had been vacated." *Williams I*, 848 F.3d at 570.

In *Shoats*, the plaintiff was placed in administrative custody with no maximum period of confinement. His release back to general population was dependent on many factors, including behavior while in administrative custody, continued risk, safety to others, and recommendations of prison personnel. *Shoats*, 213 F. 142-44.

atypical." *Blount v. Mason*, No. CV 3:22-0056, 2023 WL 6276680, at *7 (M.D. Pa. Sept. 26, 2023), *aff'd,* No. 23-2835, 2024 WL 1045226 (3d Cir. Mar. 11, 2024).

The uncontroverted summary judgment record reflects:

> a. Plaintiff T. Montana Bell did not participate in the STGMU program and spent approximately 538 days, or approximately 18 months, in the STGMU, all of which were in Phase 5. ECF No. 186, ¶ 126;
>
> b. Plaintiff Ronnie E. Johnson did not participate in the STGMU program and spent approximately 504 days, or approximately 17 months, in the STGMU, all of which were in Phase 5. *Id.*, ¶ 127;
>
> c. Plaintiff Angel Maldonado did not participate in the STGMU program and spent approximately 518 days, or approximately 17 months, in the STGMU, all of which were in Phase 5. *Id.*, ¶ 128. Plaintiffs' concise statement reflects Plaintiff Angel Maldonado was housed in STGMU 20 months. ECF No. 206, ¶ 420;
>
> d. Plaintiff Kareem Mazyck spent approximately 704 days, or approximately 23 months in the STGMU.[33] *Id.*, ¶ 130; and
>
> e. Plaintiff Xaviar Pagan spent approximately 968 days, or approximately 32 months, in the STGMU.[34] *Id.*, ¶¶ 131-132.

---

[33] The DOC Defendants state Mazyck "was progressing well through the STGMU program, but at some point stopped participating and awaited maxing out his sentence." ECF No. 186, ¶ 129. He was in Phase 5 three times for a total of 173 days (first stay: 84 days, second stay; 59 days, and third stay: 30 days; he was in Phase 4 four times for a total of 334 days (first stay: 118 days, second stay: 4 days, third stay: 141 days, fourth stay: 71 days), he was in Phase 3 once for 85 days, he was in Phase 2 once for 112 days before leaving DOC custody prior to advancing to Phase 1 on December 18, 2022. *Id.*, ¶ 129.

[34] Pagan was in Phase 5 two times for a total of 215 days (first stay: 58 days, second stay: 157 days), he was in Phase 4 four times for a total of 235 days (first stay: 61 days, second stay:71 days, third stay: 48 days, fourth stay: 55 days), he was in Phase 3 three times for a total of 155 days (first stay: 51 days, second stay: 21 days, third stay: 83 days), he was in Phase 2 twice for a total of 363 days (first stay 299 days - several months of which he was not in the STGMU as he was transferred to a different facility for court appearances) second stay 64 days), he was in Phase 1 once for 189

In *Wilkinson*, the Supreme Court singled out the indefinite nature of the claimant's confinement. *See Wilkinson,* 545 U.S. 209 (2005). There, the restricted housing was "indefinite and, after an initial 30-day review, [was] reviewed just annually," "limited only by" the inmate's sentence. *Id.* at 215, 224.

Here, the indefinite nature of Plaintiffs' confinement is in dispute. While the parties agree the STGMU did not include maximum phase durations, *see* ECF No. 186, ¶ 108; ECF No. 206, ¶ 108, they agree on little else about the duration of confinement and phase advancement. According to the DOC Defendants,

> [t]he STGMU provided a blueprint to transition inmates from restrictive conditions to GP via a five-phase step down program in which inmates began at the more restrictive Phase 5 and progressed down to Phase 1 (which took place in GP, not in the STGMU housing unit): as inmates demonstrated their ability to follow rules and meet expectations, they progressed through new phases in which they were subject to fewer restrictions and received access to more privileges such as kiosk, phone calls, and commissary.

ECF No. 186, ¶ 8. "The phased nature of the STGMU provided inmates with a clear path back to GP; whether they chose to follow the path or not is another matter." *Id.*, ¶ 111. Plaintiffs contest this characterization arguing the STGMU program offered only arbitrary standards for progress with a lack of clear benchmarks for progression and, as a result, their confinement was indefinite. Plaintiffs contend their placement in the STGMU, in conjunction with the prolonged and indefinite

---

days. Pagan ultimately successfully completed the STGMU and graduated back to general population. *Id.*, ¶¶ 131-32.

solitary confinement that ensued, without a *meaningful* opportunity to challenge their placement or retention in the STGMU, amounts to a constitution violation.

There is no question that placement or continued confinement in the STGMU, *standing alone*, does not implicate a protected liberty interest. *See Smith*, 293 F.3d at 653. And if the STGMU program provided a legitimate pathway out of the STGMU, Plaintiffs' stays were not indefinite because they were subject to measurable progress along the program. But if Plaintiffs could only move through the STGMU phases by meeting arbitrary standards, as they allege, their confinements were of an indefinite duration.

Assuming, without deciding Plaintiffs' placement and confinement in the STGMU triggered a protected liberty interest, the Court must next decide whether Plaintiffs received the process they were due.

**d. Were Plaintiffs Given the Process They Were Due?**

In *Williams I*, the Court of Appeals for the Third Circuit did *not* pronounce that any and every exposure to solitary confinement violates the Constitution. With that said, however, the Court of Appeals did hold that prisoners have a clearly established Fourteenth Amendment right to avoid *unnecessary, unexamined, and indefinite solitary confinement*. *Williams I*, 848 F.3d at 574.

Plaintiffs argue "[b]efore incarcerated individuals can be placed in units like the STGMU, they must be given 'notice of the factual basis leading to consideration for . . . placement and a fair opportunity for rebuttal' because these 'are among the

most important procedural mechanisms for purposes of avoiding erroneous deprivations.'" ECF No. 202 at 8 (quoting *Wilkinson*, 545 U.S. at 225-26). The DOC Defendants argue, assuming a protected liberty interest existed, "at no time have DOC Defendants had notice that the placement review process Plaintiffs received violated any constitutional right." ECF No. 187 at 19.

Plaintiffs respond the initial decision to place an individual in the STGMU was made pursuant to a confidential policy, which Plaintiffs "never saw . . . did not know who made the decision, were not afforded the opportunity to review the evidence or information being considered by the decisionmakers, and were never provided a hearing with the decisionmakers." ECF No. 202 at 9; *see* ECF No. 206, ¶¶ 431, 433-455. The DOC Defendants disagree contending the prisoners were informed a psychology assessment for referral to the STGMU was being performed for the purpose of evaluation of whether the prisoner should be considered for placement in the STGMU. ECF No. 186, ¶ 82. Moreover, the prisoners were notified by the PRC verbally as well as in writing that a recommendation had been made to transfer the prisoner to the STGMU. *Id.* Plaintiffs deny this occurred. According to Plaintiffs, there is no evidence the psychological assessments packets were provided to the prisoners or "that PRC told Plaintiffs about their pending placement with any consistency." ECF No. 206, ¶ 82.

A dispute also exists on the review process once Plaintiffs had been transferred to the STGMU. Plaintiffs contend they were not provided with sufficiently specific reasons for their continued placement and were subject to

"arbitrary decision making," often based on "vague and arbitrary reasons." ECF No. 202 at 10. The DOC Defendants argue the five named Plaintiffs had ongoing, meaningful reviews of their STGMU placement, "as well as realistic pathways to less restrictive housing." ECF No. 186, ¶ 103. Further, "[a]ll STGMU inmates were reviewed every 30 days by unit staff and reviewed at every 90 days by the Program Review Committee ("PRC") and the record is clear that each Plaintiff received this process." ECF No. 187 at 19; *see also* ECF No. 186, ¶¶ 92-103. To this, Plaintiffs respond the reviews were not meaningful but perfunctory in nature, as "the PRC did not have the authority to remove individuals from the STGMU." ECF No. 202 at 9. Rather, unlike the PRC reviews for individuals held in the RHU, while the PRC could make recommendations, "the decision to remove someone from the STGMU could only be made by the Regional Deputy Secretary." ECF No. 206, ¶ 456; ECF No. 213, ¶ 456.

Construing all reasonable inferences in favor of Plaintiffs, the undersigned concludes at least as by 2017, the year *Williams I* was decided, the law was clearly established prisoners had a Fourteenth Amendment right to avoid unnecessary, unexamined, and indefinite solitary confinement. And, here, the summary judgment record shows genuine disputes of material fact exist as to whether the DOC Defendants' violated Plaintiffs' clearly established constitutional rights to procedural due process by failing to provide meaningful review. These disputed issues result in recommending the DOC Defendants' motion for summary judgment

on Plaintiffs' Fourteenth Amendment claim (Count I) be denied as the DOC Defendants are not entitled to qualified immunity on the present record.

### iii. Eighth Amendment Claims (Count II)

Now, turning to Count II of the SAC and Plaintiffs' Eighth Amendment claim. This claim is brought by Plaintiffs individually and on behalf of members in the Mental Health Subclass.[35] ECF No. 75, ¶ 289. Plaintiffs contend the DOC Defendants violated "clearly established Eighth Amendment rights by placing and keeping them in prolonged solitary confinement in the STGMU despite their obvious symptoms of serious mental illness, including suicidality and self-injurious behavior." ECF No. 202 at 10.

The DOC Defendants argue the Court of Appeals for the Third Circuit "has repeatedly examined the Eighth Amendment's contours regarding restrictive confinement and never found a violation in circumstances analogous to Plaintiffs'." ECF No. 187 at 7. Further, the DOC Defendants argue confinement in the STGMU did not "run afoul of the 8th Amendment," *id.* at 8, but even assuming there was a constitutional violation, the DOC Defendants are entitled to qualified immunity as no "clearly defined" constitutional rights were established regarding STGMU placement and confinement. *Id.* at 6.

The Eighth Amendment prohibits the imposition of "cruel and unusual punishment." U.S. Const. amend. VIII; *see Rhodes v. Chapman*, 452 U.S. 337, 345-

---

[35] *See* footnote 7 for the definition of the Mental Health Subclass.

46 (1981). Yet not every injury suffered by a prisoner gives rise to a constitutional violation. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A prison official violates the Eighth Amendment only when two requirements are met: (i) the deprivation alleged must be, objectively, sufficiently serious, and (ii) the prison official possesses a sufficiently culpable state of mind. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The objective component of an Eighth Amendment claim is contextual and responsive to "contemporary standards of decency." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). Because routine discomfort is "part of the penalty that criminal offenders pay for their offenses against society, . . . only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 9. The court looks to the "totality of the circumstances" in deciding whether an individual has been deprived of "the minimal civilized measure of life's necessities." *Laird v. Terra*, No. 23-3429, 2024 WL 4476643, *7 (E.D. Pa. Oct. 11, 2024) (citing *Caldwell v. Luzerne Cnty. Corr. Facility Mgmt. Emps*., 732 F. Supp. 2d 458, 470, 471 (M.D. Pa. 2010) (first quoting *Griffin v. Vaughn,* 112 F.3d 703, 709 (3d Cir. 1997); then quoting *Rhodes,* 452 U.S. at 362–63 (1981)).

**a. Was the Confinement An Objectively Sufficient Serious Deprivation**

The answer to this inquiry requires a determination on the conditions and duration of the confinement and is a necessarily a fact intensive inquiry. As the district court so aptly observed in *Laird:* "Persons supervising incarcerated persons must balance the safety of the facility's employees and other incarcerated persons

while mindful of the incarcerated persons' physical and mental health during confinement. Incarcerated persons placed in solitary confinement may face mental health struggles as now well documented in cases and commentary." *Laird,* 2024 WL 4476643, *1.

**(1) Conditions of Confinement**

"The deprivation element is adequately pled when the allegations depict conditions where the inmate is denied 'the minimal civilized measure of life's necessities.'" *Clark v. Coupe*, 55 F.4th 167, 179 (3d Cir. 2022) (quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991)). The uncontroverted summary judgment record describes the general conditions in the STGMU as, among other things:

a. The STGMU cells were eight feet by ten feet and each contained a bed, stool, desk, toilet, and sink, in addition to a mattress, sheets, and blankets. ECF No. 186, ¶ 140. Plaintiffs state some of the STGMU cells may have been as small as six feet by eight feet. ECF No. 206, ¶ 140.

b. STGMU prisoners were "fed in their cells, until Phase 3. Inmates in Phases 3 and 2 may have meals out of cell, when available, in the pod area." ECF No. 186-29 at 6. Bell testified to one instance of deprivation of unspecified food. ECF No. 186, ¶ 144. Johnson testified on one occasion he found glass in his food. *Id.*, ¶ 146. Maldonado testified he "sometimes" received empty food trays. *Id.*, ¶ 143. Mazyck testified he found plastic in his food on one occasion. *Id.*, ¶ 145. And Pagan testified he received full meals three times a day, though at times, he

received trays without food or food he believed had been tampered with. *Id.*,¶ 142.

c. Recreation took place in an outdoor yard, which was enclosed on all sides by chain-link fencing approximately the same size as a standard STGMU cell. ECF No. 186, ¶ 150; ECF No. 206, ¶ 150. Plaintiffs contend not all individuals had the ability to access the exercise yard. ECF No. 206, ¶ 149.

d. The STGMU prisoners were given the opportunity to shower three days per week. ECF No. 186-29 at 8; ECF No. 186, ¶ 151. Plaintiffs dispute this and contend certain STGMU-placed individuals were denied access to showers on a regular basis. ECF No. 206, ¶ 151.

e. The STGMU prisoners were required to be strip-searched prior to exiting their cell, for any reason, and were restrained with the appropriate restraints for the phase they were in. ECF No. 186, ¶ 156; ECF No. 186-29 at 6.

f. Each cell had two forms of lighting, overhead lights which were controlled by the prisoner from within the cell and dimmer count lights which were controlled by corrections staff. ECF No. 186, ¶ 188. Plaintiffs contend none of their cells had functioning in-cell light switches. ECF No. 206, ¶ 188.

Plaintiffs argue courts in this Circuit have found similar conditions (in combination with a sufficient duration) sufficient to satisfy the objective element of this inquiry. *See, e.g.*, *Johnston v. Wetzel*, 431 F. Supp. 3d 666, 678 (W.D. Pa. 2019) (holding a reasonable juror could find the Eighth Amendment's objective element met where the inmate's lengthy stay in solitary confinement "deprived him of, at a

minimum, exercise, sleep, social contact and interaction, and environmental stimulation.").

### (2) Conditions Regarding Mental Illness

In *Clark v, Coupe,* the Court of Appeals for the Third Circuit reasoned a "pre-existing condition of serious mental illness heightened the impact of solitary confinement, rendering it capable of inflicting severe mental trauma." *Clark*, 55 F.4th at 185.

The DOC assigns each prisoner to one of four categories on a mental health roster:

> 'A' roster refers to individuals with no identified current psychiatric /intellectual development needs or history of psychiatric treatment;
>
> 'B' roster refers to individuals with an identified history of psychiatric treatment, but no identified current need for treatment;
>
> 'C' roster refers to individuals who currently receive psychological and/or psychiatric treatment, but are not currently diagnosed with a serious mental illness ("SMI"); and
>
> 'D' roster refers to individuals with a SMI.

ECF No. 186, ¶¶ 14-16; ECF No. 206, ¶¶14-16. Prisoners with a "D" code were not eligible to be placed in the STGMU.[36] ECF No. 187 at 9, n. 9.

---

[36] According to the DOC Defendants, the only inmate who became a "D" code during his placement in the STGMU was promptly removed from the unit. ECF No. 186, ¶ 65-66.

The summary judgment record reflects the mental health roster designation for the five named Plaintiffs during their confinement in the STGMU was:

* Bell's roster designation was "C" at all times;
* Johnson's roster designation was changed from "B" to "C";
* Maldonado's roster designation was changed from "A" to "C";
* Mazyck's roster designation was changed from "A" to "C"; and
* Pagan's roster designation was changed from "B" to "C."

ECF No. 186, ¶ 18; ECF No. 206, ¶18.[37]

Plaintiffs contend the DOC Defendants violated their Eighth Amendment rights by placing and keeping them in prolonged solitary confinement in the STGMU "despite their obvious symptoms of serious mental illness, including suicidality and self-injurious behavior." ECF No. 202 at 10. In support, Plaintiffs argue "Bell, Johnson, and Pagan had histories of mental health illness prior to their placement in the STGMU and Defendants knew this but placed them there anyway and kept them there despite their decompensation." *Id.* And "Maldonado and Mazcyk began exhibiting symptoms of serious mental illness while in the STGMU, but Defendants kept them there anyway." *Id.*

The uncontroverted summary judgment record evidence reflects:

---

[37] It is troubling that while the STGMU prisoners contended their mental health status qualified as "seriously mentally ill" and requested their mental health roster designation be changed to a "D," any changes to their roster determination apparently could be made only by Defendant Dr. Saavendra.

**Plaintiff Bell.** Prior to Bell's transfer to the STGMU, he had reported symptoms of anxiety and depression, was diagnosed with depressive disorder and anxiety disorder, and was prescribed several psychotropic medications. ECF No. 206, ¶ 358. He had been placed in a Psychological Observation Cell ("POC") at least three times. *Id.*, ¶ 359. In 2016, he had been designated a "D" code on the mental health roster. *Id.*, ¶ 360. The DOC Defendants contend when Bell was placed in the STGMU, they were unaware he had a previous mental health "D" code. ECF No. 213, ¶ 360.

And after his transfer to the STGMU, Bell requested mental health treatment stating he had been hallucinating for three weeks. *Id.*, ¶ 349. On January 7, 2023, Bell was taken to an outside hospital after he reported experiencing suicidal thoughts and swallowed the batteries to his hearing aids.[38] *Id.*, ¶¶ 352, 371.

**Plaintiff Johnson**. Prior to his transfer to the STGMU, Johnson was diagnosed with bipolar affective disorder. ECF No. 206, ¶ 362. The DOC Defendants contend "there is no indication Johnson carried that diagnosis in the DOC or at any time period that was proximate to his transfer to the STGMU, nor that this diagnosis prohibited his placement in the STGMU." ECF No. 213, ECF No.

---

[38] Plaintiffs assert Bell swallowed his actual hearing aids; the DOC Defendants counter that Bell swallowed the batteries to the hearing aids, not the hearing aids themselves. *See* ECF No. 213, ¶ 352.

206, ¶ 356. According to Plaintiffs, prior to his transfer to the STGMU, Johnson was placed in a POC at least four times. ECF No. 206, ¶ 363.

And after being placed in the STGMU, Johnson reported feeling depressed and anxious, with low energy, low motivation, and a passive death wish. *Id.*, ¶ 390. In August 2022, Johnson expressed suicidal ideation and was placed in a POC. *Id.*, ¶ 392. On December 6, 2022, following a hunger strike, Johnson continued to report feeling depressed, anxious, and stressed about being in the STGMU. *Id.*, ¶ 393. In response, Dr. Saavedra diagnosed Johnson with "other specified disruptive, impulse-control, and conduct disorder" and prescribed him Depakote. *Id.*

**Plaintiff Maldonado.** Prior to his transfer to the STGMU, Maldonado presented with no symptoms of mental illness. ECF No. 206, ¶ 356. After his placement in the STGMU, Maldonado was diagnosed on March 30, 2022, by Dr. Saavedra with "adjustment disorder with mixed anxiety and depressed mood," and his health roster code was changed from "A" to "C." *Id.*, ¶ 376. In September 2022, Maldonado wrote a suicide note, ingested a large number of pills, and was taken to an outside hospital. *Id.*, ¶ 353; ECF No. 210-16 at 2. At one point, Maldonado was placed in a camera cell after writing a letter to the PA Prison Society indicating he had thoughts of self-harm. *Id.*, ¶ 378.

**Plaintiff Mazyck**. Prior to his transfer to the STGMU, Mazyck presented with no symptoms of mental illness and maintained a mental health roster code of "A". While in the STGMU, Mazyck reported insomnia and hearing voices, and in response, Dr. Saavedra diagnosed him with "unspecified insomnia disorder and

"adjustment disorders, with anxiety," changed his roster code from "A" to "C," and prescribed him Remeron. *Id.*, ¶ 395.

**Plaintiff Pagan.** After his placement in the STGMU, Dr. Saavedra diagnosed Pagan with "adjustment disorder with mixed anxiety and depressed mood" and changed his mental health roster from "B" to "C" and prescribed him Celexa. *Id.*, ¶ 385. In August 2022, January 2023,and February 2023, Pagan reported continued symptoms of anxiety, depression, and passive thoughts of self-harm. *Id.*, ¶ 386. In September 2022, it was reported Pagan took 10 pills in front of mental health staff. *Id.*, ¶ 387.[39]

**(3) Duration of Confinement**

Duration is also a relevant consideration. *See Johnston*, 431 F. Supp. 3d at 679. The undisputed summary judgment reflects each of the five named Plaintiffs were housed in the STGMU for well over a year, with their durations ranging from 15 months to 32 months: Bell was housed in STGMU 18 months (ECF No. 206, ¶ 408); Johnson was housed in STGMU 15 months (*id.*, ¶ 416); Mazyck was housed in STGMU 23 months (*id.*, ¶ 408); and Pagan was housed in STGMU 32 months (*id.*, ¶ 428). Plaintiffs' concise statement of material facts reflects Maldonado was housed in STGMU 20 months (*id.*, ¶ 420), but the DOC Defendants state he was in the STGMU for 17 months. (ECF No. 213, ¶ 420).

[39] Plaintiffs describe this incident as an "attempted suicide." ECF No. 206, ¶ 389. The DOC Defendants respond, "[n]ot all 'suicide' attempts in correctional settings are meant as serious attempts to die; some may be representative of behavior that has a function not related to the intention to end one's life." ECF No. 213, ¶ 385.

The undersigned concludes based on the "totality of the circumstances," as reflected by the undisputed summary judgment record, Plaintiffs have produced sufficient evidence to establish their confinement in the STGMU amounted to an objectively sufficient serious deprivation to meet the first element of their Eighth Amendment claim.

**b. Were The DOC Defendants Deliberately Indifferent to The Serious Deprivation**

"A prison official is deliberately indifferent pursuant to the Eighth Amendment if the official knows an incarcerated person faces 'a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'" *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 117 F.4th 503, 514 n.58 (3d Cir. 2024) ("*Williams II*"), *cert. denied sub nom. Wetzel v. Williams*, 146 S. Ct. 91 (2025) (quoting *Farmer*, 511 U.S. at 847).

"In evaluating the subjective prong of the Eighth Amendment test, we may also consider whether officials 'had a legitimate penological purpose' behind their conduct." *Porter*, 974 F.3d at 446 (quoting *Ricks v. Shover*, 891 F.3d 468, 475 (3d Cir. 2018)). "In other words, does the evidence show that Defendants were not deliberately indifferent to the substantial risk of harm but rather more concerned with a penological end?" *Watson v. Wetzel*, No. 2:23-cv-3246, 2024 WL 5096209, at *7 (E.D. Pa. Dec. 12, 2024). In *Porter*, the Court of Appeals rejected the DOC's argument it had a legitimate penological justification for keeping the plaintiff in indefinite solitary confinement where it failed to offer "any evidence about the risk

that [the plaintiff] specifically poses, or any individualized argument about [the plaintiff] at all." *Porter*, 974 F.3d at 446.

The DOC Defendants argue the Plaintiffs' confinement in the STGMU served a penological purpose. According to the DOC Defendants, all five named Plaintiffs were determined to have met the criteria to be deemed STG members. ECF No. 186, ¶¶ 77-81. For example, the five named Plaintiffs had known affiliations in a gang (the Bloods), had engaged in institutional disruptions including participating in and orchestrating assaults, extortion of other inmates, and were found to be in possession of contraband. *Id.* Plaintiffs respond, the DOC Defendants did not rely on current information about their STG affiliation. For example, at the time of Maldonado's referral to the STGMU in 2022, he had not had a "physically violent misconduct in six years and had received no misconducts in a year and a half." ECF No. 206, ¶79. Plaintiffs deny Mazyck had a "long history of deep involvement with gang activity" and point out his STGMU referral evaluation also stated a transfer to another facility was a viable alternative to STGMU placement. *Id.*, ¶80. Similarly with Pagan, his most recent referral to the STGMU relied upon misconduct reports issued in 2009 and 2011. *Id.*, ¶81.

Here, as in *Porter*, the DOC Defendants have not offered evidence of *current* risks why Plaintiffs' placement or continued confinement in the STGMU was warranted. As a result, the DOC Defendants' arguments as to the penological purpose for placement and continued confinement in the STGMU is weak.

Construing all reasonable inferences in favor of Plaintiffs, the undersigned concludes Plaintiffs have also produced sufficient evidence to meet the second prong of their Eighth Amendment claim. Thus, assuming a constitutional violation has occurred, the question remains – are the DOC Defendants entitled to qualified immunity?

**c. Was the Right Clearly Established?**

Assuming Plaintiffs have established a violation of a constitutional right, the next step is to determine whether that right was clearly established.

The DOC Defendants argue "[t]he gradual establishment of rights associated with *Palakovic, Porter, Clark,* and *Williams II* is not sufficient to demonstrate notice that confinement in the STGMU ran afoul of the 8th Amendment." ECF No. 187 at 8.[40] Plaintiffs respond the DOC Defendants are not entitled to qualified immunity because the duration Plaintiffs were confined in solitary confinement in the STGMU was far longer than the individuals in *Palakovic* (multiple 30-day stints during a thirteen-month period) and *Clark* (seven months).

Plaintiffs also cite to the 2014 investigation by the United States Department of Justice about the DOC's use of solitary confinement on individuals with serious mental illness. In its finding, the DOJ stated the DOC's "practice of knowingly holding seriously mentally ill prisoners in solitary confinement for extended periods

---

40 These cases are addressed *infra* in the "framing the right" section of the analysis.

of time was cruel and unusual." ECF No. 202 at 14; *see* ECF No. 185-15.[41] This, Plaintiffs argue, is enough to show the DOC Defendants knew and disregarded the risks of solitary confinement to Plaintiffs.[42]

The DOC Defendants also maintain they relied on the Plaintiffs' Mental Health Roster designations and evaluations by DOC staff and Plaintiffs were not known or suspected to be seriously mentally ill. Plaintiffs counter these are disputed facts which should have no bearing on the qualified immunity analysis at summary judgment. ECF No. 202 at 15.

**(1) Framing the Right At Issue**

In this Circuit, the last decade or so has seen a steady development of the law on the Eighth Amendment rights of mentally ill prisoners held in prolonged and restrictive confinement. A brief review of a quartet of recent precedential cases from our Court of Appeals, cited by the parties, helps determine the framing of the right at issue here.

In *Palakovic v. Wetzel*, the decedent, Brandon Palakovic, had a *known* history of mental illness, suicide attempts, and suicidality, yet was placed in solitary confinement for "multiple 30-day stints" over the course of thirteen months. The

---

[41] The DOC Defendants acknowledge the DOJ's investigation found changes were appropriate to aspects of other DOC housing units, and while it noted the existence of the STGMU, it did not identify any necessary changes to the STGMU program or how the unit was run. ECF No. 187 at 6, n.6. The undersigned observes the STGMU at SCI-Fayette was not in existence at the time of the DOJ's investigation.

[42] It is important to note the DOJ investigation entailed the use of solitary confinement on individuals with serious mental illness. As noted in this R&R, the STGMU at SCI-Fayette did not house individuals that had been determined to be seriously mental ill.

Court of Appeals held plaintiff's allegations were "more than sufficient" to state an Eighth Amendment claim "in light of the increasingly obvious reality that extended stays in solitary confinement can cause damage to mental health." *Palakovic v. Wetzel*, 854 F.3d 209, 226 (3d Cir. 2017). In a later non-published opinion, the Court of Appeals explained the Eighth Amendment analysis used in *Palakovic*, "evolved out of our evaluation of deliberate indifference to serious medical need claims, but it governs cases where plaintiffs allege prison officials are liable for an inmate's suicide." *DeJesus v. Delaware through Delaware Dep't of Corr.*, 833 F. App'x 936, 939 (3d Cir. 2020) (citations omitted).

Three years later, in 2020, the Court of Appeals decided *Porter*. "That case expressed a new rule applicable to *death row inmates* that 'prolonged solitary confinement satisfies the objective prong of the Eighth Amendment test and may give rise to an Eighth Amendment claim, particularly where . . . [d]efendants have failed to provide any meaningful penological justification.'" *Williams II*, 117 F.4th at 557 (Phipps, J., dissent) (emphasis added). But because that right had not been clearly established, the Court of Appeals found defendants were entitled qualified immunity.

In 2022, the Court of Appeals decided *Clark,* in which it concluded qualified immunity did not apply because "the right of a prisoner *known* to be seriously mentally ill to not be placed in solitary confinement for an extended period of time by prison officials who were aware of, but disregarded, the risk of lasting harm

posed by such conditions," was well established by 2016, the time of the violative conduct. *Clark*, 55 F.4th at 182 (emphasis added).

And then in 2024, in *Williams II*, the Court of Appeals extended the holding in *Clark* to individuals on death row, finding "controlling precedent clearly established the right of a death row prisoner with a *known* preexisting serious mental illness not to be held in prolonged solitary confinement without penological justification." *Williams II*, 117 F.4th at 519 (emphasis added).

At least three distinctions exist between these four precedential cases and this case which cannot be overlooked in considering the proper framing of the right at issue. *First*, the decisions in *Palakovic*, *Clark*, and *Willlams II* each concerned prolonged solitary confinement of individuals with *known* preexisting serious mental illness. *Second*, the plaintiffs in *Porter* and *Williams II* were housed on death row, the decedent in *Palakovic* was housed in the RHU, and the plaintiff in *Clark* was housed in a solitary confinement unit. None of these cases involved prisoners being housed in solitary confinement in a phased step-down program. And *third*, the claim in *Palakovic* involved the defendants' awareness of the decedent's vulnerability to suicide.

The parties' frame the right at issue in vastly differing terms. According to the DOC Defendants, the right at issue is:

> for an inmate, determined to threaten facility security and determined by mental healthcare professionals to have no contraindications for placement in restrictive conditions, to not be placed in a phased RHU program with a built-in path to return to general population.

ECF No. 5, at 5. And to that end, the DOC Defendants maintain that right has not been established. Plaintiffs, on the other hand, citing *Clark* and *Williams II*, frame the right at issue as:

> the right of incarcerated individuals exhibiting symptoms of serious mental illness not to be placed in prolonged solitary confinement by officials aware of the risk such conditions posed to them.

ECF No. 202, at 11. And Plaintiffs argue that right has been established.

The undersigned finds neither of the proposed formulations defines the right allegedly violative in this case at the appropriate level of specificity. Both are based on broad propositions and do not reflect the specific context of this case and the specific allegations of the Plaintiffs. As a result, the undersigned determines the appropriate framing of the right is:

> the right of prisoners exhibiting symptoms of serious mental illness not to be confined in the STGMU at SCI-Fayette for an extended period of time, without penological justification, by prison officials who are aware of the individual's mental health history (both past and present) and the risks of lasting harm posed by such conditions.

This framing incorporates the three most important aspects of Plaintiffs' circumstances: the conditions of their confinement, their mental health history (past and present), and any penological justification for placing and maintaining the individuals in the STGMU.

**(2) Were the Contours of the Right Sufficiently Clear?**

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Clark*, 55 F.4th at 181 (quoting *L.R. v. Sch. Dist. of Philadelphia,* 836 F.3d 235, 248 (3d Cir. 2016) (quoting *Ashcroft,* 563 U.S. at 741) (internal quotation marks omitted). This is a high bar. "A right is clearly established where existing precedent has 'placed the statutory or constitutional question beyond debate.'" *Williams II*, 117 F.4th at 515. "'The ultimate question is whether the state of the law when the offense occurred" gave the prison officials 'fair warning' that their conduct violated [Plaintiffs'] Eighth Amendment right." *Clark*, 55 F.4th at 171 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). *See Ashcroft*, 563 U.S. at 741 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

To determine whether a right is clearly established, four steps may be necessary: First, the court should look for "factually analogous" cases in the Supreme Court. *Porter,* 55 F.4th at 181. If none exists, the court considers whether "binding opinions" from the Court of Appeals for the Third Circuit existed during the relevant time. *Id.* If neither source provides relevant case law, a court may then consider "a robust consensus of cases of persuasive authority in the Court of Appeals[.]" *Id.* (quoting *L.R.*, 836 F.3d at 248). And fourth, a court "may also take into account district court cases, from within the Third Circuit or elsewhere." *Id.*

(quoting *Peroza-Benitez*, 994 F.3d at 166 (citing *L.R.*, 836 F.3d at 248)). *See also Urda*, 146 F.4th at 314. Since qualified immunity is an affirmative defense, the DOC Defendants bear the burden of proving its applicability. *See Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014).

The DOC Defendants argue they are entitled to qualified immunity because none of the Plaintiffs were known or suspected to be seriously mentally ill. ECF No. 187 at 8. Additionally, the DOC Defendants argue they justifiably relied on the mental health screenings and input from the mental health professionals' contacts with the Plaintiffs. *Id.* at 9. Plaintiffs argue individuals *exhibiting* symptoms of serious mental illness should not be placed or retained in solitary confinement. ECF No. 202 at 10.

Plaintiffs' argument is beyond what established case law to date has held. The Supreme Court and the Court of Appeals for the Third Circuit decisions have focused on the use of solitary confinement and prisoners with *known* serious mental illness, not individuals *exhibiting symptoms* of serious mental illness. Whether the DOC Defendants may have erred in keeping individuals in the STGMU who were exhibiting symptoms of a serious mental illness, but were not designated on the DOC mental health roster as having such a diagnosis, is not so obvious a question that "every 'reasonable official would have understood that what he is doing violates that right." *L.R.*, 836 F.3d at 247. Without factually similar precedent or a robust consensus of court decisions condemning such conduct, of which the undersigned

finds none, it is recommended qualified immunity be granted to the DOC Defendants on Plaintiffs' Eighth Amendment claims.

### D. Mootness

The final argument the Court must address is the DOC Defendants' argument regarding Plaintiffs' requests for injunctive relief. According to the DOC Defendants, these requests are "moot since no inmates are currently confined in the STGMU or have any reasonable expectation to ever be again, as the unit closed permanently at the end of 2023." ECF No. 187 at 20.

A case traditionally becomes moot when a dispute no longer presents a live case or controversy, or the parties lack a cognizable interest in the outcome of the matter. *See Cnty. of Morris v. Nationalist Movement*, 273 F.3d 527, 533 (3d Cir. 2001). An identified narrow exception to the mootness doctrine is "voluntary cessation," and occurs when a defendant argues mootness because of some action it took unilaterally after the litigation began. *Hartnett v. Pennsylvania State Education Ass'n*, 963 F.3d 301, 306 (3d Cir. 2020). "[A] claim will not be rendered moot if there remains the possibility that plaintiffs will be disadvantaged 'in the same fundamental way.'" *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003), *as amended* (May 29, 2003) (quoting *Northeastern Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993). *See also Fields v. Speaker of the Pennsylvania House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019) (quoting *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007)) (voluntary cessation "will moot a case only if it is 'absolutely clear

that the allegedly wrongful behavior could not reasonably be expected to recur.'"). In this situation, the "heavy burden of persuad[ing] the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Env't Services (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal citations omitted).

The DOC Defendants argue the voluntary cessation doctrine applies here because the STGMU closed in December 2023 and "[t]he STGMU will never reopen, and DOC's RHU policy has been changed such that no current or hypothetical future unit could be identical to the conditions and parameters of the STGMU." *Id.* at 21 (citing ECF 186,¶¶ 207-215).

Plaintiffs respond the DOC Defendants have not met their heavy burden under the voluntary cessation doctrine because they have not shown "'that is it ***absolutely clear*** the allegedly wrongful behavior could not reasonably be expected to recur.'" ECF No. 202 at 28 (emphasis in original) (quoting *Rd-Con, Inc. v. City of Philadelphia*, 120 F.4th 346, 357 (3d Cir. 2024)). Specifically, Plaintiffs argue (1) "the DOC currently operates a 'fairly equivalent program' in the same physical location that previously housed the STGMU," and "[m]oreover, the prospective relief Plaintiffs are seeking is not limited to their potential future placement in the STGMU." *Id.* at 27.

The undersigned does not find Plaintiffs' arguments persuasive for several reasons. *First*, Plaintiffs contend the statements made by Secretary Harry in her Declaration are insufficient to carry Defendants' burden to prove mootness under

the voluntary cessation doctrine. ECF No. 202 at 28 – 30. *See* Declaration of Laurel R. Harry, ECF No. 186-14; *see also* Deposition of Laurel Harry, ECF No. 210-39. Specifically, Plaintiffs argue:

> (1) Defendant Harry only stated "she will not approve the reopening of the STGMU ***as it existed from 2020 to 2023."*** ECF No. 202 at 28 (emphasis in original);
>
> (2) Defendant Harry only stated "that she will not reopen the STGMU (as it previously existed), not that ***the DOC*** will not do so." *Id.* at 29 (emphasis in original);
>
> (3) Defendant Harry did not "disclaim the likelihood that, 'if a unit opened in the future with any comparable characteristics to the previous STGMU,' Plaintiffs and putative class members would be placed there." *Id.*;
>
> (4) "[T]he timing of Defendants' closure of the STGMU suggests it was related to this litigation . . . and, therefore, calls into question its permanence." *Id.* at 30;
>
> (5) "Defendant Harry's assertions about changes in the DOC's use of restrictive housing have little bearing on the mootness analysis." *Id.*; and
>
> (6) "Defendants are still vigorously defending the legality of the STGMU. This, too, militates against a finding of mootness." *Id.*

But more than mere speculation that a challenged activity / program will be resumed is required to show Defendants have not met their burden to prove mootness under the voluntary cessation doctrine. *See Thompson v. U.S. Dep't of Lab.,* 813 F.2d 48, 51 (3d Cir. 1987) (citing *Preiser v. Newkirk,* 422 U.S. 395, 403 (1975)) ("This criterion has been interpreted to require more than speculation that a challenged activity will be resumed.").

*Second*, a prisoner's transfer or release from the facility complained of generally moots equitable claims. *See Sutton*, 323 F.3d at 248. The undisputed summary judgment record reflects all prisoners who were in the STGMU at the time of its closure were transferred to other housing units within DOC. *Id.*[43]

And *third,* Plaintiffs indicate the prospective relief they seek "is not limited to their potential future placement in the STGMU. Plaintiffs seek injunctive relief targeted at the future placement of them and those similarly situated in ***any*** solitary-confinement unit in the DOC." ECF No. 202 at 27 (emphasis in original) (citing SAC, Prayer for Relief, ¶¶ D, E). Yet, the SAC states, "Plaintiffs seek to end the prolonged, never-ending cycle of solitary confinement in the STGMU." ECF No. 75, ¶ 9. This is not a case where Plaintiffs are challenging their placement in *any* solitary confinement unit or even about the concept of solitary confinement: it is about the Plaintiffs' confinement in the STGMU at SCI-Fayette. A request for prospective injunctive relief targeted at the future placement of *any* solitary-confinement unit in the DOC is overly broad and not within the allegations of the SAC.

For all these reasons, it is recommended Plaintiffs' claims for prospective injunctive relief be denied as moot.

---

[43] While Plaintiffs do not deny the STGMU has closed, they argue "the DOC currently operates the SMU, which is a 'fairly equivalent program' to the STGMU, with similar phases, structure, privilege schemes, and approval processes to the STGMU." ECF No. 206, ¶ 213. And, "Plaintiff Bell remains in solitary confinement to this day[.]" ECF No. 202 at 20 (citing ECF No. 206, ¶ 409) ("As of November 14, 2025, Mr. Bell has spent approximately 18 months in solitary confinement since his removal from the STGMU in May 2023.").

## III. Conclusion

For the above reasons, it is respectfully recommended the DOC Defendants' motion for summary judgment be granted in part and denied in part, as follows:

1. Summary judgment be denied on failure to exhaust grounds;

2. Summary judgment be denied on Plaintiffs' Fourteenth Amendment procedural due process claims raised in Count I of the Second Amended Complaint;

3. Summary judgment be granted on Plaintiffs' Eighth Amendment conditions of confinement claims raised in Count II of the Second Amended Complaint, as the DOC Defendants are entitled to qualified immunity as the "right" was not clearly established at the time of the alleged violative conduct; and

4. Plaintiffs' claims for injunctive relief be dismissed as moot.

Based on these recommendations, the following claims will remain: (i) Count I – Fourteenth Amendment procedural due process claims against the individual DOC defendants; (ii) Count II – Eighth Amendment conditions of confinement claims against Dr. Saavedra only; (iii) Count III – ADA claims against the DOC; and (iv) Count IV – Section 504 of the RA claims against the DOC.

Any party is permitted to file written specific Objections to this Report and Recommendation to the assigned United States District Judge. In accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b)(2), and LCvR 72.D.2, any written objections to this Report and Recommendation must be filed by **August 24, 2026.** Any party opposing the Objections shall have fourteen (14) days from the date of

service of the Objections to respond thereto. *See* Fed. R. Civ. P. 72(b)(2). The parties are cautioned that failure to file Objections within this timeframe "will waive the right to appeal." *Brightwell v. Lehman*, 637 F.3d 187, 193 n.7 (3d Cir. 2011) (quoting *Siers v. Morrash*, 700 F.2d 113, 116 (3d Cir. 1983)). *See also Equal Emp. Opportunity Comm'n v. City of Long Branch*, 866 F.3d 93, 100 (3d Cir. 2017) (describing standard of appellate review when no timely and specific objections are filed as limited to review for plain error).

DATED this 10th day of August, 2026.

BY THE COURT:

s/Christopher B. Brown
Christopher B. Brown
United States Magistrate Judge

cc: All Counsel of Record
(via ECF electronic notification)